**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| JANE STREET GROUP, LLC, | Civil Action No. 24-cv-2783 |
| *Plaintiff*, | Hon. Paul A. Engelmayer |
| v. | **FILED UNDER SEAL** |
| MILLENNIUM MANAGEMENT LLC, DOUGLAS SCHADEWALD and DANIEL SPOTTISWOOD | |
| *Defendants*. | |

**JANE STREET MEMORANDUM OF LAW IN SUPPORT OF ORDER TO SHOW CAUSE FOR: (1) A TEMPORARY RESTRAINING ORDER; (2) EXPEDITED LIMITED DISCOVERY; AND (3) AN EXPEDITED PRELIMINARY INJUNCTION HEARING**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................................. 1

FACTUAL BACKGROUND ............................................................................................... 3

    A.    Jane Street Develops And Protects Proprietary Trading Strategies ........................ 3

    B.    Mr. Schadewald's And Mr. Spottiswood's Employment At Jane Street ................ 3

    C.    Jane Street Develops And Implements The At-Issue Proprietary Trading
        Strategy ................................................................................................................... 4

    D.    Defendants Misappropriate Jane Street's Proprietary Trading Strategy ................ 7

ARGUMENT ..................................................................................................................... 8

I.     THE COURT SHOULD ENTER A TRO ENJOINING DEFENDANTS' USE OR
      EXPLOITATION OF JANE STREET'S PROPRIETARY TRADING STRATEGY ...... 8

    A.    Jane Street Has A High Likelihood Of Success On The Merits .............................. 9

        1.    Jane Street Is Likely To Succeed On Its Trade Secret Claims .................... 9

              a.    The Trading Strategy Is A Trade Secret Under The DTSA .......... 10

              b.    The Trading Strategy Is A Trade Secret Under New York
                  Law ............................................................................................... 13

              c.    Defendants Misappropriated Jane Street's Trade Secret
                  Trading Strategy ......................................................................... 14

        2.    Jane Street Is Likely To Succeed On Its Breach Of Contract And
             Tortious Interference Claims ..................................................................... 16

    B.    Jane Street Will Suffer Irreparable Harm Absent A TRO ..................................... 18

        1.    Mr. Schadewald's and Mr. Spottiswood's Employment
             Agreements Confirm That Harm Is Irreparable ......................................... 20

        2.    The Inadequacy Of Monetary Relief Confirms Irreparable Harm ............ 21

    C.    The Balance Of Hardships And Public Policy Weigh In Jane Street's Favor ....... 23

    D.    Jane Street Should Not Be Made To Post Any Bond .............................................. 23

II.    THE COURT SHOULD EXPEDITE A PRELIMINARY INJUNCTION
      HEARING AND ORDER EXPEDITED DISCOVERY .................................................. 24

CONCLUSION ................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page**

### Cases

*Anacomp, Inc. v. Shell Knob Servs., Inc.*,
    1994 WL 9681 (S.D.N.Y. Jan. 10, 1994) ............................................................................ 16

*Ashland Mgmt. v. Janien*,
    82 N.Y.2d 395 (1993) ........................................................................................................ 13

*Ayyash v. Bank Al-Madina*,
    233 F.R.D. 325 (S.D.N.Y. 2005) ........................................................................................ 24

*BaseCap Analytics Inc. v. Amenn*,
    2023 WL 8113524 (S.D.N.Y. 2023) ......................................................................... 12, 16, 17

*Broker Genius, Inc. v. Volpone*,
    313 F. Supp. 3d 484 (S.D.N.Y. May 11, 2018) ..................................................................... 9

*Catalyst Advisors, L.P. v. Catalyst Advisors Invs. Glob. Inc.*,
    602 F. Supp. 3d 663 (S.D.N.Y. 2022) ............................................................................. 9, 11

*Charter Comms., Inc. v. Mahlum*,
    2023 WL 5604258 (D. Conn. 2023) .................................................................................... 21

*Conopco, Inc. v. 2026 Third Realty, LLC*,
    2022 WL 1567795 (S.D.N.Y. 2022) .................................................................................... 24

*DermSource, Inc. v. CityMedRX, LLC*,
    2023 WL 265905 (E.D.N.Y. Jan. 18, 2023) ........................................................................... 8

*Doctor's Assocs., Inc. v. Distajo*,
    107 F.3d 126 (2d Cir. 1997) .............................................................................................. 23

*Eastmore Mgmt., LLC v. Gunta*,
    2019 WL 2902152 (N.Y. Sup. Ct. July 05, 2019) ........................................ 10, 12, 13, 14, 21

*Estee Lauder Companies Inc. v. Batra*,
    430 F. Supp. 2d 158 (S.D.N.Y. 2006) ................................................................................. 19

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
    559 F.3d 110 (2d Cir. 2009) .............................................................................................. 20

*FMC Corp. v. Taiwan Tainan Giant Indus. Co.*,
    730 F.2d 61 (2d Cir. 1984) (per curiam) ............................................................................. 18

*Graham Cap. Mgmt., L.P. v. Bongiovanni*,
    2019 WL 632287 (D. Conn. Feb. 14, 2019) ............................................................... 10

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
    481 F.3d 60 (2d Cir. 2007) ...................................................................................... 18

*Helio Logistics, Inc. v. Mehta*,
    2023 WL 1517687 (S.D.N.Y. Feb. 3, 2023) ............................................. 8, 14, 22, 23, 25

*Intertek Testing Servs., N.A., Inc. v. Pennisi*,
    443 F. Supp. 3d 303 (E.D.N.Y. Mar. 9, 2020) ....................................................... 14, 23

*Invesco Institutional (N.A.), Inc. v. Deutsche Inv. Mgmt. Ams., Inc.*
    2009 WL 6442871 (N.Y. Sup. Ct. Sept. 29, 2009) .................................................. 13, 14

*JTH Tax, Inc. v. Sawhney*,
    2019 WL 3051760 (S.D.N.Y. 2019) .......................................................................... 23

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
    2014 WL 12959675 (S.D.N.Y. July 23, 2014) ........................................................... 24

*Kraus USA, Inc. v. Magarik*,
    2020 WL 2415670 (S.D.N.Y. May 12, 2020) ............................................................ 16

*LivePerson, Inc. v. 24/7 Customer, Inc.*,
    83 F. Supp. 3d 501 (S.D.N.Y. Jan. 16, 2015) ........................................................... 14

*loanDepot.com, LLC v. CrossCountry Mortgage, LLC*,
    2023 WL 3884032 (S.D.N.Y. 2023) ..................................................................... 12, 20

*Metro. Taxicab Bd. of Trade v. City of New York*,
    615 F.3d 152 (2d Cir. 2010) ...................................................................................... 8

*Millennial Plastic Surgery PLLC v. James*,
    2021 WL 5988322 (S.D.N.Y. Dec. 16, 2021) ............................................................ 21

*N. Atl. Instruments, Inc. v. Haber*,
    188 F.3d 38 (2d Cir. 1999) ................................................................................... 2, 19

*New Horizons Educ. Corp. v. Krolak Tech. Mgmt. of Syracuse, LLC*,
    2018 WL 5253070 (N.D.N.Y. Oct. 22, 2018) ............................................................ 24

*Q-Co Indus., Inc. v. Hoffman*,
    625 F. Supp. 608 (S.D.N.Y. 1985) ........................................................................... 15

*QBE Ams., Inc. v. Allen*,
    2022 WL 889838 (S.D.N.Y. Mar. 25, 2022) ............................................................. 11

*RCN Telecom Servs., Inc. v. 202 Ctr. St. Realty LLC*,
    156 F. App'x 349 (2d Cir. 2005) ................................................................. 16

*Really Good Stuff, LLC v. BAP Invs., L.C.*,
    813 F. App'x 39 (2d Cir. 2020) ................................................................. 22

*Regeneron Pharm., Inc. v. U.S. Dept. of Health & Human Servs.*,
    510 F. Supp. 3d 29 (S.D.N.Y. Dec. 30, 2020) ................................................ 9

*Register.com, Inc. v. Verio, Inc.*,
    356 F.3d 393 (2d Cir. 2004) ................................................................. 21

*Rich v. Fox News Network, LLC*,
    939 F.3d 112 (2d Cir. 2019) ................................................................. 18

*Saye v. Old Hill Partners, Inc.*,
    478 F. Supp. 2d 248 (D. Conn. 2007) ......................................................... 10

*Ticor Title Ins. Co. v. Cohen*,
    173 F.3d 63 (2d Cir. 1999) ......................................................... 18, 21, 22

*Title Trading Servs. USA, Inc. v. Kundu*,
    2016 WL 608193 (W.D.N.C. Jan. 5, 2016) ...................................................... 10

*WeRide Corp. v. Kun Huang*,
    379 F. Supp. 3d 834 (N.D. Cal. 2019) ......................................................... 15

## Statutes/Rules

18 U.S.C. § 1836(b)(1) ......................................................................... 9

18 U.S.C. § 1839(3) ........................................................................... 10

18 U.S.C.§ 1839(5) ............................................................................ 14

18 U.S.C. § 1839(5)(B)(ii)(II) ................................................................ 15

Fed. R. Civ. P. 26 ............................................................................ 24

Fed. R. Civ. P. 26(d)(l) ...................................................................... 24

Fed. R. Civ. P.  Rule 26(f) ................................................................... 24

Fed. R. Civ. P. 65(b) ...................................................................... 1, 24

Fed. R. Civ. P. 65(b)(2) ...................................................................... 25

Plaintiff Jane Street Group, LLC ("Jane Street") respectfully submits this Memorandum of Law in support of: (1) an Order to Show Cause for a Temporary Restraining Order ("TRO") pursuant to Fed. R. Civ. P. 65(b); (2) expedited limited discovery; and (3) an expedited preliminary injunction hearing against Defendants Millennium Management LLC ("Millennium"), Douglas Schadewald and Daniel Spottiswood (collectively, "Defendants").

## PRELIMINARY STATEMENT

Jane Street seeks a TRO from this Court to immediately enjoin Millennium and two of its employees recently hired away from Jane Street—Douglas Schadewald and Daniel Spottiswood—from using and disclosing Jane Street's confidential information and proprietary trading methods in violation of trade secret law and signed confidentiality and intellectual property agreements.

Jane Street is a financial trading firm that develops quantitative and technological trading strategies. This case involves two traders, Mr. Schadewald and Mr. Spottiswood, who previously worked for Jane Street. While there, they helped Jane Street develop and implement a particularly successful trading strategy to capitalize on an opportunity in a specific market. This confidential and proprietary trading strategy has earned Jane Street ███████████████████████████ 2023, largely because Jane Street was the only firm that knew how to effectuate this strategy.

However, Mr. Schadewald and Mr. Spottiswood recently left Jane Street for Millennium, and are now improperly using Jane Street's trading strategy at Millennium, in violation of confidentiality agreements signed by both. Millennium's use of Jane Street's confidential trading strategy caused an immediate and dramatic reduction in Jane Street's profits for that strategy. For example, in the two weeks preceding Mr. Schadewald's February 5, 2024 resignation, Jane Street made ████████████████████████████████████ using the trading strategy at issue. But throughout March 2024, by which time Mr. Spottiswood had joined Mr. Schadewald at Millennium, Jane Street's ███████████████████████████

███████.  This is no mere coincidence.  The Court should immediately enjoin Millennium, Mr. Schadewald, and Mr. Spottiswood from using Jane Street's confidential trading strategy.

**First**, Jane Street is likely to succeed on the merits of its trade secret misappropriation claims, as the strategy at issue constitutes a protectable trade secret under the Defend Trade Secret Act ("DTSA") and New York law—(1) Jane Street invested enormous time and capital to develop the trading strategy at issue; (2) Jane Street has taken reasonable measures to keep it secret; and (3) the information derives independent economic value from its secrecy.  Courts routinely find investment firms' trading strategies to be trade secrets and, should this Court have any doubt, Mr. Schadewald and Mr. Spottiswood expressly acknowledged in signed agreements that Jane Street's trading strategies are trade secrets.  Jane Street is also likely to succeed on its breach of contract and tortious interference claims, which independently warrant a TRO.

**Second**, Jane Street is suffering and will continue to suffer irreparable harm absent a TRO.  Mr. Schadewald and Mr. Spottiswood are actively using Jane Street's trading strategy at Millennium, which has already eroded Jane Street's trading advantage and will continue to do so.  As the Second Circuit has recognized, the loss of a trade secret is a quintessential example of irreparable harm that "cannot be measured in money damages because a trade secret once lost is, of course, lost forever."  *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 49 (2d Cir. 1999).  Indeed, in their agreements with Jane Street, Mr. Schadewald and Mr. Spottiswood agreed that any harm to Jane Street would be irreparable.

**Third**, the balance of hardships and public interest favor a TRO.  Jane Street does not ask to bar Defendants from all trading, but to enjoin them from using discrete confidential information and trade secrets.  It is in the public interest to protect trade secrets and enforce IP agreements.

The Court should also order limited expedited discovery followed by an expedited preliminary injunction hearing, so that Jane Street may protect its valuable information until trial. Courts routinely find that good cause justifies narrow discovery to create a complete record for a preliminary injunction hearing. Jane Street seeks to serve only five targeted document requests and take only two depositions, so the burden on Defendants will be minimal. Jane Street therefore respectfully requests a deadline for limited discovery to be completed by May 3, 2024, and for a preliminary injunction hearing to be scheduled by no later than May 20, 2024, with an appropriate preliminary injunction briefing schedule.

## FACTUAL BACKGROUND

### A.    Jane Street Develops And Protects Proprietary Trading Strategies

Jane Street is a financial trading firm that specializes in developing innovative and proprietary trading strategies that allow it to outperform competitors in the marketplace. Declaration of Jeff Nanney ("Nanney Decl.") ¶ 4. Its employees are highly talented and skilled quantitative and technological professionals. *Id.* Jane Street invests significant time and capital to research and analyze market opportunities and develop trading strategies that capitalize on those opportunities. *Id.* ¶ 5. Today, Jane Street is widely recognized as one of the world's most successful trading firms. Jane Street protects its valuable trade secrets, including through confidentiality and intellectual property agreements, which bar the unauthorized disclosure of Jane Street's confidential information such as its proprietary trading strategies. *Id.* ¶¶ 6-7.

### B.    Mr. Schadewald's And Mr. Spottiswood's Employment At Jane Street

Mr. Schadewald joined Jane Street as a trader on October 1, 2018. Like all employees, he signed a confidentiality agreement upon joining; and a revised version in December 2023. Ex. A

("Schadewald IP Agreement").[1]  The Schadewald IP Agreement defines "Confidential Information" to include "information about what products the Company or its affiliates trade" and "the methods used to trade those products."  *Id.* § 1.2.  By signing the Agreement, Mr. Schadewald agreed that any use of Confidential Information "except in the course of performing services for or duties to the Company shall constitute misappropriation."  *Id.* § 2.6.  The Agreement's prohibition against unauthorized use or disclosure of Jane Street Confidential Information remains "in effect after the termination of [Mr. Schadewald]'s employment for any reason."  *Id.* § 6.

Mr. Spottiswood worked as an intern for Jane Street in 2018, and later joined Jane Street as a trader on August 17, 2020.  Mr. Spottiswood signed a comparable IP agreement as an intern and another when he joined Jane Street full time.  Ex. B ("Spottiswood IP Agreement").

## C.     Jane Street Develops And Implements The At-Issue Proprietary Trading Strategy

In 2018, Jane Street began to develop what would eventually become a very lucrative strategy (the "Trading Strategy").  Initially, a handful of people researched and analyzed potential inefficiencies in options contracts ███████████████████████████████ in Indian financial markets to explore opportunities relating to options trading in India.[2]  Nanney Decl. ¶ 10. This initial research identified unexpected ████████████████████████████████ ████████████████████████████████████████████████████████

---

[1]  All exhibits identified herein are attached to the Declaration of Deborah K. Brown.

[2]  ████████████████████████████████████████████

████████████████  *Id.*  Based on this initial research, Jane Street developed a trading strategy that generated profits in the ensuing years.  *Id.*

In 2023, Jane Street conducted a large-scale investigation to further develop, test and validate the proposed modifications it wanted to make to the on-going trading strategy.  Nanney Decl. ¶ 11.  These investigations involved extensive efforts from at least 25 team members—including Mr. Schadewald and Mr. Spottiswood.  *Id*.  Jane Street decided to invest such a significant amount of human resources and capital to validate its proposed trading strategy because the potential gain made it worthwhile.  *Id*.  Through this investigation, Jane Street made additional key insights surrounding the market opportunity, the application of which led to exceptional profits, surprising even Jane Street's experienced traders.  *Id*. ¶ 12.

Jane Street developed ways to make increased profits in the India options and equites markets based on its understanding of the ███████████████████ including, *inter alia*, techniques for ███████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████. Nanney Decl. ¶ 12.

Other firms trading in this market (including all discernible major competitors) focused on
████████████████████████████████████████████████
Nanney Decl. ¶ 13.  Through its years of research and investment and as a result of implementing the Trading Strategy, Jane Street by contrast executed █████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████. *Id*.

The trading opportunities, including their ████████████████████████

████████████████████████████ (for those with knowledge of the Trading Strategy),

order generation, and order transmission.  Jane Street's execution of the Trading Strategy is

███████████████████████████████████████████████████████████

██████████████████████████. Due to the validation of the underlying insights and heuristics on

which Jane Street's strategy relies, provided by the results of investigatory work and test trades,

Jane Street's positions entailed uniquely ████████████████████████████████

in uniquely high gains.[3]

Throughout 2023, Jane Street implemented the Trading Strategy.  Mr. Schadewald and Mr.

Spottiswood consistently expressed their amazement at its profitability and counter-intuitiveness,

as well as that the trading techniques represented Jane Street's valuable intellectual property.  Mr.

Schadewald and Mr. Spottiswood were "shocked" by the extraordinary success of the Trading

Strategy.  Ex. C; *see also* Ex. D ("we are building up india super rapidly but we consider that IP").

Mr. Spottiswood, who personally spent significant time trading and analyzing the performance of

the Trading Strategy (Nanney Decl. ¶ 20), was hesitant to discuss the Trading Strategy broadly

even within Jane Street, noting "how IP sensitive our trading is."  Ex. E.  Both traders repeatedly

declared the Trading Strategy to be "IP sensitive."  Exs. E, G, P.

---

███████████████████████████████████████████████████████████
██████████████████████████████████████████

All told, Jane Street's profits from the Trading Strategy in 2023 amounted to ███████ ███████  Nanney Decl. ¶ 19.  The success continued in 2024, with profits in January totaling ███████████████.  *Id.*  The Trading Strategy's longevity owes to its secrecy and to ███ ██████████████████████  Nanney Decl. ¶¶ 16-17.  Jane Street understood that if any other firm learned of the strategy, the opportunity could quickly dissipate, ████ ███████████████████████████████████████████.  *Id.*  ██████████ ████████████████████████████████████████████████ ████████████████████████████████████ ███████████████████████  *Id.* ¶ 17.



### D.    Defendants Misappropriate Jane Street's Proprietary Trading Strategy

On February 5, 2024, Mr. Schadewald left Jane Street to work for Millennium.  Ex. H.  Mr. Schadewald explained to his Jane Street colleagues that ███████████████████████ ████████████████████████████████████████████████████ ███████████████████████.  Nanney Decl. ¶ 21.  This compensation package exceeded industry standard for a trader with Mr. Schadewald's experience.  Mr. Spottiswood, who worked closely with Mr. Schadewald at Jane Street on the Trading Strategy, left later that month.  Ex. I (exit letter); *see also* Ex. J (email confirming job offer from Millennium).

Soon after Mr. Schadewald's departure, multiple signs indicated that a competitor was using Jane Street's Trading Strategy.  Nanney Decl. ¶ 29.  First, Jane Street observed atypical trading activity from a new market player—presumably Millennium—that mimicked essential parts of the Trading Strategy.  *Id.* ¶ 25.  Second, on March 6 and 28, 2024, a broker who processes orders for the Trading Strategy temporarily stopped processing Jane Street's orders.  *Id.* ¶¶ 26, 28.  Asked why, the broker told Jane Street that another entity—a "very select blue chip client" that was a "high-pedigree hedge fund"—was making significantly-sized trades in the same market at

the same time, which caused the broker to   *Id*.  The broker further shared

that the other entity had begun trading in mid-February 2024, which coincided with Mr.

Schadewald's arrival at Millennium.  *Id*.  Third, and perhaps most paramount, Jane Street saw a

sharp reduction in profits from the Trading Strategy.  For example, immediately preceding Mr.

Schadewald's February 5, 2024 resignation, Jane Street was  making

using the Trading Strategy.  Throughout March 2024, by which

time Mr. Spottiswood had joined Mr. Schadewald at Millennium, Jane Street's

.  *Id*. ¶ 18.

In early April, Jane Street sent cease-and-desist letters to Millennium, Mr. Schadewald,

and Mr. Spottiswood.  Exs. K, L, M.  In response, Jane Street received confirmation that the two

traders are engaged in options trading in the Indian markets, on behalf of Millennium.  Exs. N, O.

## ARGUMENT

## I.  THE COURT SHOULD ENTER A TRO ENJOINING DEFENDANTS' USE OR EXPLOITATION OF JANE STREET'S PROPRIETARY TRADING STRATEGY

This Court "applies the same standard to applications for a preliminary injunction and a

temporary restraining order." *Helio Logistics, Inc. v. Mehta*, 2023 WL 1517687, at *2 (S.D.N.Y.

Feb. 3, 2023).  A party seeking a TRO must show: (1) irreparable harm absent injunctive relief;

(2) either a likelihood of success on the merits, or a serious question going to the merits to make

them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiff's favor;

and (3) that the public's interest favors granting an injunction.  *Metro. Taxicab Bd. of Trade v. City*

*of New York*, 615 F.3d 152, 156 (2d Cir. 2010) (affirming grant of preliminary injunction).  In its

assessment, the Court may consider supporting declarations from the applicant.  *See, e.g.*,

*DermSource, Inc. v. CityMedRX, LLC*, 2023 WL 265905, at *1 (E.D.N.Y. Jan. 18, 2023) (granting

TRO enjoining use of trade secrets, considering applicant's declaration and exhibits).

To establish a likelihood of success on the merits, the movant "need not show that success is an absolute certainty.  He need only make a showing that the probability of his prevailing is better than fifty percent."  *Broker Genius, Inc. v. Volpone*, 313 F. Supp. 3d 484, 497 (S.D.N.Y. May 11, 2018); *see also, e.g.*, *Regeneron Pharm., Inc. v. U.S. Dept. of Health & Human Servs.*, 510 F. Supp. 3d 29, 41 (S.D.N.Y. Dec. 30, 2020) (similar).

### A.    Jane Street Has A High Likelihood Of Success On The Merits

Jane Street is likely to prevail (or at the very least, raises a serious question) on its claims of trade secret misappropriation, breach of contract, and tortious interference against the Defendants.  Although Mr. Schadewald and Mr. Spottiswood are of course free to trade competitively at other firms, they may not trade based on their knowledge of Jane Street's trade secrets and confidential information, *i.e.*, what products Jane Street trades and the methods used to trade those products.  This includes Jane Street's Trading Strategy, which was developed by Jane Street at significant time, expense, and ingenuity.  But Mr. Schadewald and Mr. Spottiswood are now using their knowledge of Jane Street's trading and positioning acquired due to their involvement with the Trading Strategy (and not from general market knowledge).  Nanney Decl. ¶ 29.  The speed at which Mr. Schadewald evidently began to implement the Trading Strategy for Millennium is compelling evidence of misappropriation.  *Id.*  The misappropriation is a violation of the DTSA and also constitutes a material breach of Mr. Schadewald and Mr. Spottiswood's IP Agreements and separation agreements, a breach that was tortiously induced by Millennium.

### 1.    Jane Street Is Likely To Succeed On Its Trade Secret Claims

To establish a trade secret misappropriation claim, the plaintiff must show that: (1) it "possessed a trade secret"; and (2) the defendant "misappropriated the trade secret."  *Catalyst Advisors, L.P. v. Catalyst Advisors Invs. Glob. Inc.*, 602 F. Supp. 3d 663, 671 (S.D.N.Y. 2022) (citing 18 U.S.C. § 1836(b)(1)).  Jane Street easily satisfies these elements.

## a.   The Trading Strategy Is A Trade Secret Under The DTSA

The techniques that comprise the Trading Strategy, as well as the insights that Jane Street

gleaned by developing and using the strategy, qualify as trade secrets. Under the DTSA:

> The term "trade secret" means all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes … if—
>
> > **(A)** the owner thereof has taken reasonable measures to keep such information secret; and
> >
> > **(B)** the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information

18 U.S.C. § 1839(3).

*First*, Jane Street's Trading Strategy and related information are "trade secrets." Financial

trading methods and techniques qualify for trade secret protection—the DTSA expressly protects

"financial methods, techniques, processes, [and] procedures" as protectable "trade secret." Courts

thus routinely recognize investment firm trading strategies as trade secrets. *See, e.g.*, *Eastmore*

*Mgmt., LLC v. Gunta*, 2019 WL 2902152, at *6 (N.Y. Sup. Ct. July 05, 2019) (preliminarily

enjoining investment firm's former employee from disclosing or using firm's trading strategies);

*Graham Cap. Mgmt., L.P. v. Bongiovanni*, 2019 WL 632287, at *3 (D. Conn. Feb. 14, 2019)

(likelihood of trade secret misappropriation where defendant had recordings of "discussions of

formulas, as well as GCM's ideas, methods, processes, and techniques to improve its ***trading***

***strategies***"); *Saye v. Old Hill Partners, Inc.*, 478 F. Supp. 2d 248, 274 (D. Conn. 2007) (crediting

the claim that an investment firm's "investment and *trading strategy*" qualifies as a trade secret

under CUTSA; *Title Trading Servs. USA, Inc. v. Kundu*, 2016 WL 608193, at *3, 6 (W.D.N.C.

Jan. 5, 2016) ("*trading strategy*" qualified as trade secret which plaintiff had "invest[ed] money to

10

develop and perfect for many years," and provided "a significant advantage over its competitors[,] who would be given enormous advantages if they could gain access … [and] simply modify the information to identify the same trading opportunities"); *see also, e.g.*, *QBE Ams., Inc. v. Allen*, 2022 WL 889838, at *8 (S.D.N.Y. Mar. 25, 2022) (likelihood of success on trade secret claims as to "documents reflecting operations and business strategies").

Moreover, while employed at Jane Street, Mr. Schadewald and Mr. Spottiswood repeatedly acknowledged in writing that the Trading Strategy is "incredibly valuable," "IP sensitive," and something that Jane Street didn't "want people knowing." Exs. P, E, D. Their signed IP agreements confirm that "Company Confidential Information" includes "information about what products the Company or its affiliates trade, [and] the methods used to trade those products," and that "Company Confidential Information includes trade secrets of the company which derive independent economic value from not being readily known to or ascertainable by others." Ex. A §§ 1.2, 2.6; Ex. B §§ 2.1, 2.7 (similar).

*Second*, Jane Street took reasonable measures to protect the trade secrets at issue. Jane Street required both Mr. Schadewald and Mr. Spottiswood to sign multiple confidentiality agreements that clearly explained which Jane Street properties were confidential, and reaffirmed the continuing nature of their confidentiality obligations at the time they exited Jane Street. Exs. A, B, H, I (IP agreements and separation letters). In addition, Jane Street restricts employee access to the most sensitive confidential information through security badges for office access, strict remote access requirements, and a general practice of restricting permissions to internal documents to only people reasonably expected to contribute to such documents. Nanney Decl. ¶¶ 8, 9. Courts in this Circuit generally find the combination of (1) confidentiality agreements and (2) restricted access sufficient to meet this "reasonable measures" prong. *See, e.g.*, *Catalyst Advisors, L.P. v.*

*Catalys Advisors Investors Global Inc.*, 602 F. Supp. 3d 663, 675 (S.D.N.Y. May 10, 2022) (denying motion to dismiss where "interrelated" measures of internal database secured with password and username and confidentiality agreements reasonably guarded secrecy of information); *BaseCap Analytics Inc. v. Amenn*, 2023 WL 8113524, at *3 (S.D.N.Y. 2023) ("the company takes significant measures to keep its trade secrets confidential, including by maintaining security controls, requiring employees to sign nondisclosure agreements, and limiting the number of employees who have access to the data repository"); *loanDepot.com, LLC v. CrossCountry Mortgage, LLC*, 2023 WL 3884032, at *5 (S.D.N.Y. 2023) ("[loanDepot] requires all of its employees to enter into confidentiality agreements" and "uses password-protection and restrictive-access and encryption protocols to prevent access to customer contact information by those without a business need").

*Third*, the Trading Strategy derives "independent economic value" from not being known or readily ascertainable to competitors. As detailed above, the Trading Strategy generated significant profits because Jane Street was the only firm using it in any significant or discernible scale. *See Eastmore Mgmt.*, 2019 WL 2902152, at *4 (accepting that a financial trading strategy "will only work when one firm is trading on that specific characteristic while a large number of firms using it may alter the market itself and render the strategy useless," and finding that if other firms use the same strategy, plaintiff "would lose its competitive edge"). When Jane Street alone deployed the Trading Strategy, ██████████████████████████████████████ ████ Nanney Decl. ¶ 19. Shortly after Mr. Schadewald joined Millennium, Jane Street's profits from the Strategy dipped dramatically.[4] For example, as compared to profits per trading day from

---

[4] The underlying market conditions that support the Strategy ████████████████████████████

the Strategy in the two weeks preceding Mr. Schadewald's resignation, Jane Street's profits ███████████████████████ in the month of March.  *Id.* ¶ 18.  Until these recent events, Jane Street had never seen any indication that any other firm had implemented anything like the Trading Strategy.  *Id.* ¶ 14.

        **b.**        **The Trading Strategy Is A Trade Secret Under New York Law**

Independently, Jane Street's Trading Strategy is a trade secret under New York common law, which defines a trade secret as "any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it."  *Invesco Institutional (N.A.), Inc. v. Deutsche Inv. Mgmt. Ams., Inc.* 2009 WL 6442871, at *4 (N.Y. Sup. Ct. Sept. 29, 2009) (citing *Ashland Mgmt. v. Janien*, 82 N.Y.2d 395, 407 (1993)).  New York courts assess six factors to determine whether information is a trade secret:  (1) the extent to which the information is known outside of the business, (2) the extent to which it is known by employees and others involved in the business, (3) the extent of measures taken by the business to guard the secrecy of the business, (4) the value of the information to the business and its competitors, (5) the amount of effort or money expended by the business in developing the information, and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.  *Eastmore Mgmt.*, 2019 WL 2902152, at *3.

The Trading Strategy qualifies under this framework as well.  As discussed, (1) the Trading Strategy was not known outside of Jane Street, and (2, 3) was known within Jane Street only by employees who were subject to strict confidentiality agreements as well as other security measures. (4) The Trading Strategy is immensely valuable to Jane Street, responsible for ████████████████

---

████████████████████████████████████████████████████████████████
████████████████████████████

████████████████████████, and (5) Jane Street deployed significant time and capital to research, develop, and validate the Strategy.  Finally, (6) without investing in similar research and analysis, others are unable to independently develop the Trading Strategy.[5]

**c.**  **Defendants Misappropriated Jane Street's Trade Secret Trading Strategy**

Defendants knowingly misappropriated, and continue to misappropriate, Jane Street's confidential trade secrets.  Under the DTSA, "misappropriation" occurs by: (1) "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means"; or (2) "disclosure or use of a trade secret of another without express or implied consent" in particular circumstances.  18 U.S.C. § 1839(5).  Mr. Schadewald and Mr. Spottiswood disclosed and used the Trading Strategy at Millennium, and Millennium then used the Strategy while aware of Mr. Schadewald and Mr. Spottiswood's confidentiality obligations to Jane Street barring such disclosure or use.  *Id.* § 1839(6)(A); *see also Helio Logistics*, 2023 WL 1517687, at *4 (granting TRO: likelihood of success where defendant misappropriated trade secrets with knowledge that trade secrets were acquired through improper means); *Intertek Testing Servs., N.A., Inc. v. Pennisi*, 443 F. Supp. 3d 303, 342 (E.D.N.Y. Mar. 9, 2020) (likelihood of success where plaintiff demonstrated that defendants disclosed trade secrets without consent, regardless of the likelihood of success of demonstrating improper means).

---

[5]  *See, e.g.*, *LivePerson, Inc. v. 24/7 Customer, Inc.*, 83 F. Supp. 3d 501, 515 (S.D.N.Y. Jan. 16, 2015) (trade secret alleged under New York law where "algorithms" based on "many years of research" could not have been replicated without incurring "millions of dollars in research and development costs"); *Eastmore Mgmt.*, 2019 WL 2902152, at *3 (investment strategy to qualify as a trade secret where defendant "cites no example of such a firm [using the claimed trade secret strategy], nor any public report of that strategy"); *Invesco Institutional (N.A.), Inc.*, 2009 WL 6442871, at *4 ("unique compilation of software tools which, as developed by plaintiff, gave rise to a trade secret which was of value to the competitive companies").

At the time Mr. Schadewald and Mr. Spottiswood began using the Trading Strategy at Millennium, they both knew they had learned the Trading Strategy "under circumstances giving rise to a duty to maintain the secrecy of the trade secret" (*i.e.*, through their employment at Jane Street, governed by their executed IP agreements).  18 U.S.C. § 1839(5)(B)(ii)(II).  Millennium knew or had reason to know that the Trading Strategy was "derived from or through a person who owed a duty to [Jane Street] to maintain the secrecy of the trade secret" (*i.e.*, derived through Mr. Schadewald and Mr. Spottiswood).  *Id.* § 1839(5)(B)(ii)(III).

As described above, approximately two dozen people at Jane Street spent at least months developing and honing the Trading Strategy, but the undisputed facts strongly support the conclusion that Millennium implemented the Trading Strategy shortly after Mr. Schadewald's arrival.  *See* Nanney Decl. ¶ 30.  This timeline alone is compelling proof of misappropriation. *WeRide Corp. v. Kun Huang*, 379 F. Supp. 3d 834, 849 (N.D. Cal. 2019) ("implausibly fast" development indicates misappropriation); *Q-Co Indus., Inc. v. Hoffman*, 625 F. Supp. 608, 618 (S.D.N.Y. 1985) (misappropriation typically shown with circumstantial evidence).  The facts again in brief:  Jane Street's profits from the Trading Strategy dropped sharply shortly after Mr. Schadewald joined Millennium in February.  In March, a broker confirmed to Jane Street that another blue-chip firm had begun ███████████████████████████ in February 2024 evidencing ████████████████████████████████ based on market dynamic heuristics.  And in April, counsel for Mr. Schadewald and Mr. Spottiswood confirmed they had been "trading in the Indian options market" at Millennium.  Ex. O.

Defendants claim that Millennium's trading in India does not "employ[] any Jane Street trade secrets" and is merely an exercise of "hard-earned skill and ability." Ex. N.  This ignores that the Trading Strategy involves specific proprietary methods actually obtained by Mr. Schadewald

and Mr. Spottiswood in the course of their employment with Jane Street.  It is *not* "a defense to say that a trade secret is readily available if the information was actually obtained via a confidential relationship."  *Kraus USA, Inc. v. Magarik*, 2020 WL 2415670, at *6 (S.D.N.Y. May 12, 2020).  Even if some of the information used within the Trading Strategy is publicly available, "compilation of the public information which incorporates the information in a unique way is, nonetheless, protectable as a trade secret."  *Anacomp, Inc. v. Shell Knob Servs., Inc.*, 1994 WL 9681, at *8 (S.D.N.Y. Jan. 10, 1994) (granting preliminary injunction).

Nor can Mr. Schadewald and Mr. Spottiswood credibly explain why, if the Trading Strategy is already known to any skilled trader, there is no evidence that anyone other than Jane Street (and now Millennium) ever used it.  Tellingly, Mr. Schadewald repeatedly expressed his belief that Jane Street was the only firm that understood and implemented the Trading Strategy. Nanney Decl. ¶ 30.  Millennium's admission that it has been trading in the relevant market "for years," Ex. N (Dechert 4/5 letter), makes it more striking that its trading activity increased dramatically as soon as it hired Mr. Schadewald at above-market compensation.

### 2. Jane Street Is Likely To Succeed On Its Breach Of Contract And Tortious Interference Claims

Because Jane Street has established a likelihood of success on its trade secret claims, the Court need not address Jane Street's additional claims, each of which independently justify the same relief—*i.e.*, a TRO enjoining Defendants' use of Jane Street's Trading Strategy and related information.  But should the Court have any doubt, Jane Street's breach of contract and tortious interference claims independently warrant the issuance of a TRO.

***Breach of Contract***:  Under New York law, the elements of breach of contract are:  "(1) the existence of a contract, (2) performance by the party seeking recovery, (3) non-performance by the other party, and (4) damages attributable to the breach."  *BaseCap Analytics Inc. v. Amenn*,

2023 WL 8113524, at *3 (S.D.N.Y. 2023) (quoting *RCN Telecom Servs., Inc. v. 202 Ctr. St. Realty LLC*, 156 F. App'x 349, 350-51 (2d Cir. 2005)).

Here, Jane Street had employment contracts with Mr. Schadewald and Mr. Spottiswood. Mr. Schadewald first signed a confidentiality agreement with Jane Street when he joined in October 2018.  He signed a slightly revised version in December 2023.  Ex. A.  Later, as part of Mr. Schadewald's separation letter from Jane Street on February 7, 2024, Mr. Schadewald reaffirmed his ongoing confidentiality obligations:

> Intellectual Property Agreement; Confidentiality.  ***As a material term of this agreement, you acknowledge that you have ongoing obligations to adhere to Confidentiality and Intellectual Property Agreement that survive your departure*** from Jane Street and you agree to comply with the Confidentiality and Intellectual Property Agreement.  It is also a material term of this agreement that you will maintain the confidentiality of the existence and terms of this separation agreement….

Ex. H (separation letter).

Like Mr. Schadewald, Mr. Spottiswood signed a confidentiality agreement as a condition of his employment at Jane Street.  Ex. B.  Mr. Spottiswood also reaffirmed that his "***Confidentiality and Intellectual Property Agreement survives your departure***."  Ex. I (separation letter).

As detailed above, almost immediately after resigning from Jane Street in February 2024, Mr. Schadewald unlawfully used and/or disclosed Jane Street's Trading Strategy at Millennium. Shortly after hiring Mr. Schadewald, Millennium hired Mr. Spottiswood, who was intimately involved with, and has detailed knowledge of, the Trading Strategy—further confirming that Millennium is the new market player.  Nanney Decl. ¶ 24.  Again, Mr. Schadewald and Mr. Spottiswood have not denied that they are placing trades at Millennium using some of the same methods and techniques they helped develop at Jane Street as part of the Trading Strategy.  *See BaseCap Analytics Inc. v. Amenn*, 2023 WL 8113524, at *3 (S.D.N.Y. Nov. 22, 2023) (finding likelihood of success on breach of contract claim where defendant had, to date, declined to sign

document certifying that he had returned or destroyed any confidential information in his possession, in breach of a Nondisclosure and Invention Assignment Agreement).

**_Tortious Interference With Contract_**:   A claim of tortious interference with contract requires "[1] the existence of a valid contract between the plaintiff and a third party, [2] defendant's knowledge of that contract, [3] defendant's intentional procurement of the third-party's breach of the contract without justification, [4] actual breach of the contract, and [5] damages resulting therefrom."  *Rich v. Fox News Network, LLC*, 939 F.3d 112, 128 (2d Cir. 2019).

As discussed, Jane Street had valid confidentiality agreements with both Mr. Schadewald and Mr. Spottiswood.  Millennium surely knew or had reason to know of these contracts (which are common) based on past interactions with Jane Street, but nonetheless engaged in intentional conduct that was a significant factor in causing Mr. Schadewald and Mr. Spottiswood to breach their Agreements.  Millennium induced Mr. Schadewald with an above-market offer, and shortly after hired Mr. Spottiswood as well.  Millennium knows that Mr. Schadewald and Mr. Spottiswood are implementing elements of the Trading Strategy at Millennium.  Exs. N, O (4/5 letters).

### B.    Jane Street Will Suffer Irreparable Harm Absent A TRO

Irreparable harm means that absent relief, the plaintiff "will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (cleaned up).  The loss of control of a trade secret is a quintessential form of irreparable harm that warrants preliminary injunctive relief.  As the Second Circuit has stated:

> *We have held that "loss of trade secrets cannot be measured in money damages" because "[a] trade secret once lost is, of course, lost forever."*  FMC Corp. v. Taiwan Tainan Giant Indus. Co., 730 F.2d 61, 63 (2d Cir. 1984) (per curiam).  In addition, Haber *acknowledged in his Employment Agreement that a breach of the confidentiality clause would cause "irreparable injury"* to North Atlantic.  Cf. Ticor Title Ins. Co. v. Cohen, 173 F.3d 63, 69 (2d Cir. 1999) (relying on a similar clause in determining irreparable injury).

*N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 49 (2d Cir. 1999) (emphasis added).  The same applies here: (1) Mr. Schadewald and Mr. Spottiswood each acknowledged in their respective employment agreements that violation would cause "irreparable injury" to Jane Street; and (2) once Jane Street's trade secrets are lost, no amount of money damages can ever restore their trade secret status.  *See* Ex. B (Spottiswood) § 8 ("Employee agrees that a remedy at law for any breach of the covenants or other obligations in this Agreement would be inadequate and that the Company, in addition to any other remedies available, shall be entitled to obtain preliminary and permanent injunctive relief."); Ex. A (Schadewald) § 8 (similar).

The full extent of the harm is immeasurable.  Markets are complex and ever-adapting, and it is difficult or impossible to measure the full set of downstream effects caused by Millennium's misappropriation.  Nanney Decl. ¶ 31, 32.  Further, if traders like Mr. Schadewald and Mr. Spottiswood were free to take Jane Street's most valuable trading strategies to competitors, that would materially erode Jane Street's competitive advantages.  *Id*. ¶ 33.  It would have a broad, and unquantifiable, impact on Jane Street's business, raising issues with Jane Street's investors, clients, creditors, and regulators, among others.  *Id*. ¶ 34.  The question of whether Jane Street can successfully maintain confidentiality over its trading strategies while at the same time not imposing non-competes on its employees (a well-known fact in the industry) has raised, and will continue to raise, a host of questions and concerns among Jane Street's various constituencies that are impossible to quantify at this time.  *Id*. ¶ 35.  For example, Jane Street may be less able to attract outside funding or less able to hire and retain top talent, and those factors would amplify one another and cause untold harm to Jane Street.  *Id*. ¶ 33.

"Irreparable harm is presumed where a trade secret has been misappropriated," *Estee Lauder Companies Inc. v. Batra*, 430 F. Supp. 2d 158, 174 (S.D.N.Y. 2006), and Defendants

cannot overcome that presumption here.  As demonstrated above, Defendants' use of the Trading Strategy is irreparably impairing the value that the strategy creates for Jane Street.  "A rebuttable presumption of irreparable harm might be warranted in cases where there is a danger that, unless enjoined, a misappropriator of trade secrets will …. irreparably impair the value of those secrets." *loanDepot.com, LLC v. CrossCountry Mortgage, LLC*, 2023 WL 3884032, at *4 (S.D.N.Y. 2023) (quoting *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009)).

### 1. Mr. Schadewald's and Mr. Spottiswood's Employment Agreements Confirm That Harm Is Irreparable

The employment agreements signed by Mr. Schadewald and Mr. Spottiswood confirm a finding of irreparable harm.  The agreements expressly state that Jane Street's trading strategies are valuable, confidential, and trade secrets.  *See* Ex. A § 2.6; Ex. B § 2.7 (acknowledging that Jane Street's confidential trade strategies are trade secrets).  Moreover, Mr. Schadewald and Mr. Spottiswood each expressly agreed that irreparable harm would flow from a breach of confidentiality with respect to Jane Street's trading strategies.  Mr. Schadewald's agreement states:

> The Undersigned acknowledges and agrees that the restrictions contained in this Agreement are reasonable and no greater than necessary to protect the business and interests of the Company and its affiliates, and that ***a violation of these restrictions could cause the Company or any of its affiliates substantial irreparable injury and that monetary damages may not be adequate relief***.

Ex. A § 8  (emphasis added).  And Mr. Spottiswood's states:

> Employee acknowledges and agrees that the restrictions contained in this Agreement are reasonable and necessary to protect the business and interests of the Company and that ***any violation of these restrictions would cause the Company substantial irreparable injury***.

Ex. B § 8 (emphasis added).

The Court need go no further—Mr. Schadewald's and Mr. Spottiswood's agreement that their disclosure of Jane Street's trade secrets would cause irreparable harm is enough.  Other courts have found similar language in employment agreements demonstrates irreparable harm.  *See, e.g.,*

*Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999) (employment contract's term that "plaintiff will suffer irreparable harm were [Defendant] to breach the contract's non-compete provision" sufficient to establish element); *Charter Comms., Inc. v. Mahlum*, 2023 WL 5604258, at *2 (D. Conn. 2023) ("The mutual, contractual acknowledgement between the employer and the employee that breach of confidentiality clause or non-competition clause would cause irreparable injury weighs in favor of finding [irreparable harm]."). Further, Mr. Schadewald and Mr. Spottiswood's breach of these confidentiality agreements constitutes irreparable harm to Jane Street because, as discussed below, the negative impact on Jane Street's profits hits the core of Jane Street's reputation and relationships. *See Millennial Plastic Surgery PLLC v. James*, 2021 WL 5988322, at *2 (S.D.N.Y. Dec. 16, 2021) ("loss of reputation, good will, and business opportunities from a breach of contract can constitute irreparable harm") (quotations omitted).

### 2.    The Inadequacy Of Monetary Relief Confirms Irreparable Harm

The misappropriation of the Trading Strategy harms Jane Street's profits in ways that cannot reasonably be calculated, and also causes intangible harm to Jane Street.

*First*, the impact on Jane Street's profits is highly uncertain and therefore weighs in favor of a restraining order on Defendants. To be sure, as detailed above, once Millennium began using the Trading Strategy, Jane Street's related profits plummeted because it was no longer the only firm employing such practices. But the harm goes far beyond money, as the loss of control over a trade secret is irreparable. *Eastmore Mgmt.*, 2019 WL 2902152, at *4 (irreparable harm where employee could potentially bring trading strategies to competitor, diminishing their value). Moreover, because of the complexity and interdependent nature of options trading markets, it is difficult (if not impossible) to fully reconstruct what Jane Street's profits would have been in the but-for world in which there was no misappropriation by Millennium, or to reconstruct how long the Trading Strategy would remain profitable into the future. *See, e.g., Register.com, Inc. v. Verio,*

*Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) (affirming preliminary injunction: "[t]he district court found it impossible to estimate 'with any precision the amount of the monetary loss which has resulted and which would result in the future from the loss of Register.com's relationships with customers and co-brand partners,' by reason of Verio's actions"); *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999) ("[I]t would be very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come.").

*Second*, absent an injunction, Defendants' activities threaten to destroy the value of the Trading Strategy. As noted above, ███████████████████████████████████



Nanney Decl. ¶ 33. This places Jane Street into a no-win predicament: ███████████████████

*Third*, Defendants' misappropriation harms Jane Street's reputation and goodwill. *See Really Good Stuff, LLC v. BAP Invs., L.C.*, 813 F. App'x 39, 44 (2d Cir. 2020) ("The loss of reputation and goodwill constitutes irreparable harm."). Jane Street's many stakeholder relationships, including with counterparties, investors, prime brokers, and employees, are dependent on the understanding that Jane Street can protect the IP of, and maintain the profitability of, its secret trading strategies. *See, e.g., Helio Logistics*, 2023 WL 1517687, at *4 (irreparable harm where defendants misappropriated trade secrets such as business strategies, client lists, advertising data analytics, pricing structure, and vendor relations).

*Fourth*, traders at Jane Street work much more collaboratively than at competitor firms, and the innovation that flows from that culture helps to drive Jane Street's collective success.  If individual traders can take Jane Street trade secrets to competing firms, then the lost sense of trust and loyalty will discourage collaboration (for fear of a leak).  Any such deterioration of Jane Street's collaborative culture presents immeasurable harm to Jane Street.

## C.  The Balance Of Hardships And Public Policy Weigh In Jane Street's Favor

The balance of hardships is decidedly in Jane Street's favor.  Jane Street asks that the Court enjoin Defendants only from using its trade secrets.  A prohibition against making ill-gotten gains cannot constitute undue harm to Defendants, and will return Millennium to its status quo prior to the misappropriation.  Nor will Mr. Schadewald or Mr. Spottiswood endure undue hardship; they are free to continue their careers and to use non-proprietary trading strategies.  *See Helio Logistics*, 2023 WL 1517687, at *4 n.4 (balance of hardships favors TRO where defendants are only enjoined from using particular trade secrets and are not "shut down").  Conversely, absent an injunction, Jane Street will continue to suffer the enormous and immeasurable harm discussed above.

Injunctive relief also serves the public interest by protecting Jane Street's legitimate interest in the secrecy of its trade secrets and confidential information.  *Intertek Testing Servs., N.A., Inc. v. Pennisi*, 443 F. Supp 3d 303, 347 (E.D.N.Y. 2020).  The public interest is also served by "ensuring that reasonable restrictive covenants into which the parties voluntarily entered are enforced."  *JTH Tax, Inc. v. Sawhney*, 2019 WL 3051760, at *7 (S.D.N.Y. 2019).

## D.  Jane Street Should Not Be Made To Post Any Bond

Because Defendants cannot show harm from being enjoined from misappropriation, it is appropriate for this Court to impose no bond on Jane Street.  *See Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126, 136 (2d Cir. 1997) (courts may "dispense with the bond requirement where there has been no proof of likelihood of harm") (quotations omitted).  Mr. Schadewald and Mr.

Spottiswood also expressly waived their right to seek bond.  Ex. A § 8, Ex. B § 8.  This provides an independent basis to waive the bond requirement.  *See*, *e.g.*, *New Horizons Educ. Corp. v. Krolak Tech. Mgmt. of Syracuse, LLC*, 2018 WL 5253070, at \*10 (N.D.N.Y. Oct. 22, 2018) ("The Court … imposes no bond in accord with the parties' agreement.").

## II.     THE COURT SHOULD EXPEDITE A PRELIMINARY INJUNCTION HEARING AND ORDER EXPEDITED DISCOVERY

The immediate and ongoing harm to Jane Street owing to Defendants' trading activities justifies a TRO and expedited schedule for Jane Street's preliminary injunction motion.  *See* Fed. R. Civ. P. 65(b).  Jane Street seeks targeted expedited discovery in order to prepare its motion for a preliminary injunction in a timely manner.

The Court has the discretion to grant expedited discovery where "good cause" and "reasonableness" are shown.  *Ayyash v. Bank Al-Madina*, 233 F.R.D. 325, 326-27 (S.D.N.Y. 2005); Fed. R. Civ. P. 26(d)(l) (party may seek discovery prior to a Rule 26(f) conference when "[the party] has made a strong evidentiary showing of the substantiality of his claims").  This Court regularly permits expedited discovery where a plaintiff intends to seek a preliminary injunction. *See, e.g.*, *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 2014 WL 12959675, at \*2 (S.D.N.Y. July 23, 2014) ("Requests for expedited discovery are typically appropriate in cases involving requests for preliminary injunction."); *Conopco, Inc. v. 2026 Third Realty, LLC*, 2022 WL 1567795, at \*11 (S.D.N.Y. 2022) (similar); Fed. R. Civ. P. 26 Adv. Comm. Note (1993) (expedited discovery appropriate in cases "involving requests for a preliminary injunction").

Jane Street seeks expedited discovery to uncover information regarding Millennium's trading activities, which Jane Street can obtain only through discovery.  Jane Street requests only reasonable, targeted discovery to assist with the presentation of a fully-developed preliminary injunction motion.  Jane Street anticipates issuing only five requests for documents, and seeking

only two depositions.  *See* Ex. Q.  Such documents should be easy to produce, as they largely involve the recent engagement and activities of just two named employees who were hired recently, and basic P&L information.  Jane Street requests Defendants complete this document production within five business days of this Court ordering a preliminary injunction hearing.

Jane Street also: (1) seeks to depose Mr. Schadewald and Mr. Spottiswood within five business days of the completion of said document production; and (2) requests that a preliminary injunction hearing be scheduled no later than May 20, 2024, with an appropriate briefing schedule.

Finally, pursuant to Fed. R. Civ. P. 65(b)(2), and based upon the good cause established by Jane Street's meritorious issues and the need for targeted discovery, the Court should extend the TRO to the date of the preliminary injunction hearing.  *See Helio Logistics*, 2023 WL 1517687, at *5 (granting TRO to enjoin use of trade secret information, and extending TRO's duration by several weeks to permit limited discovery before preliminary injunction hearing).

## CONCLUSION

For the foregoing reasons, Jane Street respectfully requests that the Court:

(1)   Enter a TRO enjoining Defendants from using or disclosing Jane Street's Trading Strategy and confidential information as set forth in Jane Street's accompanying proposed Order to Show Cause (pp. 3-4);

(2)   Enter a schedule for limited expedited discovery in furtherance of a preliminary injunction;

(3)   Schedule an expedited preliminary injunction hearing to be held on a date no later than May 20, 2024, with an appropriate briefing schedule; and

(4)   Extend the TRO to the date of the preliminary injunction hearing, per Rule 65(b)(2).

Dated: New York, New York
        April 16, 2024

QUINN EMANUEL URQUHART &
  SULLIVAN, LLP

By:    */s/ Deborah K. Brown*

Alex Spiro
Deborah K. Brown
Jeffrey C. Miller
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
alexspiro@quinnemanuel.com
deborahbrown@quinnemanuel.com
jeffreymiller@quinnemanuel.com

Greg Miraglia (*pro hac vice* forthcoming)
300 West 6th Street
Austin, Texas 78701
Telephone: (737) 667-6100
gregmiraglia@quinnemanuel.com

Jeff Nardinelli (*pro hac vice* forthcoming)
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone: (415) 875-6600
jeffnardinelli@quinnemanuel.com

*Attorneys for Plaintiff Jane Street Group, LLC*