# EXHIBIT A

# CONFIDENTIALITY AND INTELLECTUAL PROPERTY AGREEMENT

This Confidentiality and Intellectual Property Agreement ("Agreement") is entered into as of 12/22/23 between Jane Street Group, LLC (the "Company") and the undersigned person who may either be employed by the Company or its affiliates (an "Employee") or otherwise be associated with the Company or its affiliates whether as an investor, partner, adviser, director, officer, service provider or otherwise (each of any Employee or other such person, the "Undersigned").

The Company now has and expects to develop, alone or with its affiliates, confidential and proprietary materials and other highly sensitive information ("Company Confidential Information," defined below), which the Undersigned recognizes must be carefully protected for the Company to realize its full use and value.

In consideration of employment or continued employment in the case of an Employee and the Undersigned being granted access to Company Confidential Information and being able to participate in the further development of Company Confidential Information, the sufficiency of which as consideration for the following promises the Undersigned expressly acknowledges, the Company and the Undersigned hereby agree, intending to be legally bound, as follows:

1. **Company Confidential Information.**

1.1. "Company Confidential Information" shall mean any and all proprietary and/or confidential information (whether or not patentable or protectable under copyright or other applicable statutes), which is now or hereafter owned, possessed, developed, or used by or on behalf of the Company, including information received from third parties under an obligation of confidentiality, in all cases whether reduced to writing, maintained on any form of electronic media, or maintained in the Undersigned's mind or memory, and the physical embodiments of such information in any tangible form, whether written or machine-readable in nature, whether compiled by the Company and/or the Undersigned.

1.2. For the avoidance of doubt, Company Confidential Information includes any and all proprietary trading systems ("PTS") (including algorithms or the proprietary trading strategies embodied in those algorithms), "black box" systems (including the mechanisms for sending orders and system checks to ensure that orders are submitted properly, and systems that identify and send orders in securities either automatically or by setting up an electronic trading ticket requiring minimal human involvement prior to sending the order), analytical and evaluative tools, computer code and proprietary software, information about what products the Company or its affiliates trade, the methods used to trade those products, the Company's or its affiliates' profitability, internal business procedures, controls, plans, suppliers, research and development, discoveries or improvements, the identity of vendors, customers and counterparties and their respective information, clearing arrangements, clearing and commission rates, computer system passwords and other

computer security controls, financial information, personal employee data, and all other information concerning or relating to the way the Company or its affiliates conduct its or their respective business which is not generally known to the public or within the industry.

1.3.   Company Confidential Information does not include information, knowledge, or data that constitutes general skills, knowledge and experience gained during the Undersigned's employment or association (as applicable) with Company; information known by the Undersigned prior to the Undersigned's employment by or association with the Company as evidenced by the Undersigned's records predating the Undersigned's employment by or association with the Company; information publicly available, generally known or readily ascertainable from public sources within the industry or trade in which Company or its affiliates compete through no fault of the Undersigned; and information disclosed to the Undersigned by a third party not in a relationship of confidentiality with Company or any of its affiliates.  However, the Undersigned acknowledges that a combination, integration or compilation of such information, either with or using Company Confidential Information, is itself Company Confidential Information.

2.   **Obligations with respect to Company Confidential Information**. During employment or association with the Company, as applicable, the Undersigned acknowledges and agrees that the Undersigned will have access to and become acquainted with Company Confidential Information and materials, and will occupy a position of trust and confidence with respect to the Company's and its affiliates' affairs, business and Company Confidential Information. The Undersigned agrees to take the following steps to preserve Company Confidential Information:

2.1.   *Usage*. All Company property and materials, including Company Confidential Information, shall be used for the exclusive benefit of the Company both during and after employment or association with the Company.  During and after employment or association with the Company, the Undersigned is not allowed to sell, license or otherwise appropriate, exploit or use any products which embody or otherwise exploit in whole or in part any Company Confidential Information or materials.

2.2.   *Non-Disclosure*. Except as authorized in connection with the performance of duties or services on behalf of the Company, during and after employment or association with the Company, including after retirement or other separation from employment or association for any reason (as applicable), the Undersigned will not disclose in writing, orally or by electronic means, any Company Confidential Information, directly or indirectly, to any other person or entity for as long as the Company Confidential Information remains confidential. The Undersigned acknowledges and agrees that the Company Confidential Information can be applied to markets worldwide and that the Undersigned's use or disclosure of Company Confidential Information will harm the Company regardless of where such use or

disclosure occurs, and therefore, the protection afforded the Company under this Agreement must likewise be worldwide.

2.3. *Disclosure Prevention.* The Undersigned, at the Company's sole cost and expense, shall use best efforts and take reasonable precautions to prevent inadvertent or accidental disclosure of Company Confidential Information to any third party. During employment or association with Company, the Undersigned agrees to use only those computer resources of the Company or its affiliates (as applicable) (both on and off premises) for which the Undersigned has been granted access and then only to the extent authorized, and in so doing, to comply with Company's or its affiliates' policies and procedures concerning computer security. The Undersigned shall not copy Company Confidential Information, except as needed in furtherance of and for use in the Company's business. Copies of Company Confidential Information shall be treated with the same degree of confidentiality as the original information and shall be subject to all restrictions herein.

2.4. *Ownership of Company Confidential Information.* During and after employment or association with the Company, the Undersigned acknowledges and agrees that all Company Confidential Information, whether prepared by the Undersigned or otherwise coming into the Undersigned's possession, shall remain the exclusive property of the Company.

2.5. *Return All Materials.* Upon the termination of employment by the Company or termination of the Undersigned's association with the Company (as applicable), or at any other time at the Company's request, the Undersigned expressly agrees to return to the Company, or at the Company's request delete, all Company Confidential Information and materials, and any and all copies thereof, including any hardware, whether prepared by the Undersigned or otherwise coming into the Undersigned's possession. The Undersigned agrees not to retain any property of the Company or its affiliates, including any copies of any Company Confidential Information and Company-owned materials after termination of employment or association for any reason whatsoever, except in connection with any ongoing inquiry, investigation, litigation or similar matter involving the Undersigned personally where the Undersigned has a legal right to retain such materials.

2.6. *Trade Secrets.* The Undersigned expressly acknowledges that Company Confidential Information includes trade secrets of the Company which derive independent economic value from not being readily known to or ascertainable by others; that reasonable efforts have been made by the Company to maintain the confidentiality of such information; that such information is the sole property of the Company; and that any retention or use of such information by the Undersigned except in the course of performing services for or duties to the Company shall constitute misappropriation. In particular, misappropriation of Company Confidential Information in breach of this Agreement may subject the Undersigned to criminal liability under the Defend Trade Secrets Act of 2016, as amended (the "DTSA"), entitle

the Company to injunctive relief, and require the Undersigned to pay compensatory damages, double damages, and attorneys' fees. Notwithstanding any other provision of this Agreement, the Undersigned hereby is notified in accordance with the DTSA that the Undersigned will not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made (a) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney, in each case solely for the purpose of reporting or investigating a suspected violation of law; or (b) in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. The Undersigned is further notified that if the Undersigned files a lawsuit for retaliation by the Company for reporting a suspected violation of law, the Undersigned may disclose the Company Confidential Information to the Undersigned's attorney and use that information in the court proceeding if the Undersigned files any document containing that information under seal and does not disclose it except pursuant to court order.

2.7.  *Permitted Disclosures.* Notwithstanding the foregoing, nothing in this Agreement or in any other agreement or Company policy prohibits or restricts the Undersigned from reporting possible violations of federal, state, or local law or regulation to, or discussing any such possible violations with, law enforcement or any governmental agency or entity or self-regulatory organization, including by initiating communications directly with, responding to any inquiry from, or providing testimony before any federal, state, or local regulatory authority or agency or self-regulatory organization, including without limitation the Securities and Exchange Commission, the Financial Industry Regulatory Authority, the Occupational Safety and Health Administration and the Equal Employment Opportunity Commission, the state division on human rights, a local commission on human rights, or an attorney retained by the Undersigned, or from making any other disclosures that are protected by the whistleblower provisions of any federal, state, or local law or regulation.  Further, nothing in this Agreement restricts any rights to engage in concerted protected activity as afforded under the National Labor Relations Act, including the right for non-manager Employees to communicate with coworkers or third parties about terms and conditions of employment or labor disputes.

3.  **Prior Proprietary Information; Conflicting Obligations and Rights.**

3.1.  *Prior Proprietary Information and No Conflicts.* During employment or association (as applicable) with the Company, the Undersigned shall not knowingly improperly use or disclose any proprietary information or trade secrets of any former employer or other person or entity intended by such person or entity not to be disclosed to the Company or its affiliates. The Undersigned will not bring onto the Company's or its affiliates' premises any unpublished document or proprietary information belonging to any such former employer, person or entity unless consented to by such prior employer, person or entity.

The Undersigned represents that, to the best of the Undersigned's knowledge, the Undersigned's performance of all of the terms of this Agreement and the Undersigned's capacity as an Employee or associate of the Company do not and will not breach any agreement with any third party, including any agreement to keep in confidence proprietary information acquired prior to the Undersigned's employment by or association with the Company. Further, the Undersigned represents that, to the best of the Undersigned's knowledge, the performance of duties or services for the Company or its affiliates will not breach any contractual or other legal obligation owed to any third party.

3.2. *Conflicting Obligations and Rights.* The Undersigned agrees to inform the Company of any apparent conflicts between the Undersigned's work, duties or services for the Company or its affiliates and (a) any obligations the Undersigned may have to preserve the confidentiality of another's proprietary information or materials or (b) any rights the Undersigned claims to any inventions or ideas or other intellectual property before using the same on the Company's or its affiliates' behalf. Otherwise, the Company may conclude that no such conflict exists and the Undersigned agrees thereafter to make no such claim against the Company. The Company shall receive such disclosures in confidence and consistent with the objectives of avoiding any conflict of obligations and rights or the appearance of any conflict of interest.

4. **Ownership of Intellectual Property.**

4.1. During the Undersigned's employment or association with the Company, any and all intellectual property, including trade secrets, inventions, discoveries, concepts, improvements, technology, know-how, products, algorithms, formulas, models, methods, techniques, processes, data, works of authorship, computer software, and the physical embodiments of such intellectual property, that is created, conceived, developed, written or reduced to practice by the Undersigned, either individually or jointly in collaboration with others, shall belong to and be the sole and exclusive property of Company if it (a) is created, conceived, developed, written or reduced to practice by the Undersigned in the performance of the Undersigned's duties for the Company or its affiliates or in connection with the Undersigned's association with the Company (as applicable), as the result of any work or services performed by the Undersigned for the Company or its affiliates; (b) is created, conceived, developed, written or reduced to practice by the Undersigned using Company Confidential Information or the Company's or its affiliates' equipment, supplies, facilities, personnel, software or other resources, including in the case of an Employee, during working hours; or (c) could reasonably be considered to fall within the scope of the Company's actual or contemplated business, including the Company's or its affiliates' actual or demonstrably anticipated research or development, or relates to trading or financial markets (collectively, the "Developments"). The Undersigned acknowledges that all Developments that are works of authorship will be deemed "works made for hire" prepared for and owned by the Company, within the meaning of the copyright laws of the United States and any similar laws of other jurisdictions. The Undersigned

agrees to, and does hereby, irrevocably assign to the Company or its designee, to the extent not otherwise vested in the Company, (1) all of the Undersigned's right, title and interest in and to such Developments, including any patent rights, trade secret rights, copyrights, mask work rights and all other intellectual property rights therein that may be secured in any place under laws now or hereafter in effect; (2) all claims, demands and causes of action arising out of or relating to infringements of such Developments; (3) the right to apply for and obtain patents, copyrights and other intellectual property protection for such Developments.

4.2. During the period of the Undersigned's employment or association with the Company, the Undersigned agrees to promptly and fully communicate, in writing to the Company (in accordance with such procedures as the Company may direct from time to time), all Developments created, conceived, developed, written or reduced to practice by the Undersigned. However, Developments that are created, conceived, developed, written or reduced to practice by the Undersigned in the performance of the Undersigned's duties for the Company or its affiliates or in connection with the Undersigned's association with the Company (as applicable), as the result of any work or services performed by the Undersigned for the Company or its affiliates, are presumed to be known by and disclosed to the Company. If there is any ambiguity as to whether any intellectual property constitutes a Development, the Undersigned shall consult with their manager or an appropriate member of senior management. During the period of the Undersigned's employment or association with the Company and thereafter, the Undersigned, at the Company's sole cost and expense, agrees to (a) sign and deliver patent applications and otherwise assist the Company in obtaining patents on all Developments that are patentable; (b) sign and deliver copyright registration applications and otherwise assist the Company in obtaining copyright registrations on all Developments that are copyrightable, and (c) execute all documents and do all things considered advisable by the Company or its counsel to convey to the Company, apply for, prosecute, maintain, perfect, enforce or defend intellectual property protection for any Developments anywhere in the world.

During the period of the Undersigned's employment or association with the Company and thereafter, the Undersigned further agrees that if the Company is unable, after reasonable effort, to secure the Undersigned's signature on any papers serving to further the Company's rights under this Section, any executive officer of the Company shall be entitled to execute any such papers as agent and attorney-in-fact, and the Undersigned hereby irrevocably designates and appoints each Managing Director or any counsel of the Company as Employee's agent and attorney-in-fact to execute any such papers on the Undersigned's behalf, and to take such actions as the Company may deem necessary or desirable in order to protect its rights and interests in any Developments, under the conditions described in this sentence.

However, this Section 4.2 shall not apply to any intellectual property created, conceived, developed, written or reduced to practice before the Undersigned's employment by or association with the Company ("Pre-Existing IP"). To clearly

establish the Undersigned's rights, the Undersigned has listed on Appendix A any Pre-Existing IP. The Undersigned also promises and agrees that the Undersigned will promptly disclose to the Company all patent applications filed by the Undersigned or on the Undersigned's behalf within a year after termination of the Undersigned's employment or association with the Company that relate to or concern the Company's actual or contemplated business, including the Company's or its affiliates' actual or demonstrably anticipated research or development, or trading or financial markets.

4.3. *Moral Rights*. The term "moral rights" means any rights of attribution or integrity, including any right to claim authorship of a copyrightable work, to object to a modification of such copyrightable work, and any similar right existing under the judicial or statutory law of any country in the world or under any treaty, regardless of whether or not such right is denominated or generally referred to as a "moral right." The Undersigned forever hereby waives and agrees never to assert any moral rights the Undersigned may have in any copyrightable work that is the property of the Company as a result of this Section 4, even after any termination of employment or association with the Company. Further, the Undersigned states that the Undersigned does not require use of the Undersigned's name in connection with any such work or any derivative works thereof and that the Undersigned has no objection to publication and use of such works in the business of the Company, its affiliates or its or their licensees or successors.

5. **Publications**. During the period of the Undersigned's employment or association with the Company and thereafter, except as permitted under Sections 2.6 and 2.7 of this Agreement, the Undersigned shall not submit any writing for publication or dissemination (regardless of format) or deliver any speech that contains any Company Confidential Information, or any description of the Company's or its affiliates' business, except pursuant to advance written clearance from an authorized representative of Company.

Further, while employed by or associated with the Company and except as permitted under Sections 2.6 and 2.7 of this Agreement, the Undersigned shall not submit any writing for publication or deliver any speech that contains any information relating to any aspect of the Company's or its affiliates' business, except pursuant to advance written clearance from an authorized representative of Company.

6. **Termination**. If the Undersigned is an Employee, the Employee continues to be an Employee at will, and this Agreement does not otherwise create any right or expectation of continuation of employment for any particular period. Nevertheless, Employee acknowledges that Employee will be subject to immediate dismissal for any breach of this Agreement. Employee further understands that this Agreement will continue in effect after the termination of Employee's employment for any reason.

7. **Enforcement – Mutual Arbitration. During the period of the Undersigned's employment or association with the Company and thereafter,** the Undersigned and Company agree that any and all disputes arising out of this Agreement will be submitted to and resolved exclusively by arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules, including its Rules for Emergency Measures of Protection, and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. Claims shall be heard by a single arbitrator, who shall be a lawyer admitted to practice in New York. The place of arbitration shall be the County and State of New York.

Except as may be required by applicable law, neither the parties nor the arbitrator may disclose the existence, content, information disclosed in, or results of any arbitration hereunder without the prior written consent of both parties; provided that the foregoing does not prohibit the Company or its affiliates from making any disclosure to a regulator or self-regulatory organization or to its prospective or actual affiliates, attorneys, directors, agents, auditors, counterparties, advisors or investors in connection with a valid business purpose. The arbitrator shall enter a protective order consistent with the above, including by providing that all evidence and other information presented by the parties shall remain confidential to the same extent as Company Confidential Information under this Agreement must be held confidential by the Undersigned. The parties agree that the Federal Arbitration Act, as amended applies to this Agreement. Nothing herein shall be interpreted to prevent the Undersigned from filing charges with any government agency with appropriate jurisdiction.

Nothing herein shall preclude the parties from seeking provisional remedies in connection with or in aid of arbitration in court; provided that any such action between the parties are brought in accordance with Section 8 of this Agreement.

The Undersigned will provide the Company with a full accounting of all proceeds and profits received as a result of or in connection with a breach of this Agreement.

8. **Injunctive Relief.** The Undersigned acknowledges and agrees that the restrictions contained in this Agreement are reasonable and no greater than necessary to protect the business and interests of the Company and its affiliates, and that a violation of these restrictions could cause the Company or any of its affiliates substantial irreparable injury and that monetary damages may not be adequate relief. In the event of a breach or threatened breach by the Undersigned of the Undersigned's obligations under this Agreement, the Company, in addition to being entitled to exercise all rights granted by law, will be entitled to specific performance of its rights under this Agreement without proving actual damages. Accordingly, notwithstanding anything in this Agreement to the contrary including Section 7 above, the Company, at its discretion, may seek and/or obtain from a court a

temporary restraining order, preliminary injunction, permanent injunction, or any other comparable injunctive relief. Employee agrees not to seek, and Employee agrees to waive any requirement for, the securing or posting of a bond in connection with the Company seeking or obtaining the relief described in this Section 8. Each party irrevocably waives, to the fullest extent permitted by applicable law, any objection or opposition to the other party's motion to seal and/or close to the public any portion of the record or any hearings, motions, or trials in connection with any such action.

The Undersigned and the Company further agree that the prevailing party in any action brought pursuant to this Section 8 shall be entitled to recover all costs and expenses (including attorneys' fees) incurred in connection with the enforcement of its or their rights hereunder. If a party prevails on some, but not all issues, the court shall apportion such fees and costs between the parties. The Undersigned further agrees that all of the Company's rights and remedies shall be cumulative, and that the commencement of any proceeding under this Section 8 shall not act as a waiver of the Company's rights under Section 7 of this Agreement.

9. **Jurisdiction, Venue and Waiver of Jury Trial**. Without limiting Sections 7 and 8 of this Agreement, in the event that any legal proceedings are commenced in any court with respect to any matter arising out of this Agreement, the parties hereto specifically consent and agree that the courts of the State of New York and/or the United States District Court for the Southern District of New York shall have exclusive jurisdiction over each of the parties hereto and over the subject matter of any such proceedings, the exclusive venue of any such proceedings shall be the County and State of New York, and each party irrevocably waives any and all right to plead or contend lack of personal jurisdiction in those courts or that such proceedings have been brought in an incorrect or inconvenient venue; and they each irrevocably waive any and all right to trial by jury in any such proceedings.

10. **Actions**. Notwithstanding Sections 7 and 9 of this Agreement, in the event that the parties have a dispute under this Agreement, and a party has a related dispute with a non-party who is not subject to arbitration pursuant to Section 7 of this Agreement or voluntarily, then such party to this Agreement may seek resolution of the parties' dispute under this Agreement and the dispute with the **non**-party in a single proceeding in the same court ("Consolidated Court Proceeding"). In the event the court does not allow a single proceeding, the parties' dispute shall be subject to Sections 7 and 9 of this Agreement. For purposes of this Section of the Agreement, each party irrevocably waives any and all right to plead or contend lack of personal jurisdiction or incorrect or inconvenient venue in the court in which the Consolidated Court Proceeding is being heard; and they each irrevocably waive any and all right to trial by jury in any such proceedings

11. **Notification of Agreement**. The Undersigned authorizes the Company to notify third parties for whom the Undersigned performs services including the

Confidentiality and Intellectual Property Agreement          Page 9
December 2023 (US)

3086865.v1

Undersigned's employer (or new employer if the Undersigned is an employee) about the Undersigned's rights and obligations under this Agreement.

12. **Governing Law; Actions to Enforce**. This Agreement and its terms shall be construed, enforced and governed by the laws of the State of New York without regard to conflict of law provisions. Nothing in this Section 12 shall affect the right of any party hereto to serve legal process in any manner permitted by law.

13. **Notices**. All required or permitted notices under this Agreement shall be in writing and shall be effective upon personal delivery or upon deposit in the United States Post Office, by registered or certified mail, postage prepaid, or by overnight mail via Federal Express or by electronic mail addressed to the other party at the following addresses:

> If to the Company:
>
> Director of Human Resources
> Jane Street Group, LLC
> 250 Vesey Street
> New York, NY 10281
> nyc-hr@janestreet.com
>
> If to the Undersigned, at address indicated below.

Any notice delivered in accordance with the terms hereof shall be deemed received on the third day following the date of mailing, or the day following dispatch by overnight mail or upon transmission if sent by facsimile. Either party may change the address or other information to which notices to such party may be given hereunder by serving a proper notice of such change of address or other information to the other party.

14. **Successors and Assigns**. The Company may assign this Agreement and all covenants hereunder will inure to the benefit of and be enforceable by the Company's successors and permitted assigns, including any entity with which or into which the Company may be merged or which may succeed to its assets or business. This Agreement is binding upon the Undersigned's heirs, administrators, and other legal representatives. The Undersigned's obligations under this Agreement are personal and may not be assigned.

15. **"Blue Pencil" and Severance**. If and to the extent any arbitrator or court of competent jurisdiction finds that any term, provision or clause of this Agreement restricting the post-employment or association activities of the Undersigned is unenforceable as written because it is unreasonably broad in its scope or duration, the scope or duration of such term, provision or clause shall be construed and enforced to the maximum extent permitted by applicable law, and this Agreement shall be deemed modified and amended to reflect such enforcement. If and to the

extent any term, provision or clause of this Agreement is found, by an arbitrator or court of competent jurisdiction to be unenforceable (even if construed pursuant to the prior sentence if and to the extent applicable), then any such term, provision or clause shall be deemed severed and stricken from this Agreement, and the remaining terms shall remain in full force and effect, and shall be construed, to the greatest extent permissible, giving effect to the intentions of the parties with respect to the terms of this Agreement, as reflected herein.

16. **General Terms**. This is the entire agreement between the Undersigned and the Company with respect to its subject matter, superseding any prior oral or written, express or implied negotiations and agreements. This Agreement may not be changed in any respect except by a written agreement signed by both the Undersigned and an authorized representative of the Company. The delay or omission in exercising any rights under this Agreement, or the failure of either party to insist on strict compliance with any of the terms, covenants, or conditions of this Agreement by the other party, shall not be deemed a waiver of any terms, covenants or conditions of this Agreement, nor shall any waiver or relinquishment of any right or power at any one time or times be deemed a waiver or relinquishment of that right or power for all times or any other time. The captions of the sections of this Agreement are for convenience of reference only and in no way define, limit or affect the scope or substance of any section of this Agreement. The term includes, including and other forms thereof shall be deemed to be followed by the words without limitation. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. This Agreement shall survive termination of the Undersigned's employment or association with the Company.

By the Undersigned's signature below, the Undersigned acknowledges that the Undersigned has reviewed this Agreement carefully and understands that the covenants and obligations it contains are binding, that the Undersigned has had sufficient time to consider the Agreement and the opportunity to consult with an attorney or other representative of their choosing, and has freely and voluntarily accepted this Agreement.

| | |
|---|---|
| The Undersigned | JANE STREET GROUP, LLC |
| Signature: _Douglas Schadewald_<br>Douglas Schadewald (Dec 22, 2023 13:27 EST) | By: _[signature]_<br>Managing Director |
| Print Name: Douglas Schadewald | |
| Date Signed: 12/22/23 | |
| Address:<br>111 Murray Street Apt 16W<br>New York, NY 10007 | |

# APPENDIX A