# EXHIBIT M

**quinn emanuel** trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York 10010-1601 | TEL (212) 849-7000 FAX (212) 849-7100

WRITER'S DIRECT DIAL NO.
**(212) 849-7116**

WRITER'S EMAIL ADDRESS
**deborahbrown@quinnemanuel.com**

April 3, 2024

<u>VIA E-MAIL</u>

**To: Daniel Spottiswood**
danielspottiswood@gmail.com

c/c Gil Raviv
gil.raviv@mlp.com
Millennium Management LLC
399 Park Avenue
New York, NY 10022

Re:      <u>*Millennium Management LLC's Employment of Daniel Spottiswood*</u>

Dear Mr. Spottiswood:

I write on behalf of Jane Street Group, LLC ("Jane Street").  Based on your recent hiring and the hiring of Douglas Schadewald by Millennium Management LLC ("Millennium"), and a review of data and reports from certain markets, Jane Street has significant concerns that you, as part of your ongoing work at Millennium, are improperly using Jane Street's confidential and proprietary information and trade secrets.  This includes, for example, using trading strategies researched, developed, and implemented for and by Jane Street during your employment there. Jane Street is seriously concerned that Millennium is aware of such activity and hired you with the expectation that you would use Jane Street's confidential and proprietary trading strategies at Millennium.

This conduct is also a breach of your Confidentiality and Intellectual Property Agreement, executed during your tenure at Jane Street.

I have attached your Confidentiality and Intellectual Property Agreement, executed August 17, 2020 (Ex. A).  As you know, that agreement broadly requires that you maintain the confidentiality of any confidential information, intellectual property, or trade secrets owned, used, or developed by Jane Street, including any confidential information or intellectual property or trade secrets developed by you while employed by Jane Street.  It forbids you from using or

**quinn emanuel urquhart & sullivan, llp**
ABU DHABI | ATLANTA | AUSTIN | BEIJING | BERLIN | BOSTON | BRUSSELS | CHICAGO | DALLAS | DOHA | HAMBURG | HONG KONG | HOUSTON |
LONDON | LOS ANGELES | MANNHEIM | MIAMI | MUNICH | NEUILLY-LA DEFENSE | NEW YORK | PARIS | PERTH | RIYADH | SALT LAKE CITY |
SAN FRANCISCO | SEATTLE | SHANGHAI | SILICON VALLEY | STUTTGART | SYDNEY | TOKYO | WASHINGTON, DC | WILMINGTON | ZURICH

disclosing to third parties such as Millennium confidential information, intellectual property, or trade secrets—including but not limited to "what products [Jane Street] trades, the methods used to trade those products, its profitability, and all other information concerning or relating to the way [Jane Street] conducts its business." Ex. A, §§ 2.1, 2.5, 4.1.  It confirms that all such confidential information and trade secrets have been and remain the exclusive property of Jane Street.  Ex. A, §§ 2.7, 6.1.

By the terms of the Confidentiality and Intellectual Property Agreement, your obligations under the Agreement have remained in force since the execution of the Agreement and remain in effect today.  Ex. A, §§ 1, 2.1, 2.2, 6.  Additionally, as you know, you also reaffirmed your confidentiality obligations upon separating from Jane Street on February 7, 2024 (Ex. B), including as follows:

> Intellectual Property Agreement; Confidentiality. As a material term of this agreement, you acknowledge that you have ongoing obligations to adhere to Confidentiality and Intellectual Property Agreement that survive your departure from Jane Street and you agree to comply with the Confidentiality and Intellectual Property Agreement.

Jane Street's intellectual property rights carry extraordinary value that is difficult to quantify; therefore, your trading activities are to the grave and imminent harm of Jane Street's economic and business interests.  *See, e.g.*, Ex. A, § 4.8 (use of Jane Street trading strategies for the benefit of Millennium "shall constitute misappropriation" and may subject you to "damages").  To this end, Jane Street demands that you immediately cease all trading activities that exploit Jane Street's confidential information and trade secrets, including the aforementioned trading strategies researched, developed, and implemented for and by Jane Street of which you have knowledge.  You must confirm that you have ceased all such trading activities.

***If said confirmation is not received by 5:00 PM (ET) Friday, April 5, 2024,*** Jane Street will be forced to seek immediate court intervention, seeking emergency injunctive relief for trade secret misappropriation pursuant to the Defend Trade Secrets Act ("DTSA") and New York state law, breach of contract, and tortious interference, among other claims.  Jane Street will also seek associated attorney's fees.  Jane Street reserves all rights, including, but not limited to, the right to seek both civil remedies and injunctive relief without further notice to prevent any further retention, disclosure, or use of its intellectual property by you.

Failure to provide this confirmation and continued improper activity will further demonstrate your willful and malicious scienter.

**PLEASE CONSIDER THIS LETTER A FORMAL NOTICE THAT YOU <u>MUST</u> PRESERVE <u>ALL</u> DOCUMENTS THAT COULD BE RELEVANT TO A DISPUTE BETWEEN JANE STREET, MILLENNIUM, AND/OR FORMER JANE STREET EMPLOYEES WHO NOW WORK FOR MILLENNIUM, INCLUDING YOU**.  That includes, but is not limited to, all documents related to your recruitment, hiring and onboarding by Millennium, the development and deployment of trading activities that exploit Jane Street's

confidential information and trade secrets, including any trading activities developed or implemented at Millennium by you based on strategies researched, developed, or implemented at Jane Street, and any communications between you and any agent, representative, or employee of Millennium.


Best regards,

*/s/ Deborah Brown*

Deborah Brown

# EXHIBIT A

CONFIDENTIALITY AND INTELLECTUAL PROPERTY AGREEMENT

This Agreement ("Agreement") is entered into between Jane Street Group, LLC (the "Company") and the undersigned Employee of the Company ("Employee"). The Company now has and expects to develop confidential and proprietary materials and other highly sensitive information of significant value that is not easily or completely subject to ascertainment, which Employee recognizes must be carefully protected for the Company to realize its full use and value. In consideration of Employee being granted access to the Company's intellectual property and being able to participate in the further development of the Company's intellectual property, the sufficiency of which as consideration for the following promises Employee expressly acknowledges, the Company and Employee hereby agree, intending to be legally bound, as follows:

1.      **Termination.** Employee continues to be an Employee at will, and this Agreement does not otherwise create any right or expectation of continuation of employment for any particular period. Nevertheless, Employee acknowledges that he or she will be subject to immediate dismissal for any breach of this Agreement. Employee further understands that this Agreement will continue in effect after the termination of Employee's employment for any reason.

2.      **Company Confidential Materials and Information** (except as provided in Section 3).

        2.1.    *General Company Information.* General company information includes information about what products the Company trades, the methods used to trade those products, its profitability, and all other information concerning or relating to the way the Company conducts its business which is not generally known to the public (such as internal business procedures, controls, plans, suppliers, vendor information, clearing arrangements, clearing and commission rates, computer system passwords and other computer security controls, financial information, and employee data). It is inappropriate to disclose general Company information to people outside the Company, including those outside of the securities industry. Employee therefore agrees not to disclose or discuss such information with non-employees of the Company, and, not to discuss any such information with other employees of the Company outside the office, in each case, except in the performance of the Employee's duties.   When asked, it is permissible to disclose that the Company engages in arbitrage, and may make markets in different securities markets, but not to discuss specific arbitrage situations, or particular securities in which it makes or has made markets.

        2.2.    *Proprietary Trading Systems—Generally*. Proprietary Trading Systems (PTS) or Black Box systems generally includes the mechanisms for sending orders and system checks to ensure that orders are submitted properly. PTS means systems that identify and send orders in securities either automatically or by setting up an electronic trading ticket requiring minimal human involvement prior to sending the order. Information about PTS is highly confidential and is not to be disclosed or discussed outside of the Company's office, or in the presence of anyone who is not a Company employee except in the performance of Employee's duties.

2.3.     Proprietary Trading Systems—The specific algorithms behind them. This refers to the specific proprietary trading strategies embodied in the algorithms in the PTS. These algorithms are the property of the Company, and shall not be used or disclosed to anyone, for any purpose (except their use in the business of the Company) without the express written permission of the Company, while employed at the Company or at any time thereafter except in the performance of Employee's duties.

2.4.     *Code*. Any computer code or proprietary software that Employee writes or participates in writing, or is written by others, for the Company is the Company's property. Such code shall not be used for any purpose other than the business of the Company without the written permission of the Company, while employed at the Company, or at any time thereafter. Employee agrees that the Company shall own, all rights, including rights of copyright with respect to any code that he or she or any other employee participates in writing related to the business of the Company.

2.5.     *Not Generally Known*. Any information in addition to the foregoing which is not generally known to the public or within the industry or trade in which the Company competes which gives the Company any advantage over its competitors, and the physical embodiments of such information in any tangible form, whether written or machine-readable in nature, and information received from third parties under an obligation of confidentiality, are part of Company Confidential Information.

2.6.     *Third Party Confidential Information*. Company Confidential Information includes information or material received by the Company from others and intended by the Company to be kept in confidence by its recipients.

2.7.     *Trade Secrets*. Employee acknowledges and agrees that the Company Confidential Information identified in paragraphs 2.1 through 2.6 above, constitute trade secrets of the Company.

3.     **General Knowledge.** The general skills, knowledge and experience gained during Employee's employment with Company, information publicly available, generally known or readily ascertainable from public sources within the industry or trade in which Company competes, and information disclosed to Employee by a third party not in a relationship of confidentiality with Company, is not considered Company Confidential Information. Excluded from Company Confidential Information, is information known by Employee prior to his or her employment by the Company.

4.     **Employee Obligations.** During employment with the Company, Employee acknowledges and agrees that he or she will have access to and become acquainted with Company Confidential Information and materials, including its trade secrets, and will occupy a position of trust and confidence with respect to the Company's affairs, business and Company Confidential Information. Employee acknowledges and agrees that the interests afforded protection by this Agreement are the Company's legitimate business interests, deserving of

protection. Employee agrees to take the following steps to preserve the confidential and proprietary nature of Company Confidential Information and materials:

4.1.     *Non-Disclosure*. Except as authorized in connection with the performance of Employee's duties on behalf of Company, during and after employment with the Company, Employee will not misuse, misappropriate, or disclose in writing, orally or by electronic means, any Company Confidential Information, directly or indirectly, to any other person. Employee is not allowed to sell, license or otherwise exploit, use in business or disclose any products, which embody or otherwise exploit in whole or in part any Company Confidential Information or materials. Employee acknowledges and agrees that the Company's Confidential Information can be applied to markets worldwide, and therefore, the protection afforded the Company must likewise be worldwide.

4.2.     *Disclosure Prevention*. Employee, at Company's sole cost and expense, shall use best efforts and take reasonable precautions to prevent inadvertent or accidental disclosure of Company Confidential Information to any third party.

4.3.     *Removal of Material.* Employee acknowledges and agrees that all Company Confidential Information, whether prepared by Employee or otherwise coming into Employee's possession, shall remain the exclusive property of Company. Employee shall not remove any Company Confidential Information from Company's premises except for use in Company's business.

4.4.     *Return All Materials*. Employee will return to Company all Company Confidential Information and materials, and all copies thereof, whether written in a fixed media or otherwise, at any time upon the Company's request including, among other things, any hardware loaned to Employee by the Company. Additionally, without such request, upon the termination of employment by the Company, Employee expressly agrees to return to Company all Company Confidential Information and materials, and any and all copies thereof, whether prepared by Employee or otherwise coming into Employee's possession. Employee agrees not to retain any copies of any Company Confidential Information and Company-owned materials after termination of employment for any reason whatsoever, except in connection with any ongoing inquiry, investigation, litigation or similar matter involving Employee personally.

4.5.     *Delete Confidential Information*. Employee must, if requested by the Company, delete all Company Confidential Information from any re-useable material and destroy all other documents, tangible items or any electronic media which contain or refer to any Company Confidential Information and which are in Employee's possession or under Employee's control.

4.6.     *Copying*. Employee shall not copy Company Confidential Information, except as needed in furtherance of and for use in the Company's business. Copies of Company Confidential Information shall be treated with the same degree of confidentiality as the original information and shall be subject to all restrictions herein.

4.7.    *Computer Security*. During employment with Company, Employee agrees only to use computer resources of the Company (both on and off Company's premises) for which Employee has been granted access and then only to the extent authorized and to comply with Company's policies and procedures concerning computer security.

4.8.    *Trade Secrets*. Misappropriation of a trade secret of the Company in breach of this Agreement may subject Employee to criminal liability under the Defend Trade Secrets Act of 2016 (the "DTSA"), entitle the Company to injunctive relief, and require Employee to pay compensatory damages, double damages, and attorneys' fees. Notwithstanding any other provision of this Agreement, Employee hereby is notified in accordance with the DTSA that Employee will not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made (a) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney, in each case solely for the purpose of reporting or investigating a suspected violation of law; or (b) in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. Employee is further notified that if Employee files a lawsuit for retaliation by the Company for reporting a suspected violation of law, Employee may disclose the Company's trade secrets to Employee's attorney and use the trade secret information in the court proceeding if Employee files any document containing the trade secret under seal and does not disclose the trade secret except pursuant to court order.

4.9.    *Permitted Disclosures*. Notwithstanding the foregoing, nothing in this Agreement or in any other agreement or Company policy prohibits or restricts Employee from reporting possible violations of federal, state, or local law or regulation to, or discussing any such possible violations with, any governmental agency or entity or self-regulatory organization, including by initiating communications directly with, responding to any inquiry from, or providing testimony before any federal, state, or local regulatory authority or agency or self-regulatory organization, including without limitation the Securities and Exchange Commission, FINRA, the Occupational Safety and Health Administration and the Equal Opportunity Commission, or making any other disclosures that are protected by the whistleblower provisions of any federal, state, or local law or regulation.

5.    **Prior Proprietary Information; Conflicting Obligations and Rights.**

5.1.    *Prior Proprietary Information*. During employment with Company, Employee shall not knowingly improperly use or disclose any proprietary information or trade secrets of any former employer or other person or entity intended by such person or entity not to be disclosed to Company. Employee will not bring onto Company's premises any unpublished document or proprietary information belonging to any such former employer, person or entity unless consented to by such prior employer, person or entity.

Employee represents that, to the best of Employee's knowledge, Employee's performance of all of the terms of this Agreement and as an Employee of the Company does not and will not breach any agreement to keep in confidence proprietary information acquired

by Employee prior to Employee's employment by the Company. Further, Employee represents that, to the best of Employee's knowledge, the performance of Employee's duties with the Company will not breach any contractual or other legal obligation owed to any third person.

5.2.    *Conflicting Obligations and Rights.* Employee agrees to inform Company of any apparent conflicts between Employee's work for Company and (a) any obligations he or she may have to preserve the confidentiality of another's proprietary information or materials or (b) any rights he or she claim to any inventions or ideas before using the same on Company's behalf. Otherwise, Company may conclude that no such conflict exists and Employee agrees thereafter to make no such claim against Company. Company shall receive such disclosures in confidence and consistent with the objectives of avoiding any conflict of obligations and rights or the appearance of any conflict of interest.

6.      **Ideas and Inventions.**

6.1.    During employment while performing Employee's duties for Company, any and all intellectual properties, including, but not limited trade secrets, inventions, products, algorithms, formulas, models, methods, techniques, processes, data, works of authorship, software programs, software program codes, and the physical embodiments of such information; contacts at or knowledge of suppliers or prospective suppliers of the Company; and information received from third parties under an obligation of confidentiality, and other matters constituting trade secrets or Company Confidential Information, that are conceived, developed or written by Employee, either individually or jointly in collaboration with others, shall belong to and be the sole and exclusive property of Company, are "works for hire", and to the extent they are not "works for hire", Employee  hereby assigns all of his/her rights in such intellectual properties to Company, including without limitation, all patent, copyright or trade secret rights therein.

6.2.    With respect to intellectual properties described in 6.1, Employee, at Company's sole cost and expense, agrees to assist the Company in obtaining patents on all inventions, designs, improvements and discoveries that are patentable ("Inventions"), or copyright registrations on all works of creation that are copyrightable ("Works"), and to execute all documents and do all things necessary to vest Company with full and exclusive title and protect against infringement by others.

Employee further agrees that if the Company is unable, after reasonable effort, to secure Employee's signature on any papers serving to further the Company's rights under this section, any executive officer of the Company shall be entitled to execute any such papers as agent and attorney-in-fact, and Employee hereby irrevocably designates and appoints each Managing Director or the General Counsel of the Company as Employee's agent and attorney-in-fact to execute any such papers on Employee's behalf, and to take such actions as the Company may deem necessary or desirable in order to protect its rights and interests in any Inventions, under the conditions described in this sentence. Company agrees to indemnify Employee for any costs or liabilities arising from this section 6.2.

However, this paragraph 6.2 shall not apply to Inventions and Works identified in Appendix A, wherein Employee has identified Inventions and Works that he or she can either not assign to the Company because of a prior commitment, or that he or she have identified as not being the company's Invention or Works. Employee also promises and agrees that he or she will promptly disclose to Company all patent applications filed by Employee or on Employee's behalf within a year after termination of Employee's employment that relate to or concern actual or contemplated Company's business.

6.3.    *Moral Rights*. The term "moral rights" means any rights of attribution or integrity, including any right to claim authorship of a copyrightable work, to object to a modification of such copyrightable work, and any similar right existing under the judicial or statutory law of any country in the world or under any treaty, regardless of whether or not such right is denominated or generally referred to as a "moral right."  Employee forever hereby waives and agrees never to assert any moral rights he or she may have in any copyrightable work that is assigned to Company as a result of this Section, even after any termination of employment with Company.

6.4.    *Personal Inventions*. This Section shall not apply to any of Employee's rights in any invention that Employee develops entirely on Employee's own time without using Company's equipment, supplies, facilities or trade secret information, except for inventions that either: (1) are created during the course of the employee's employment and relate, at the time that the invention is conceived or reduced to practice, to Company's business or to any other trading in securities or other financial markets; or (2) are derived from the Company's Confidential Materials and Information as defined in paragraph 2 of the Agreement regardless of when invented.

6.5.     *Scope*. The restrictions of this Section shall apply whether or not the idea in question was conceived during regular working hours.

7.    **Publications.** Employee shall not submit any writing for publication or dissemination (regardless of format) or deliver any speech that contains any Company Confidential Information, or any description of the Company's business other than a description complying with the last sentence of Section 2.1, except pursuant to advance written clearance from an authorized representative of Company.

Further, while employed by the Company, Employee shall not submit any writing for publication or deliver any speech that contains any information relating to any aspect of the securities business, except pursuant to advance written clearance from an authorized representative of Company.

8.    **Enforcement.** Employee acknowledges and agrees that the restrictions contained in this Agreement are reasonable and necessary to protect the business and interests of the Company and that any violation of these restrictions would cause the Company substantial irreparable injury. Accordingly, Employee agrees that a remedy at law for any breach of the

covenants or other obligations in this Agreement would be inadequate and that the Company, in addition to any other remedies available, shall be entitled to obtain preliminary and permanent injunctive relief to secure specific performance of such covenants and to prevent a breach or contemplated or threatened breach of this Agreement without the necessity of proving actual damage and without the necessity of posting bond or security, which Employee expressly waives.

Employee will provide the Company a full accounting of all proceeds and profits received as a result of or in connection with a breach of this Agreement. Employee hereby agrees to indemnify and hold harmless the Company from and against any damages incurred by the Company as assessed by a court of competent jurisdiction as a result of any breach of this Agreement by Employee. The prevailing party shall be entitled to reasonable attorney's fees and costs, whether or not such costs are allowable as costs under applicable law. If a party prevails on some, but not all issues, the court shall apportion such fees and costs between the parties. It is the express intention of the parties that the obligations of this Agreement shall survive its expiration. Employee agrees that each of Employee's obligations specified in this Agreement is a separate and independent covenant that shall survive any termination of this Agreement and that the unenforceability of any of them shall not preclude the enforcement of any other covenants in this Agreement.

9.      **Notification of New Employer.** Employee authorizes Company to notify Employee's new employer about Employee's rights and obligations under this agreement. The foregoing consent is limited to the delivery by Company to a new employer a signed copy of this Agreement, and any written modifications thereto, and not to any characterization thereof made by Company.

10.     **Governing Law; Actions to Enforce.** This Agreement and its terms shall be construed, enforced and governed by the laws of the State of New York without regard to conflict of law provisions. Nothing in this Section 10 shall affect the right of any party hereto to serve legal process in any manner permitted by law.

11.     **Notices.** All required or permitted notices under this Agreement shall be in writing and shall be effective upon personal delivery or upon deposit in the United States Post Office, by registered or certified mail, postage prepaid, or by overnight mail via Federal Express or by facsimile addressed to the other party at the following addresses:

If to the Company:

Director of Human Resources
Jane Street Group, LLC
250 Vesey Street
New York, NY 10281
(212) 651-6966 (fax)

If to Employee, at address indicated below.

Confidentiality and Intellectual Property
Agreement                                                                        Page 7
January 2018 (US)

Any notice delivered in accordance with the terms hereof shall be deemed received on the third day following the date of mailing, or the day following dispatch by overnight mail or upon transmission if sent by facsimile. Either party may change the address or other information to which notices to such party may be given hereunder by serving a proper notice of such change of address or other information to the other party.

12.     **Successors and Assigns.** This Agreement shall be binding upon and inure to the benefit of both parties and their respective successors and permitted assigns, including any corporation or entity with which or into which the Company may be merged or which may succeed to its assets or business, provided, however, Employee's obligations are personal and shall not be assigned.

13.     **"Blue Pencil" and Severance.** If and to the extent any court of competent jurisdiction finds that any term, provision or clause of this Agreement restricting the post-employment activities of Employee is unenforceable as written because it is unreasonably broad in its scope or duration, the scope or duration of such term, provision or clause shall be construed and enforced to the maximum extent permitted by applicable law, and this Agreement shall be deemed modified and amended to reflect such enforcement. If and to the extent any term, provision or clause of this Agreement is found, by a court of competent jurisdiction, not to be enforceable (even if construed pursuant to the prior sentence if and to the extent applicable), then any such term, provision or clause shall be deemed severed and stricken from this Agreement, and the remaining terms shall remain in force and effect, and shall be construed, to the greatest extent permissible, giving effect to the intentions of the parties with respect to the terms of this Agreement, as reflected herein.

14.     **General Terms.** This is the entire agreement between the Employee and the Company with respect to its subject matter, superseding any prior oral or written, express or implied negotiations and agreements. This agreement may not be changed in any respect except by a written agreement signed by both Employee and an authorized representative of the Company. If any provision of the agreement is held to be invalid, illegal or unenforceable for any reason, the validity, legality and enforceability of the remaining provisions will not in any way be affected or impaired thereby. The delay or omission in exercising any rights under this Agreement, or the failure of either party to insist on strict compliance with any of the terms, covenants, or conditions of this Agreement by the other party, shall not be deemed a waiver of any terms, covenants or conditions of this Agreement, nor shall any waiver or relinquishment of any right or power at any one time or times be deemed a waiver or relinquishment of that right or power for all times or any other time. The captions of the sections of this Agreement are for convenience of reference only and in no way define, limit or affect the scope or substance of any section of this Agreement. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. It is the express intention and agreement of the parties hereto that all covenants, agreements and statements made by any party in this Agreement shall survive the execution and delivery of this Agreement. In addition, this Agreement shall survive termination

of Employee's employment with the Company. If any legal action is necessary to enforce or interpret the terms of this agreement, the prevailing party shall be entitled to reasonable attorneys' fees, costs, whether or not such costs are allowable as costs under applicable law, and necessary disbursements in addition to any other relief to which that party may be entitled.

This Agreement will be binding upon Company, its successors and assigns and Employee's heirs, executors, administrators, and other legal representatives.

By Employee's signature below, Employee acknowledges that Employee has reviewed this Agreement carefully and understands that the covenants and obligations it contains are binding on him/her.

EMPLOYEE                                                    JANE STREET GROUP, LLC

Signature:_____*Daniel Spottiswood*_____
              Daniel Spottiswood (Aug 17, 2020 23:10 EDT)

Print Name:_____Daniel Spottiswood_____           By:_____

Date Signed:_____Aug 17, 2020_____                   Managing Director

Address:_~~201 Rockridge Road San Carlos CA< 94070~~

APPENDIX A

# EXHIBIT B



**Jane Street**

250 Vesey Street
New York, NY 10281

**T** +1 646 759 6000
janestreet.com

March 4, 2024

Daniel Spottiswood
danielspottiswood@gmail.com

Dear Daniel,

This letter confirms our discussion concerning your resignation from Jane Street Group, LLC (together with its affiliates, "Jane Street"), effective February 23, 2024 (the "Separation Date").

**Payment of salary and accrued, unused vacation.** Whether you sign this letter or not, you will receive your base salary and accrued but unused vacation through the Separation Date.

**Benefits.** If you currently have health, dental, and vision insurance through Jane Street, your coverage will end on the last day of the month in which the Separation Date occurs. Pursuant to COBRA, you are eligible to elect continued health, dental, and vision coverage, at your own expense, following this date.  You will be eligible for COBRA continuation coverage whether you sign this agreement or not.  More information about COBRA, including cost and application procedures, has been provided to you separately.  All other employee benefits will terminate in accordance with their terms.

**Consideration.** If you sign and comply with this agreement, Jane Street will provide you with a separation payment in the amount of ▮▮▮▮▮▮▮ess applicable withholdings (the "Consideration"). The Consideration will be paid to you within 30 days after you sign this agreement.

**Profit Interest Award.** In accordance with the terms of the Jane Street Group, LLC Profit Interest Award Agreement (and related plan document), your outstanding award (both the vested and unvested portion) will be automatically canceled as of your Separation Date. With respect to the vested portion of your award, you will receive ▮▮▮▮▮▮ a final adjusted payment for the period of your employment in 2024. This payment will be in full consideration of the canceled vested profit interests.

**Complete Release**.  By signing below, and in exchange for the Consideration described above, you are agreeing that the Consideration is in full satisfaction of, and supersedes, any other written or oral agreements or understandings for compensation or payment between you and Jane Street, and you are agreeing to and hereby release and forever discharge each Jane Street entity and its employee benefit plans and its and their members, partners, employees, fiduciaries, administrators, and its and their successors and assigns, from all grievances, complaints, claims or lawsuits you have or may have against them, whether known or unknown, including without limitation all claims of discrimination, harassment or retaliation in employment under federal, state and local laws such as, but not limited to, the Age Discrimination in Employment Act, the Americans with Disabilities Act, Title VII of the Civil Rights Act of 1964, the New York State Human Rights Law and the New York City Human Rights Law (all as amended). This Complete Release only releases claims relating to events occurring before the execution of this agreement (including any matters relating to your hiring, employment, and separation of employment with Jane Street), and does not apply to claims relating to events that occur after the execution of this agreement. This agreement will be governed by New York law, without regard to conflicts of law principles.

**Return of Jane Street Property.**  You confirm that you have returned any Jane Street equipment and you returned, destroyed, and no longer have any Jane Street documents or files in your personal possession,

other than those relating to your Jane Street employment terms (for example, your offer letter or benefits information).

**Intellectual Property Agreement; Confidentiality.**  By signing this agreement you are also acknowledging that your Confidentiality and Intellectual Property Agreement survives your departure and that you will maintain the confidentiality of the existence and terms of this separation agreement.  Nothing in this paragraph precludes you from confidentially discussing the terms of this agreement with your legal or financial advisors, or from responding truthfully to a valid subpoena, a request by a governmental agency in connection with any investigation it is conducting, or as required by law.  Please note that Jane Street has the right to provide notice of your continuing confidentiality obligations under your Intellectual Property agreement. To this end, you agree to promptly notify Jane Street in writing if you accept employment in finance (or otherwise re-commence work in finance, whether as an employee, contractor, joint venturer, or otherwise). In this notification, you agree to provide us contact information and any other information sufficient for us to be able to directly notify such person or entity of your continuing IP and confidentiality obligations.

**Review.** You have 21 days from the date of this letter to review and consider this agreement before signing it. You may use as much of this 21-day period as you wish prior to signing.

Sincerely,                                                    Agreed and Accepted:

_Kara Tanzer_
Kara Tanzer (Mar 4, 2024 20:49 EST)                           _Daniel Spottiswood_

Kara Tanzer                                                   Daniel Spottiswood

                                                              Date: Mar 20, 2024