**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| JANE STREET GROUP, LLC,<br><br>　　　　　　　　*Plaintiff*,<br><br>　　*v.*<br><br>MILLENNIUM MANAGEMENT LLC,<br>DOUGLAS SCHADEWALD, and DANIEL<br>SPOTTISWOOD,<br><br>　　　　　　　　*Defendants.* | Case No. 24-CV-02783<br>Hon. Paul A. Engelmayer<br><br>**Oral Argument Requested**<br><br>**Filed Under Seal** |

**DEFENDANTS DOUGLAS SCHADEWALD AND DANIEL SPOTTISWOOD'S**
**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S ORDER TO SHOW**
**CAUSE FOR A TEMPORARY RESTRAINING ORDER**

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

Plaintiff's Delay Forecloses Expedited Injunctive Relief.........................................................2

No Factual Allegations That Defendants  Did Anything To *Take* Any Confidential Information..3

No Exhibits Filed (Even Under Seal On AEO Basis)  That Supposedly *Constitute* Confidential
 Information ....................................................................................................................4

Nebulous Descriptions Of The Alleged "Confidential" Information ..............................................5

No Showing That Any Specific "Confidential"  Component Of The Trading Strategy Was Used
 Or Disclosed.................................................................................................................7

Plaintiff's Alleged "Harm" Is Redressable Through Money Damages .........................................7

Defendants' Detailed Declarations With Concrete Evidence ..........................................................8

LEGAL STANDARD ..........................................................................................................11

ARGUMENT .......................................................................................................................11

I. Plaintiff Fails to Establish Likely Success on the Merits ..................................................12

  A. Plaintiff's Claims Are Speculative And Contradicted By Record Evidence .........12

  B. Plaintiff Cannot Establish Breach Of Contract (Counts I-II)................................15

  C. Plaintiff Cannot Establish Misappropriation Under Federal Or New York
   Law (Counts IV-V) ...................................................................................15

II. Plaintiff Fails to Show Imminent Irreparable Harm ........................................................19

III. The Balance of the Equities Favors Defendants A TRO Serves No Public Interest .........22

IV. Alternatively, The Court Should Require a Substantial Bond ...........................................23

CONCLUSION....................................................................................................................24

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

<u>Federal Cases</u>

*Am. Airlines, Inc. v. Imhof*,
  620 F. Supp. 2d 574 (S.D.N.Y. 2009) ....................................................................................19

*Carter v. Sewell*,
  2023 WL 7164304 (S.D.N.Y. Oct. 31, 2023) ........................................................................11

*Cognac Ferrand S.A.S. v. Mystique Brands LLC*,
  2021 WL 2250822 (S.D.N.Y. Jan. 7, 2021)...........................................................................11

*EarthWeb, Inc. v. Schlack*,
  71 F. Supp. 2d 299 (S.D.N.Y. 1999) .....................................................................................19

*Elsevier Inc. v. Doctor Evidence, LLC*,
  2018 WL 557906 (S.D.N.Y. Jan. 23, 2018)...........................................................................17

*Estee Lauder Companies Inc. v. Batra*,
  430 F. Supp. 2d 158 (S.D.N.Y. 2006) ...................................................................................20

*Faiveley Transp. Malmo AB v. Wabtec Co.*,
  559 F.3d 118 (2d Cir. 2009) ............................................................................................20, 21

*General Mill, Inc. v. Champion Petfoods USA, Inc.*,
  2020 WL 915824 (S.D.N.Y. Feb. 26, 2020) ............................................................................4

*Graham Cap. Mgmt., L.P. v. Bongiovanni*,
  2019 WL 632287 (D. Conn. Feb. 14, 2019)...........................................................................17

*Hopkins Hawley LLC v. Cuomo*,
  2021 WL 8200607 (S.D.N.Y. Jan. 8, 2021).............................................................................3

*In re Pfizer Inc. Sec. Litig.*,
  819 F.3d 642 (2d Cir. 2016) ...............................................................................................8, 22

*Janus et Cie v. Kahnke*,
  2013 WL 5405543 (S.D.N.Y. Aug. 29, 2013) .....................................................................3, 19

*Kewazinga Corp. v. Microsoft Corp.*,
  2021 WL 1222122 (S.D.N.Y. 2021) ........................................................................................4

*Kumaran v. Vision Fin. Markets, LLC*,
  2022 WL 18774949 (S.D.N.Y. Aug. 4, 2022) ..........................................................5, 6, 16, 17

*La Jolla Cove Invs., Inc. v. GoConnect Ltd.*,
    2012 WL 1580995 (S.D. Cal. May 4, 2012) ........................................................23

*Marblegate Asset Mgmt. v. Educ. Mgmt. Corp.*,
    75 F. Supp. 3d 592 (S.D.N.Y. 2014) ...................................................................19

*Marsh USA Inc. v. Schuhriemen*,
    183 F. Supp. 3d 529 (S.D.N.Y. 2016) .................................................................24

*QBE Ams., Inc. v. Allen*,
    2022 WL 889838 (S.D.N.Y. Mar. 25, 2022) .......................................................17

*Rodney v. United Masters*,
    2023 WL 2184865 (E.D.N.Y. Feb. 10, 2023) .....................................................16

*Sandoz Inc. v. Cediprof, Inc.*,
    2020 WL 4482634 (S.D.N.Y. Aug. 3, 2020) ...............................................22, 23

*Saye v. Old Hill Partners, Inc.*,
    478 F. Supp. 2d 248 (D. Conn. 2007) ................................................................17

*Synergy Advanced Pharms., Inc. v. CapeBio, LLC*,
    2010 WL 2194809 (S.D.N.Y. June 1, 2010) ......................................................23

*T.C. v. New York State Dep't of Health*,
    2022 WL 17689841 (S.D.N.Y. Dec. 15, 2022) ....................................................3

*Team Rubicon Glob., LTD. v. Team Rubicon, Inc.*,
    2020 WL 3127877 (S.D.N.Y. June 12, 2020) ....................................................24

*Ticor Title Ins. Co. v. Cohen*,
    173 F.3d 63 (2d Cir. 1999) .................................................................................23

*Trading Servs. USA, Inc. v. Kundu*,
    2016 WL 608193 (W.D.N.C. Jan. 5, 2016) .......................................................17

*TRB Acquisitions LLC v. Yedid*,
    2021 WL 293122 (S.D.N.Y. Jan. 28, 2021) .......................................................17

*Turpel v. Canopy Growth Corp.*,
    2023 WL 8276633 (S.D.N.Y. Nov. 30, 2023) ...................................................8, 9

*Vaeso, Inc. v. High Peak Software, Inc.*,
    2022 WL 583641 (S.D.N.Y. Feb. 25, 2022) .......................................................11

*Victorio v. Sammy's Fishbox Realty Co.*, LLC,
    2014 WL 7180220 (S.D.N.Y. Dec. 12, 2014) ....................................................13

**State Cases**

*Eastmore Mgmt., LLC v. Gunta*,
　　2019 WL 2902152 (N.Y. Sup. Ct. July 05, 2019)....................................................................17

**Federal Statutes**

18 U.S.C. § 1836...........................................................................................................................4

18 U.S.C. § 1839.........................................................................................................................16

**Federal Rules**

Fed. R. Civ. P. 65(c) ...................................................................................................................24

Defendants Douglas Schadewald ("Schadewald") and Daniel Spottiswood ("Spottiswood," and together with Schadewald, "Defendants"), by and through counsel, submit this Memorandum of Law in opposition to Plaintiff Jane Street Group, LLC's ("Plaintiff" or "Jane Street") Order to Show Cause for a Temporary Restraining Order.[1]

## INTRODUCTION

Looking past the rhetoric, adjectives and conclusory allegations, Plaintiff's factual allegations boil down to this: Two of Plaintiff's high performers left Jane Street to join a competitor, then Plaintiff's profits dropped, and now Plaintiff wants to use the judicial system to stop their former employees from competing against Plaintiff. Of course, it is not surprising that Plaintiff's profits fell after two of its best traders left. Together, Defendants Schadewald and Spottiswood made more than ███████████ for Jane Street. Declaration of Douglas Schadewald ("Schadewald Decl.") ¶ 68. Towards the end of 2023, both men asked Jane Street for career advancement and an increase in compensation, but Jane Street never made any meaningful commitment. *Id.* ¶¶ 61-63; Declaration of Daniel Spottiswood ("Spottiswood Decl.") ¶¶ 18-19. So Defendants left Jane Street and took their talent elsewhere. *Id.* There is nothing unusual or nefarious about that. It is how fair competition in a free market works.

But now Jane Street apparently regrets its failure to retain two of its top traders, who Jane Street does not want to compete against. Plaintiff's fear of fair competition is betrayed by the fact that, even though it is undisputed that there are no non-compete or garden-leave provisions binding on Defendants, Schadewald Decl. ¶¶ 29-34, Plaintiff in effect ask this Court to impose a non-

---

[1] Defendants address Plaintiff's requests for expedited discovery and an expedited preliminary injunction hearing through a separate letter to the Court.

existent and overly broad covenant not to compete that would bar Defendants from trading India options using their <u>general skill and knowledge</u> that resides solely <u>in their brains.</u>

Plaintiff does <u>not even allege</u>, much less attempt to provide any evidence, that Defendants <u>ever did anything</u> whatsoever to <u>take any confidential information</u>.  For example, Plaintiff does not allege that Defendants took any Jane Street information by downloading it onto a thumb drive, or by emailing Jane Street information to their personal email accounts so that they could use such information to compete after their departure.  Nor does Plaintiff identify any <u>specific methodology</u> that is allegedly both (a) a trade secret or protected confidential information and (b) something that Defendants have ever disclosed or used at Millennium.  This Court should reject Plaintiff's invitation to hold Defendants to a non-existent and breathtakingly broad non-compete agreement to restrain Defendants from using their general skill and knowledge.  Plaintiff comes nowhere close to justifying the "extraordinary remedy" of a temporary restraining order.

### Plaintiff's Delay Forecloses Expedited Injunctive Relief

If the Court addresses the likelihood of success on the merits, Defendants will prevail (*see* <u>Point I</u>, *infra*)—but there is no need for the Court to perform such an analysis, because Plaintiff's own allegations demonstrate that it delayed so long in seeking expedited injunctive relief that it cannot demonstrate such relief is needed to avoid irreparable harm.  Plaintiff alleges that it was aware of the alleged malfeasance here for at least <u>two months</u> (or more)—from approximately February 5 through April 17, 2024—before it finally filed its papers seeking a TRO:  On <u>February 5</u>, Mr. Schadewald resigned from Jane Street[2] and "almost immediately" Jane Street "learned that a new competitor entered and immediately began manually trading in significant volume in the India options market," Complaint ("<u>Compl.</u>") ¶¶ 8, 152.  By that time, Plaintiff already had

---

[2] Schadewald Decl. ¶ 75.

"grave concern regarding [Mr. Schadewald's] possible misuse of its intellectual property." *Id.* ¶ 139.  Within just "days or weeks" of February 5, Plaintiff was certain: it "became apparent that a competitor [Mr. Schadewald] was executing Jane Street's Trading Strategy … directly harming Jane Street in the competitive market."  *Id.* ¶ 8.  Yet, Plaintiff waited to file its motion seeking a TRO until <u>April 17</u>.  That lengthy delay forecloses Plaintiff from now claiming that an expedited injunction is required to prevent imminent, irreparable harm.[3]

**No Factual Allegations That Defendants
<u>Did Anything To *Take* Any Confidential Information</u>**

Plaintiff fails to make <u>any</u> factual allegations—must less provide <u>any</u> concrete evidence—that Defendants did anything whatsoever to <u>take or transfer</u> any confidential information whether by emailing or downloading or transmitting it by any other means.  Instead, Plaintiff offers only speculation—based on utterly unsupported "information and belief"—that Defendants supposedly "have delivered [a] proprietary trading strategy and related confidential information to Millennium," apparently by means of switching employers and bringing their brains with them.  Compl. ¶ 3.

But New York law disfavors the "inevitable disclosure" doctrine—which is "resorted to … *only* in instances where there is *evidence of the actual misappropriation of trade secrets,* or where the plaintiff asserts a claim for *breach of a non-compete agreement*," and there is no non-compete here.  *See Janus et Cie v. Kahnke*, 2013 WL 5405543, at *2 (S.D.N.Y. Aug. 29, 2013).[4]  Likewise, the Defend Trade Secrets Act explicitly states that injunctive relief should "be based on evidence

---

[3] *See e.g. T.C. v. New York State Dep't of Health*, 2022 WL 17689841, at *6 (S.D.N.Y. Dec. 15, 2022) ("It is well established that a plaintiff's significant delay in seeking a preliminary injunction can undermine the argument that the plaintiff will suffer irreparable harm"); *Hopkins Hawley LLC v. Cuomo,* 2021 WL 8200607, at *1 (S.D.N.Y. Jan. 8, 2021) (three-week delay between the allegedly harmful act and Plaintiffs filing a TRO constituted lack of immediacy).

[4] Emphases added throughout unless otherwise indicated.

3

of misappropriation and <u>not</u> merely on the information the person knows." 18 U.S.C. § 1836(b)(3)(A)(i)(I).

## No Exhibits Filed (Even Under Seal On AEO Basis)<br>That Supposedly *Constitute* Confidential Information

Plaintiff's papers also lack evidence demonstrating that the information at issue was actually <u>confidential, proprietary or protectable</u>. Plaintiff fails to attach any exhibits—even under seal and on an AEO basis—showing the Court any information that Defendants supposedly took or used that comes close to being confidential or proprietary. Parties routinely submit such evidence to the court (under seal and on an AEO basis), including, for example, confidential details concerning "source code," "specific algorithms," "proprietary data collection procedures," and the like.[5] Plaintiff does not attach a single alleged representative example. Not even an example involving information that is now stale.

Additionally, Plaintiff fails to provide evidence to support its conclusory allegations that specific alleged components of the Trading Strategy are "confidential." The Complaint (¶ 52) alleges that a litany of items are supposedly "trade secrets"—but Plaintiff's Declaration of Jeff Nanney ("<u>Nanney Decl.</u>") does not even <u>mention</u>, much less attempt to supply any evidence, supporting the notion that many of these items are confidential. The Complaint alleges that the "trade secrets" include "multimodal signals leveraging machine learning (including particular architecture and data sets) to characterize market dynamics at various time scales including code-named signals ███████████ [and] additional signals used for trade implementation, including

---

[5] *See, e.g., Kewazinga Corp. v. Microsoft Corp.*, 2021 WL 1222122, *3–*9 (S.D.N.Y. Mar. 31, 2021) (parties submitted to the court, under seal or with redactions: "confidential details about Microsoft's <u>source code, including specific algorithms</u> and the names of specific variables and functions in that source code"; "confidential technical information … regarding … <u>proprietary data collection procedures</u>, image processing procedures, specific hardware used to perform these procedures"; and, "quantitative details about usage of specific product features").

4

████████████████████████████████████████ " Compl. ¶ 52.  But Mr. Nanney's decla-

ration does not even refer to these "code-named signals."

Moreover, Mr. Nanney's carefully qualified testimony suggests that the "Trading Strategy"
is not confidential, but rather, is known and used by other entities that have nothing to do with
Defendants:  he testifies that "I can state with a high degree of confidence that at the time Mr.
Schadewald left Jane Street and joined Millennium, no other firm was using a similar strategy *to
a similar degree*."  Nanney Decl. ¶ 14.  The fair inference is that Mr. Nanney believes that, to
varying degrees, other entities were using a similar strategy.

<u>**Nebulous Descriptions Of The Alleged "Confidential" Information**</u>

Instead of describing the "Trading Strategy" in concrete and specific terms, Plaintiff uses
descriptions that are extremely general and nebulous.  Mr. Nanney testifies that the "Trading Strat-
egy" is comprised of "insights and techniques" including this "non-exhaustive list": ████████
for forecasting and modeling changes in options prices at various time scales; intra-day market
signals; hedging strategies; methods to leverage the relationship between the prices of derivatives
and their underlying securities in light of latent liquidity asymmetry; and optimization of trade
sizing."  Nanney Dec. ¶ 12.

Plaintiff's "allegations of 'components that provide the trade secrets' are insufficient be-
cause they refer only to general categories of information *that could apply to any [options] trading
strategy*."  *Kumaran v. Vision Fin. Mkts., LLC*, 2022 WL 18774949, at *11 (S.D.N.Y. Aug. 4,
2022) (citation omitted), *report and rec. adopted*, 2022 WL 17540669 (S.D.N.Y. Dec. 6, 2022).
As discussed in <u>Point I.C</u>, *infra*, the nebulous descriptions found deficient in *Kumuran* are just like
the jumble of generalized jargon advanced by Plaintiff here.

It is fair to infer that Plaintiff obfuscates because it has no evidence that Defendants used any specific component of the Trading Strategy that is confidential. Otherwise, Plaintiff would identify and describe the components with specificity, and allege that Defendants misused those identified components. Options trading strategies can obviously be described in plain language using specific and concrete terms that demonstrate what the strategy is, and how it works. For example, Schwab describes the complex "Iron Condor" trading strategy as follows: "An iron condor strategy combines a call spread and a put spread; it involves two call legs and two put legs, all with the same expiration date, generally with consistent distances between strike prices."[6] Schwab goes on to provide an illustrative, step-by-step example of how the strategy is implemented[7]—just the kind of thing Plaintiff could have done here, but did not.[8] *See also* Schadewald Decl. ¶ 74.

In addition to its vague descriptions, Plaintiff also has a grossly overbroad view of what could conceivably be "confidential." Plaintiff goes so far as to redact the following phrases on the basis that they somehow reveal "confidential" information that give it a competitive advantage: "the India options market" (Compl. ¶¶ 31, 32, 41); "the █████████████████████████████████" ███████████" (*id.* ¶ 32); ████████████████████████ (*id.* ¶ 33); and the fact that

---

[6] *Iron Condor*, SCHWAB, https://help.streetsmart.schwab.com/SSCentral/1.0/Content/Iron%20Condor.htm (last visited Apr. 18, 2024).

[7] "Example:
- Sell to Open 1 XYZ 01/17/2015 40.00 Put
- Buy to Open 1 XYZ 01/17/2015 42.50 Put
- Buy to Open 1 XYZ 01/17/2015 45.00 Call
- Sell to Open 1 XYZ 01/17/2015 47.50 Call." *Id.*

[8] Likewise, Forbes describes seventeen options strategies with clarity and specificity, such as "Long and Short Strangles" which Forbes explains "consists of buying a call option with a higher strike price and a put option with a lower strike price." Armaan Joshi, *17 Best Option Trading Strategies You Should Know*, FORBES, (Aug. 18, 2023, 9:48 PM), https://www.forbes.com/advisor/in/investing/best-option-trading-strategies/. Similarly, Investopedia describes ten options strategies with clarity and specificity, such as the "Bull Call Spread" strategy, which Investopedia explains is a strategy pursuant to which "an investor simultaneously buys calls at a specific strike price while also selling the same number of calls at a higher strike price. Both call options will have the same expiration date and underlying asset." Lucas Downey, *10 Options Strategies To Know*, INVESTOPEDIA (Dec. 14, 2023), https://www.investopedia.com/trading/options-strategies/.

"[t]here are two ██████████████ in India" (*id.* ¶ 44).  These redactions of general public knowledge are indicative of Plaintiff's preposterously broad view of the kind of information (all of which resides in Defendants' heads) that is supposedly confidential and protectable.

**No Showing That Any Specific "Confidential"**
**Component Of The Trading Strategy Was Used Or Disclosed**

Even if Plaintiff had provided sufficiently specific descriptions of components of the Trading Strategy that are supposedly confidential, Plaintiff fails to provide evidence that Defendants actually <u>used</u> any particular "confidential" component.  Plaintiff asserts (vaguely) that confidential information exists, and Plaintiff also asserts that Defendants trade in the same market as Plaintiff, but Plaintiff never tells the Court <u>what</u> the allegedly "confidential" component used by Defendants is or was, or how Defendants used or disclosed that particular component.  That is fatal to Plaintiff's motion.

Plaintiff relies instead on a tower of speculation piled upon speculation.  For example, Plaintiff asserts that the fact that an unnamed new entity entered the India options trading market— and the fact that Plaintiff's profits went down—constitute evidence that Defendants misappropriated confidential information and caused harm.  Mot. 15.  But traders' profits inevitably go up and down (particularly in the type of volatile options trading market at issue here, *see* Nanney Decl. ¶ 19); Plaintiff's profitability figures are misleading (Schadewald Decl. ¶ 110); and a drop in profits and the entry of a new participant in the India options market is entirely consistent with healthy and fair competition in the marketplace.

**Plaintiff's Alleged "Harm" Is Redressable Through Money Damages**

Any harm Plaintiff allegedly suffers is fully redressable by money damages, and injunctive relief is therefore improper.  Plaintiff's claims are fundamentally financial in nature:  Plaintiff alleges that Defendants have exploited proprietary trading strategies and information, preventing

7

Plaintiff from making as much money as it otherwise would.  Plaintiff has already purported to quantify its alleged losses[9] and Courts—aided, if necessary, by expert witnesses—are well-equipped to determine what, if any, potential profits were lost by the purported misappropriation. Indeed, Courts regularly evaluate counterfactual scenarios and the impact of exogenous events on markets.  *See, e.g.*, *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 649 (2d Cir. 2016) (discussing expert analysis of counterfactuals in stock-drop cases).

**Defendants' Detailed Declarations With Concrete Evidence**

Against the glaring gaps in Plaintiff's submission discussed above, Defendants have submitted sworn, detailed declarations demonstrating that they have not taken or used any of strategies that could possibly be considered confidential or proprietary.  By way of example only, Mr. Schadewald testified as follows:

*Pre-Existing Knowledge And Expertise.*  Before joining Jane Street, through his years of experience—including at Barclays and as a member of the Trading Advisory Committee of the Chicago Futures Exchange—Mr. Schadewald had already developed deep expertise in trading index-based options—which is the same expertise and experience that he now uses to earn his livelihood at Millennium.  Indeed, when Jane Street hired Mr. Schadewald, Jane Street "acknowledge[d] and recognize[d]"—in writing—his "extensive *prior* experiences in trading ███

████████████   and ████████████████."  Schadewald Decl. ¶ 11 (quoting Ex. A to the Declaration of Rollo C. Baker ("Defs. Ex. 1," or the "2018 Schadewald Agreement") at 1).  During his tenure at Jane Street, nobody there suggested it was unlawful for him to use the knowledge and expertise he gained from his prior experiences at Barclays.  Schadewald Decl. ¶ 28.

---

[9] "[I]n March 2024, profitability decreased by over fifty percent, approximated to be ███████ as of the time of filing this Complaint."  Compl. ¶ 60.

***Jane Street <u>Abandoned</u> Now-Expired Restrictive Covenants***.  In 2018, Mr. Schadewald signed an agreement with restrictive covenants—which Jane Street chose to allow to expire, so that they have no force or effect.  Defs. Ex. 1; Schadewald Decl. ¶ 29.  The 2018 Schadewald agreement included a <u>non-compete</u> provision, a <u>garden leave</u> provision, an <u>employee non-solicit</u> provision, and a ███████████████████████████  Defs. Ex. 1 §§ 1.4, 2, 3; Schadewald Decl. ¶¶ 29-33.  Jane Street had the right to extend all these provisions (instead of allowing them to expire by default).  Jane Street voluntarily elected <u>not</u> to extend these restrictive covenants so that that they are of no force and effect.  Schadewald Decl. ¶¶ 29, 33.

Furthermore, the now applicable Confidentiality Agreements for Mr. Schadewald and Mr. Spottiswood both state that "Company Confidential Information" does <u>not</u> include "information known by [Mr. Schadewald or Mr. Spottiswood] prior to [their Jane Street] employment"; nor "general skills, knowledge and experience gained during [their Jane Street] employment"; nor "information publicly available, generally known, or readily ascertainable from public sources." Plts. Ex. A ("<u>2023 Schadewald Agreement</u>") § 1.3; Plts. Ex. B ("<u>Spottiswood Agreement</u>") § 3.

***No Use or Disclosure Of "Confidential" Information***.  Mr. Schadewald testified unequivocally and without qualification that "***I have <u>not</u> in any way, shape or form, consulted, relied on, or disclosed any of Jane Street's confidential, proprietary, or trade secret information***." Schadewald Decl. ¶ 72 (emphasis in original).  He further testified that "none of [his team's] strategies or [his] team's trades have been based on confidential or proprietary information [he] learned at Jane Street," *id*. ¶ 75, but instead have been based on "commonly known strategies" he used "prior to [his] employment at Jane Street."  *id*. ¶¶ 74-76.

Mr. Schadewald also testified without qualification that (a) he has not used, and has no reason to believe that anybody at Millennium has used, the code-named signals,[10] *id*. ¶ 89; (b) the findings from the 2023 Trading Investigation were stale given publicly available information—and, in any event, his team at Millennium has "not traded on nor benefited from [the] findings," *id*. ¶ 92; (c) █████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

and (e) before Mr. Schadewald arrived at Millennium, Millennium already had in place much of the infrastructure, approvals and broker relationships needed to trade in the India options market, including a pre-existing relationship with the broker Jane Street refers to in Complaint ¶¶ 153-58, *id*. ¶¶ 101-104.

Mr. Spottiswood testified that he fully agreed with these parts of Mr. Schadewald's testimony.  Spottiswood Decl. ¶ 4.

**Supposedly "Confidential" Arbitrage Opportunities Are Public Information**.  Mr. Schadewald testified that supposedly "confidential" options-trading arbitrage opportunities identified by Jane Street have in fact been identified and discussed at length in numerous publicly available articles—and that multiple financial firms across the industry have been entering the India options market or expanding their existing operations, as reported by Bloomberg and other outlets.  Schadewald Decl. ¶¶ 77-85.

---

[10] Plaintiff apparently recognized that it could not support allegations that Defendants used allegedly confidential aspects of the "Trading Strategy" Plaintiff identified in its Complaint.  Plaintiff alleged that the "trade secrets" Defendants supposedly misappropriated ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████ Compl. ¶ 152.  But Mr. Nanney's declaration does not even mention these signals, much less provide any support for the notion that these signals are "trade secrets" or that Defendants used or disclosed them.

***It Is Not Possible That Millennium Caused The*** ████████████. Jane Street alleges that its ████████████████ (between February and March), was profit taken by Millennium. Complaint ¶¶ 59-60. As Mr. Schadewald's testimony shows, that is simply <u>not possible</u>: Millennium's net profits on his team's trading to date is nowhere nea ████████ but instead is only about <u>$4 million</u>. Schadewald Decl. ¶¶ 76. Mr. Schadewald's testimony also demonstrates that the drop in Jane Street's profits is easily explainable by factors that have nothing to do with Mr. Schadewald and his team. *Id.* ¶ 112.

## LEGAL STANDARD

"A temporary restraining order ... is an extraordinary remedy that will not be granted lightly … In considering the appropriateness of a temporary restraining order, courts must examine whether the movant has demonstrated a threat of irreparable harm that will occur *immediately*." *Carter v. Sewell*, 2023 WL 7164304, at *1 (S.D.N.Y. Oct. 31, 2023) (cleaned up) (emphasis in original). "Aside from the issue of immediate relief, the standard for granting a [TRO] and preliminary injunction is the same." *Id.*

"To justify a TRO, a movant must show: (1) irreparable harm absent injunctive relief; (2) either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping [decidedly] in the plaintiff's favor; and (3) that the public's interest favors granting an injunction." *Cognac Ferrand S.A.S. v. Mystique Brands LLC*, 2021 WL 2250822, at *1 (S.D.N.Y. Jan. 7, 2021) (cleaned up). Of these elements, "irreparable harm is the single most important prerequisite for [] issuance [of a TRO]." *Vaeso, Inc. v. High Peak Software, Inc.*, 2022 WL 583641, at *2 (S.D.N.Y. Feb. 25, 2022) (cleaned up).

## ARGUMENT

Plaintiff fails to establish any of the elements required for a temporary restraining order. Its motion should be denied. <u>First</u>, as discussed *infra* in <u>Point I</u>, Plaintiff comes nowhere close to

showing through its declarations—or even sufficiently alleging through its Complaint—that any identifiable part of its vaguely-defined, word-soup "Trading Strategy" is (a) a trade secret or "Confidential Company Information" that (b) Defendants have misappropriated or misused.

Second, as discussed *infra* in Point II, Plaintiff cannot prove irreparable harm. Plaintiff cannot defensibly identify any specific, likely harm that is not redressable by money damages, so Plaintiff's case ultimately rests on the misleading assertion that "[i]rreparable harm is presumed where a trade secret has been misappropriated." Mot. 19. Such a presumption can only ever apply—under settled law and common sense—if Plaintiff first establishes "a danger that [Defendants] will disseminate [trade] secrets to a wider audience or otherwise irreparably impair the value of those secrets." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009). Where "pursuit of profit" from the alleged trade secret is what's at stake, as here, damages are "a complete remedy." *Id*.

Third, as discussed *infra* in Point III, the balance of the equities favors Defendants, and there is no public interest in granting a TRO here. Fourth, as discussed *infra* in Point III, in the event this Court were inclined to issue a TRO, it should require Plaintiff to post a substantial bond as security for the harm Defendants will suffer.

## I. Plaintiff Fails to Establish Likely Success on the Merits

Cutting across each Count in Plaintiff's Complaint is its vaguely pled and unsupported allegation that Defendants are deploying Jane Street's purportedly proprietary and confidential "Trading Strategy" and "related information" (Mot. 10, 16) at Millennium. That allegation—and each legal theory it supports—collapses under scrutiny.

### A. Plaintiff's Claims Are Speculative And Contradicted By Record Evidence

To succeed on any of their theories of liability, Plaintiff must (a) establish the existence of identified "Confidential Company Information" under the governing Agreements or a protected

Jane Street "trade secret" and (b) prove Defendants used that specific confidential or proprietary information in a way that violated their contracts or constitutes misappropriation.

Plaintiff's claims on both prongs are conjectural and thoroughly contradicted by Defendants' evidence, which shows that Defendants trade in India options at Millennium using their general skills, knowledge, and experience. Schadewald Decl. ¶¶ 72-74; Spottiswood Decl. ¶ 22.[11]

First, Plaintiff fails to concretely identify any confidential or proprietary information that constitutes the "Trading Strategy," relying instead on vague and confusing jargon. Through its declarant Jeff Nanney, Plaintiff states that its "Trading Strategy" is based on "inefficiencies in options contracts and the underlying equity assets," Nanney Decl. ¶ 10, and describes the "Trading Strategy" by referring to unspecified "models," "signals,"

id. ¶ 12; see also Mot. 5. This tells the Court nothing concrete or tangible about what the allegedly confidential strategy looks like, or how anyone—including Defendants—allegedly uses it. Nanney goes on to suggest Jane Street's secret is that it takes

hat constitutes a protectable trade secret. Mot. 5 (quoting Nanney Decl. ¶ 13) (emphasis in original); see also Nanney Decl. ¶ 27. Jane Street's italics cannot convert these                                            - into any sort of identifiable and protectable "Trade Strategy" or "Company Confidential Information" that Defendants could possibly have stolen.

Second, Plaintiff's allegation that Defendants "were, in fact, using Jane Street's proprietary Trading Strategy" is equally unsupported. Compl. ¶ 140. Plaintiff does not adduce a single piece

---

[11] Defendants Schadewald and Spottiswood's evidence alone, at a minimum, creates a factual conflict which "justif[ies] denying a preliminary injunction motion." *Victorio v. Sammy's Fishbox Realty Co.*, LLC, 2014 WL 7180220, at *4 (S.D.N.Y. Dec. 12, 2014).

of evidence to suggest that Defendants took with them *any* information, systems, algorithms, or data that Defendants could have then misused at Millennium.  Instead, to show that Defendants must be doing something wrong, Plaintiff relies on facially speculative inferences.  Plaintiff claims that its profits on the Trading Strategy decreased dramatically after Defendants began working at Millennium and asks this Court to infer that Defendants' wrongdoing must have been the cause.  According to Plaintiff, its profit drop in March can be "no mere coincidence."  Mot. 2.

It can, in fact, be a coincidence.  Plaintiff is in the highly volatile business of trading options in an emerging market—its failure to continue generating ████████████████ (Compl. ¶ 57) is hardly a surprise and is not evidence of Defendants' wrongdoing.  Plaintiff's Nanney Declaration itself shows that Jane Street's profitability for example, changed from ████████████ ████████████████████—in <u>one month</u> between April and May 2023, while Defendants still worked at Jane Street.  *Id.*; *see also* Schadewald Decl. ¶ 112(b) ("January was an especially volatile month … March was a relatively calm month by comparison.").

There are other explanations that do not involve wrongdoing by Defendants.  In addition to changes in volatility, Plaintiff's decreased profits between the January-February versus March periods are explainable by a difference in the number of trading days, or ill-advised trading choice, and Jane Street's loss of two highly-skilled options traders—Mr. Schadewald and Mr. Spottis-wood.  *Id.* ¶ 112(a), (c)-(d).  As one of Jane Street's highest-ranking executives told Mr. Schadewald, "your impact on the firm was huge and *I don't know how we can fill the gap left*."  *Id.* ¶ 112(c).

Against Plaintiff's conjecture, each Defendant's sworn declaration affirms that he did not and does not use any confidential or proprietary Jane Street information in his trading at Millennium.  While it is true that Defendants trade options in India and profit on market inefficiencies,

none of that activity draws on protected Jane Street information.  Schadewald Decl. ¶¶ 72-74.  The inefficient India options market is no secret, Schadewald Decl. ¶¶ 77-85, and it is not Jane Street's property, much as Jane Street would like it to be so.

Defendants have, in fact, each gone out of their way to avoid conducting any trades that could conceivably be based on information or methods that are confidential or proprietary to Jane Street.  Defendants are aware of certain Jane Street "Validated Trading Methods"—the code names referenced in Plaintiff's Complaint ¶ 52(1)—but they <u>do not trade using those methods</u>, "even though certain of these trades are based on widely known and discussed patterns and trends."  Schadewald Decl. ¶ 89.

### B.  Plaintiff Cannot Establish Breach Of Contract (Counts I-II)

Plaintiff's breach of contract claims against each of the Defendants fail because Defendants have not deployed—and do not intend to deploy—"Company Confidential Information."  Plaintiff has failed to identify any particular Confidential Information that Defendants allegedly use in their roles at Millennium.  *Supra* at 3-6.  Each Defendants' Confidentiality Agreement expressly <u>ex-cludes</u> from the ambit of "Confidential Information" any "general skills, knowledge, and experience," even if that general skills, knowledge, and experience was "gained during [Defendants'] employment" with Jane Street.  *Supra* at 9 (quoting 2023 Schadewald Agreement § 1.3; Spottis-wood Agreement § 3).  Defendants are entitled to use their general knowledge and skills to trade alongside Jane Street in the India options market, and that is all they have done.

### C.  Plaintiff Cannot Establish Misappropriation Under Federal Or New York Law (Counts IV-V)

On their federal and New York claims for misappropriation of trade secrets (Counts IV-V), Plaintiff must prove that Defendants (a) "possessed a trade secret" and (b) "misappropriated the trade secret."  *Rodney v. United Masters*, 2023 WL 2184865, at *2 (E.D.N.Y. Feb. 10, 2023)

15

(stating that federal and New York law are "fundamentally the same").  To establish the existence of a trade secret, Plaintiff must show that the information at issue is confidential <u>and</u> that it "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person …"  18 USCA § 1839.

    <u>First</u>, Plaintiff's misappropriation claims fail because Plaintiff has not sufficiently identified anything that constitutes a trade secret.  Plaintiff cites a series of cases to support its proposition that "investment firm trading strategies" qualify as a "trade secret."  Mot. 10.  It is true that trading strategies <u>can</u> constitute trade secrets, but a Plaintiff <u>cannot</u> establish a trade secret by referring "only to general categories of information" that could apply to "any [] trading strategy" within a particular market.  *Kumaran v. Vision Fin. Markets, LLC*, 2022 WL 18774949, at *11.

    In *Kumaran*, Plaintiff tried to assert trade secret protection over a "set of options trading and risk management strategies." *Id.* at *10.  It described the ""[s]pecific components that provide the trade secrets of the trading strategy [as] the ***type of option strategy***, combination of options trades placed, ***volumes***, strikes, premiums, delta, gamma, vega, and ***times to expiration***, and the combination and integration of the foregoing' as well as '***the timing and execution of the trades*** …'" and further described the strategy as one that "seek[s] accelerated capital appreciation in ***short time frames***." *Id*.  This mirrors the vague description Plaintiff's offer this Court, *see* Nanney Decl. ¶ 12.  The Court in *Kumaran* found "these allegations too general to plausibly allege the existence of a trade secret." 2022 WL 18774949 at *11.[12]  So too here.

---

[12] *See also TRB Acquisitions LLC v. Yedid*, 2021 WL 293122, at *2 (S.D.N.Y. Jan. 28, 2021) ("Naturally a DTSA plaintiff has no obligation to reveal its secrets in the complaint simply to prove that they exist.  But that does not mean a party can get away with nebulous descriptions at the highest level of generality.") (cleaned up); *Elsevier Inc. v. Doctor Evidence, LLC*, 2018 WL 557906, at *6 (S.D.N.Y. Jan. 23, 2018).

Meanwhile, the cases Plaintiff relies on, where courts have suggested trading strategies may receive trade secret protection, illustrate Plaintiff's shortcomings. In each of those cases, the court relied on (a) evidence of <u>specific documents or recordings</u> that were improperly taken or recorded (absent here), and/or (b) the existence (and alleged misappropriation) of <u>specific, identified programs or algorithms</u> (also absent here).[13]

Plaintiff tries to support its allegation that the nebulous "Trading Strategy" and unidentified "related information" are trade secrets by citing and inaccurately describing a handful of incomplete emails and Slack communications by or between Mr. Schadewald and Mr. Spottiswood. Mot. 10. Nothing in any of those communications defines the purportedly secret "Trading Strategy" that Plaintiff has been unable to articulate, nor do they support Plaintiff's assertion that Defendants consider some part of that "Trading Strategy" to be legally protectable. *See* Schadewald Decl. ¶¶ 41-58 (explaining that (a) **Plts. Ex. C** concerns Mr. Schadewald's surprise at ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; and are explained in countless articles; (b) **Plts. Ex. D** concerns Mr. Schadewald's desire, in March 2023, to avoid making it "widely known that we were building up our India ▮▮▮▮▮▮▮▮▮▮▮▮," and (c) **Plts. Ex. G** concerns Mr. Schadewald's Jane Street group's "profits and loss," not any kind of "Trading Strategy."). In any event, Mr.

---

[13] Mot. 10-11, citing *Title Trading Servs. USA, Inc. v. Kundu*, 2016 WL 608193, at *3, 6 (W.D.N.C. Jan. 5, 2016) (default judgment granted against Defendant, who gave others "<u>copies of [Plaintiff's] proprietary code</u>," and "was secretly taking the [trading strategies] and <u>technologies</u> and deploying and using them for his own gain"); *Eastmore Mgmt., LLC v. Gunta*, 2019 WL 2902152, at *6 (N.Y. Sup. Ct. July 05, 2019) (injunction against Defendant "using, disclosing, or transferring <u>Eastmore's algorithms</u>," where Defendant created a simulation based on, or copying, Plaintiff's algorithm and described Plaintiff's strategy in his resume after being terminated); *Graham Cap. Mgmt., L.P. v. Bongiovanni*, 2019 WL 632287, at *3 (D. Conn. Feb. 14, 2019) ( Defendant secretly recorded information discussed at meetings of Plaintiff business); *Saye v. Old Hill Partners, Inc.*, 478 F. Supp. 2d 248, 274 (D. Conn. 2007) (genuine questions of fact where issue was whether <u>entire "business model*</u>,"* including, for example, "<u>investor lists</u>," "<u>portfolio contents</u>," and "<u>marketing methods</u>," was a trade secret); *QBE Ams., Inc. v. Allen*, 2022 WL 889838, at *7 (S.D.N.Y. Mar. 25, 2022) (defendants "<u>possessed documents</u> alleged by QBE to contain trade secret information").

Schadewald does not use the facts and information reflected in those communications in his ongoing work at Millennium. *Id.*

Second, even if Plaintiff had sufficiently identified a trade secret, it cannot show that Defendants misappropriated any such secret. As described above, Jane Street's reduction in profit in March is exceptionally weak evidence of trade secret misappropriation. Beyond that, Plaintiff asserts only that a Messrs. Schadewald and Spottiswood were trading in the India options market (true, as they were entitled), and that "another blue-chip firm had begun placing ███████████ ████████████████████" Mot. 15. Even if that is true—and even if that blue-chip firm was ██████████████████████████ that Jane Street speculatively believes were based on some sort of "market dynamic heuristic" is not misappropriation of any identified or identifiable trade secret.

Plaintiff's case comes down to speculation that Defendants must be misappropriating trade secrets because they moved to a competitor and trade in the same general market as Jane Street. Plaintiff's logic loosely follows the so-called "doctrine of inevitable disclosure"—which "treads an exceedingly narrow path through judicially disfavored territory," *EarthWeb, Inc. v. Schlack*, 71 F. Supp. 2d 299, 310 (S.D.N.Y. 1999)—and is strictly limited to where "**[a]** there is ***evidence of the actual misappropriation*** of trade secrets, or **[b]** where the plaintiff asserts a claim for ***breach of a non-compete agreement***." *Janus et Cie v. Kahnke*, 2013 WL 5405543, at *2 (S.D.N.Y. Aug. 29, 2013). Likewise, the DTSA states that an injunction against misappropriation may only be based on "evidence of threatened misappropriation and ***not merely on the information the person knows***." 18 U.S.C. § 1836(b)(3)(A); *IDEXX Lab'ys, Inc*, 2022 WL 3042966, at *1–5 (D. Me. Aug. 2, 2022).

This narrow approach to inevitable disclosure doctrine is imperative because a presumption of misappropriation risks effectively "binding the former employee to an implied-in-fact restrictive covenant not to compete to which the former employee never explicitly agreed." *Am. Airlines, Inc. v. Imhof*, 620 F. Supp. 2d 574, 581 (S.D.N.Y. 2009). And that is precisely what Plaintiff seeks here. Plaintiff here did not execute any operative non-compete agreements with Defendants (it made the express choice <u>not</u> to), and using some notion of inevitable disclosure to achieve that end is precluded by New York law. *See Janus*, 2013 WL 5405543 at *2.

## II.   Plaintiff Fails to Show Imminent Irreparable Harm

Plaintiff does not and cannot show that it will suffer "actual and imminent harm"; to the contrary, any harm alleged is "remote or speculative," *see Marblegate Asset Mgmt. v. Educ. Mgmt. Corp.*, 75 F. Supp. 3d 592, 607 (S.D.N.Y. 2014), and compensable through money damages, making an injunction inappropriate. *Id*.

<u>First</u>, Plaintiff's excessive delay in filing this motion demonstrates that there is no "imminent" risk of irreparable harm. Mr. Schadewald told Plaintiff that he intended to trade in Asia ▮▮▮▮▮ when he joined Millennium, Schadewald Decl. ¶¶ 64, and Plaintiff raised no concerns at that time. Plaintiff asserts that "[w]ithin weeks" of Schadewald joining Millenium in February 2024, it was "apparent" that a competitor was "capitalizing on the same opportunity" and thereby harming Jane Street. Compl. ¶ 8. But Jane Street did not file its motion seeking a TRO until April 17. The Court should deny Plaintiff's request to rush a severe and damaging injunction after failing to request intervention after about <u>two months</u> of purportedly "apparent" "harm." *Id*.

<u>Second</u>, Plaintiff is dead wrong when it states—in what becomes the lynchpin of its irreparable harm analysis—that the Court should *presume* irreparable harm here, and that Defendants have a presumption of harm to "overcome." Mot. 19-20, citing *Estee Lauder Companies Inc. v. Batra*, 430 F. Supp. 2d 158 (S.D.N.Y. 2006). As the Second Circuit authority cited by the Court

in *Estee Lauder* states, it is "***not correct***" to state that "a presumption of irreparable harm automatically arises upon the determination that a trade secret has been misappropriated." *Faiveley Transp*., 559 F.3d at 118. Such a presumption "***might*** be warranted" only "where there is a danger that, unless enjoined, a misappropriator of trade secrets will ***disseminate those secrets to a wider audience*** or otherwise ***irreparably impair the value of those secrets***." *Id*.

Here, there is no such danger. Plaintiff does not allege that Defendants have any interest in "disseminat[ion]" of the purported trade secrets. That would make no sense, because if Defendants were misappropriators of the "Trade Strategy" (they are not), they would "have the same incentive as [Plaintiff] to maintain the confidentiality of the secret in order to profit from the proprietary knowledge." *Id*. at 119. And even within the four walls of Millennium, according to Plaintiff's allegations, "Millennium organized Schadewald's trading unit as a 'pod,'" which "does not share its trading strategies with the rest of Millennium." Compl. ¶ 130–31.

Nor is there any sense to Plaintiff's argument that the "combined size of the positions" allegedly taken by Jane Street and Millennium together somehow "destroy[s] the value of the Trading Strategy" by "creating a signal that may be detected." Mot. 22. Even if this were a non-fictional problem (and based on a non-fictional trade secret), Plaintiff itself admits it could manage this risk by "tak[ing] a smaller position and the attendant event smaller profits." *Id*. That is a straightforward admission that the "harm" at issue here is purely profit-based, which means that damages are "a complete remedy." *Faiveley* 559 F.3d at 118–19. In any event, the size of Millennium's options trading in India is small compared to Jane Street's. The assertion that Millennium's volume—which "pales in comparison to Jane Street's massive operation," Schadewald Decl. ¶ 92—is responsible for "a signal that may be detected," Mot. 9, is meritless.

Third, Plaintiff's claim for monetary damages is speculative in light of Plaintiff's utter evidentiary failure. Plaintiff's "evidence" of monetary harm is simply that it is now making less money than it did from trading India options. Plaintiff asks the Court to speculate that it would have continued making substantial profits (apparently in excess of ███████████████ from "market inefficiencies," Compl. ¶ 36, in one of the most heavily traded (and heavily scrutinized) markets in the world.[14] There is no record evidence to support that conjecture.

Regardless, Plaintiff's purported lost profits are compensable through money damages. Plaintiff claims that "the impact on [its] profits is highly uncertain and therefore weighs in favor of a restraining order." Mot. 21. As noted, the impact on its profits are "uncertain" as a result of Plaintiff's choice to ask this Court to simply assume that Plaintiff would have continued generating profits of ███████████████— rather than adducing evidence that would support any such inference. Where, unlike here, a plaintiff does provide appropriate evidence to the court, the court—aided, if necessary, by expert witnesses—is well-equipped to determine what, if any, potential profits were lost by the purported misappropriation or breach of contract. Indeed, courts regularly evaluate complex counterfactual scenarios and the impact of exogenous events on markets. *See, e.g.*, *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 649 (2d Cir. 2016) (discussing expert analysis of counterfactuals in stock-drop cases).[15]

Fourth, Plaintiff point to contractual provisions stating that a breach of confidentiality "***could*** cause … irreparable injury," 2023 Schadewald Agreement § 8, and "would cause …

---

[14] Megha Mandavia, The Wall Street Journal, *Eighty Percent of the World's Stock Options Aren't Traded Where You Think*, March 11, 2024 (https://www.wsj.com/finance/stocks/eighty-percent-of-the-worlds-stock-options-arent-traded-where-you-think-35a46ddc).

[15] Plaintiff's remaining, miscellaneous arguments in favor of a finding of irreparable injury fall even wider off the mark. Plaintiff does not attempt to explain (a) why any of the extremely speculative alleged harm to its reputation or "culture," Mot. 22-23, is not compensable with money damages, or (b) why a temporary restraining order is necessary to avoid that alleged, highly-speculative harm.

irreparable injury," Spottiswood Agreement § 8, asserting that "[t]he Court need go no further." Mot. 20. That's decidedly false. "Quite simply, a party may not contract its way to a finding of irreparable harm, and where (as here) a plaintiff cannot otherwise demonstrate irreparable harm, such provisions do not carry the day." *Sandoz Inc. v. Cediprof, Inc.*, 2020 WL 4482634, at *2 (S.D.N.Y. Aug. 3, 2020). Those provisions "cannot substitute for the factual determination of whether [Plaintiff] has demonstrated actual and imminent irreparable harm," *id.*, and that analysis here shows Plaintiff has not.[16]

## III.  The Balance of the Equities Favors Defendants A TRO Serves No Public Interest

The equities support Defendants, not Plaintiff. Plaintiff continues to trade in the India options market, although it asserts that its profits from that trading have diminished. But if it secures an injunction preventing Defendants from trading in the Indian options market (*i.e.*, "placing orders in the relevant international options and equities markets," Plaintiff's Proposed OTSC at 2), Defendants will be unable to perform the job for which they were hired. And Millennium— a non-party to Defendants' Confidentiality Agreements—will lose the benefit of their trading. Moreover, having elected not to extend Defendants' non-competes, it would be inequitable—and send a chill through the marketplace—if Plaintiff were permitted to enjoin Defendants as if they had a contractual non-compete in place.

---

[16] Plaintiff's citation to *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999) for the proposition that "employment contract's term that 'plaintiff will suffer irreparable harm were [Defendant] to breach the contract's non-compete provision' <u>sufficient to establish element</u>," Mot. 21, is a gross misstatement of what *Ticor Tile* says. *Ticor* held such a provision "<u>might arguably</u> be viewed as an admission," and found that irreparable harm existed based on "<u>several</u>" factors. *Ticor*, 173 F.3d at 68–69; *see also Synergy Advanced Pharms., Inc. v. CapeBio, LLC*, 2010 WL 2194809, at *6 (S.D.N.Y. June 1, 2010) ("the contractual provision providing for injunctive relief [in *Ticor*] was only <u>one reason among 'several'</u> that supported the Second Circuit's finding of irreparable harm"); *La Jolla Cove Invs., Inc. v. GoConnect Ltd.*, 2012 WL 1580995, at *4 n.2 (S.D. Cal. May 4, 2012) (finding "the view in *Ticor Title* that a contractual provision <u>could</u> serve as an admission of irreparable harm [is] unsound" in light of Supreme Court precedent).

The public does not benefit in any way if a hedge fund restrains another hedge fund from trading in an active and competitive market.  To the contrary, market efficiency is harmed if Plaintiff can discourage competition in this way.  While Jane Street purports to "make the world's financial markets more efficient and transparent" (https://www.janestreet.com (Accessed Apr. 18, 2024)), the request for an anti-competitive injunction here is expressly premised on Jane Street's desire to benefit by hiding so-called "signal[s]," Mot. 22, which would make the market less transparent and efficient for all other market participants.

## IV.    Alternatively, The Court Should Require a Substantial Bond

Pursuant to Fed. R. Civ. P. 65(c), the "court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."

Courts in this district are not bound by contractual waivers of Rule 65(c)'s bond requirement and retain discretion, even in the presence of a contractual waiver, to order a bond if necessary to prevent harm that would otherwise arise.[17]  *Marsh USA Inc. v. Schuhriemen*, 183 F. Supp. 3d 529, 538 (S.D.N.Y. 2016) (contractual waiver of bond requirement "is not binding as to the Court's authority to impose a bond"), *amended*, 2016 WL 2731588 (S.D.N.Y. May 3, 2016); *Team Rubicon Glob., LTD. v. Team Rubicon, Inc.*, 2020 WL 3127877, at *2–3 (S.D.N.Y. June 12, 2020).

Defendants refer to Millennium's request for a bond as set forth in its letter brief filed on April 18, 2024.

---

[17] While Defendants Schadewald and Spottiswood have waived the requirement of a bond (but have not divested the Court of its discretion to issue one), Defendant Millennium has entered no such agreement with Jane Street, who cannot use Schadewald and Spottiswood's contracts to escape a bond that would benefit Millennium.

Defendants also respectfully request that the language of any TRO (i) allow Defendants two weeks to unwind the existing trades and (ii) prohibit Jane Street from trading based on its knowledge of Millennium unwinding.  If Jane Street were given advance knowledge that Millennium were required to unwind substantial positions, Jane Street could employ certain trades taking advantage of this information and cause Millennium (and other market participants) further harm. Schadewald Decl. ¶ 115.

<u>**CONCLUSION**</u>

The Court should deny Plaintiff's request for a TRO and grant Defendants attorney fees as the "prevailing party" under the Confidentiality Agreements.  Schadewald Agreement § 8; Spottiswood Agreement § 14.  In the alternative, if the Court does impose injunctive relief, it should (a) require that Plaintiff post a substantial bond due to the damage such an injunction will have on Defendants and (b) impose terms that allow Defendants to unwind existing trades and prevent Plaintiff from taking any steps to profit off of the injunction and forced close-out of Defendant's positions.

Dated: April 18, 2024
     New York, NY

**ELSBERG BAKER & MARURI PLLC**

By:    *s/ Rollo C. Baker*
        Rollo C. Baker
        David Elsberg
        Vivek Tata
        Brian Campbell
        Nicholas Martin
        1 Penn Plaza, Suite 4015
        New York, NY 10119
        (212) 597-2600
        rbaker@elsberglaw.com
        delsberg@elsberglaw.com
        vtata@elsberglaw.com
        bcampbell@elsberglaw.com
        nmartin@elsberglaw.com

        *Attorneys for Defendants Douglas*
        *Schadewald and Daniel Spottiswood*