**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JANE STREET GROUP, LLC,

               *Plaintiff,*

     v.

MILLENNIUM MANAGEMENT LLC,
DOUGLAS SCHADEWALD, and DANIEL
SPOTTISWOOD

               *Defendants.*

Civil Case No. 24-cv-2783

Hon. Paul A. Engelmayer

**AMENDED COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiff Jane Street Group, LLC ("Jane Street"), by and through its undersigned counsel, alleges as follows against Defendants Millennium Management LLC ("Millennium"), Douglas Schadewald ("Schadewald"), and Daniel Spottiswood ("Spottiswood"):

## NATURE OF THE ACTION

1.    This is an action for breach of contract, tortious interference, trade secret misappropriation, unjust enrichment, and unfair competition.

2.    Jane Street dedicated years of time and capital to identify a latent economic opportunity in a specific market and to research, analyze, and develop a confidential and innovative trading strategy to profit from its discovery (the "Trading Strategy"). Two of Jane Street's former employees, Douglas Schadewald and Daniel Spottiswood, were intimately involved in the development and deployment of this specific proprietary strategy and thus possessed knowledge of Jane Street's most valuable proprietary and confidential information.

3.    In February 2024, Schadewald and Spottiswood resigned to join Jane Street's competitor, Millennium. Based on information and belief, despite contractually agreeing not to use or disclose Jane Street's proprietary and confidential strategies and information outside of their

employment with Jane Street, these two former employees have delivered this proprietary trading strategy and related confidential information to Millennium.

4.      Based on information and belief, Millennium offered Schadewald millions of dollars so it could avoid the risk, time, and expense of independently developing its own successful trading strategy; this calculated scheme is providing and/or will provide Millennium an enormous windfall at Jane Street's expense.

5.      Prior to Schadewald and Spottiswood joining Millennium, Jane Street was aware of no evidence indicating that any other market player had discovered or implemented any strategy comparable to the Trading Strategy.  Indeed, when Schadewald worked for Jane Street he explicitly acknowledged that no one else had discovered the target, means, or benefits of Jane Street's particular trading methodologies.  Schadewald and Spottiswood knew the immense value of, and the need to keep secret, Jane Street's Trading Strategy.

6.      Given that Jane Street is a market leader in this space, it expended significant effort and resources to keep its Trading Strategy confidential, as its use by, or disclosure to, a competitor would quickly reduce or entirely eliminate Jane Street's ability to capitalize on this opportunity and significantly harm Jane Street's business, both economically and in other intangible forms.

7.      To this end, Jane Street's confidentiality agreements with employees provide strict protections for Jane Street's confidential information, including intellectual property and trade secrets.  Schadewald and Spottiswood, who participated in the development and implementation of the Trading Strategy, agreed to the terms of the confidentiality and intellectual property agreement as a condition of employment with Jane Street.   This agreement forbids the unauthorized use or disclosure of Jane Street's confidential information, including proprietary trading strategies, and explicitly survives the end of their employment with Jane Street.  In no

uncertain terms, neither Schadewald nor Spottiswood are permitted to disclose Jane Street's proprietary trading strategies to Millennium or to use that confidential information within the scope of their employment at Millennium.

8.      Yet, it has recently become clear that almost immediately after resigning from Jane Street in February 2024, Schadewald unlawfully used and/or disclosed Jane Street's highly valuable, unique, and proprietary Trading Strategy as part of his employment with Millennium. Within weeks of Schadewald starting at Millennium, it became apparent that a competitor was executing Jane Street's Trading Strategy and capitalizing on the same opportunity as Jane Street, directly harming Jane Street in a competitive market.

9.      First, Jane Street's profits from the Trading Strategy have significantly decreased, for the first time in many months, at almost exactly the same time Schadewald began at Millennium. Second, shortly after hiring Schadewald, Millennium targeted and poached Jane Street employee Spottiswood, who was intimately involved with, and has detailed knowledge of, the Trading Strategy due to his managing of its implementation for Jane Street. Third, Millennium has confirmed that Schadewald and Spottiswood are ████████████████████ in the same market as the Trading Strategy. Fourth, immediately following Schadewald starting at Millennium, a new entity entered the same market and has placed orders mirroring the Trading Strategy.

10.      This use and disclosure of Jane Street's trade secrets and confidential information is not only expressly prohibited by the confidentiality agreement, but is also an egregious misappropriation of Jane Street's closely guarded trade secrets in the face of a clear and known duty by both former employees to maintain the secrecy of this information. Millennium is well aware of the continuing obligations Schadewald and Spottiswood owe Jane Street as former

employees, which prohibit use and disclosure of Jane Street's trade secrets and confidential information.

11.     Defendants' use and Schadewald's and Spottiswood's disclosure of Jane Street's Trading Strategy thus violate state and federal trade secret law.  Instead of developing their own trading strategy, Defendants stole the results of Jane Street's long-term and hard-earned investments—its intellectual property and trade secrets.  On information and belief, Defendants are reaping and will continue to reap massive profits from this theft.

12.     Jane Street's success is derived, in part, from an open and collaborative culture that allows talented and skilled employees to identify market opportunities and develop strategies to execute on those.  Jane Street's collaborative culture is profoundly important to its business and has distinguished it from competitors for decades.  As a matter of this collaborative culture, Jane Street does not typically require employees to sign non-compete agreements, but it does strictly enforce the protection of its intellectual property through confidentiality agreements.

13.     Never before has Jane Street, in the 24 years the firm has existed, filed a legal action against a former employee—for misappropriation of trade secrets or anything else.  As with any firm, employees have left Jane Street to pursue other opportunities, often with competitors.  Such competition by former employees, when lawful, is expected and Jane Street has no issue with such departures.  However, Jane Street cannot simply surrender its confidential information and trade secrets to former employees who breach their confidentiality obligations for, and to the benefit of, competitors.  Therefore, Jane Street files this suit as part of its mandate to protect its intellectual property and in order to stop the severe and immediate harm caused by Schadewald's and Spottiswood's breach of their confidentiality and intellectual property obligations and

Millennium's use of Jane Street's trade secrets to gain an immediate and unfair competitive and commercial advantage.

14.     In light of Defendants' misappropriation of Jane Street's Trading Strategy and other improper conduct, Jane Street brings this Complaint to prevent any further misuse of its confidential and proprietary information, to prevent Defendants from further harming Jane Street, and to obtain compensation for its damages and for Defendants' unjust enrichment resulting from their unlawful conduct.

15.     Jane Street therefore seeks damages and specific performance to stop these egregious violations of confidentiality agreements, the misappropriation of Jane Street's trade secrets, and other wrongdoing by Defendants.

## THE PARTIES

16.     Plaintiff Jane Street Group, LLC (defined above as "Jane Street") is a global proprietary trading firm in the financial services industry.  Jane Street employs more than 2,600 people in five offices across the United States, Europe, and Asia and trades in 45 countries.  Jane Street is a Delaware limited liability company with its principal place of business in New York, New York.

17.     Defendant Millennium Management LLC (defined above as "Millennium") is an investment management firm and hedge fund with more than $60 billion in assets under management.   Millennium employs approximately 5,500 people in 17 offices across North America, Europe, and Asia.  Millennium is a Delaware limited liability company with its principal place of business in New York, New York.

18.     Defendant Douglas Schadewald (defined above as "Schadewald") is an individual residing in New York, New York and a current employee of Millennium.  Schadewald is a trader who was employed by Jane Street from October 1, 2018 to February 5, 2024.

19.     Defendant Daniel Spottiswood (defined above as "Spottiswood") is an individual residing in Hong Kong and a current employee of Millennium.  Spottiswood is a trader who was an intern during the summer of 2018 and employed by Jane Street from August 17, 2020 to February 23, 2024.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because this is an action arising under the laws of the United States, namely the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq*.  To the extent this action implicates state law doctrines, the Court has supplemental jurisdiction over such claims pursuant to 28 U.S.C. § 1367(a) as the state law claims are part of the same case or controversy.

21.     The Court has general personal jurisdiction over Schadewald and Millennium because Millennium's principal place of business is in New York and Schadewald resides in New York.  Additionally, through his confidentiality agreement with Jane Street, Schadewald submitted to the personal jurisdiction of the courts of the State of New York and the United States District Court for the Southern District of New York.  Schadewald IP Agreement § 9.

22.     The Court has specific personal jurisdiction over all Defendants because Schadewald and Spottiswood were formerly employees of Jane Street, a New York-based company; entered into confidentiality agreements with Jane Street governed by the laws of the State of New York, under which Schadewald and Spottiswood gained access to the proprietary and confidential information from which the asserted claims arise; and were employed by Millennium, a New-York based company, when they intentionally and purposefully misappropriated, used, and/or disclosed Jane Street's trade secret information and breached their contractual obligations to Jane Street for the benefit of Millennium.

23.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391 because Millennium and Schadewald's principal places of business and residence are within this District and because a substantial part of the events giving rise to the claims against all Defendants occurred within this District. Additionally, through their confidentiality agreements with Jane Street, Schadewald and Spottiswood consented to this venue in a forum selection clause designating the County and State of New York as the exclusive venue. Schadewald IP Agreement § 9, Spottiswood IP Agreement § 10.

## FACTUAL ALLEGATIONS

### A.     Jane Street Develops And Protects Successful Proprietary Trading Strategies

24.     Jane Street specializes in developing innovative quantitative and technological trading strategies that allow it to outperform competitors in the marketplace. It employs researchers, engineers, and traders with exemplary quantitative and technological skills to research, develop, and implement unique and proprietary trading strategies.

25.     Financial markets are notoriously efficient—but not perfectly efficient. That means that through the investment of resources and skillful analysis, management, and execution, it is possible to gain an edge on competitors in the marketplace (that is, to identify, develop, and implement trading strategies that others have not). The successful proprietary trading strategies developed by Jane Street are not readily known or ascertainable by other market participants and, as a result, give Jane Street a competitive advantage. This competitive advantage is the return Jane Street receives on its investment in its intellectual property, which it develops at significant cost.

26.     Jane Street's cultivation of highly confidential intellectual property has allowed it to grow from a handful of employees at its founding in 1999 into one of the most successful liquidity providers in financial markets around the world in 2024. Jane Street's success over the past decades is due, in part, to its research, analysis, development, implementation, and execution

of proprietary trading strategies.  Jane Street deploys this confidential intellectual property to earn trading profits that regularly outperform competitors and, in turn, its traders, software developers, researchers, technologists, and other team members are rewarded with highly competitive compensation awards.

27.    In short, Jane Street's exponential growth is no accident: it is the result of capital, time, and work, invested and deployed by highly-skilled employees to develop unique knowledge of global markets, in the form of, *e.g.*, the quantitative and qualitative analysis and characterization of market dynamics and signals, the testing and validation of predictive models and heuristics, and the implementation and refinement of strategies that leverage the insights and understanding gained from those efforts.  Taken together, from research to execution, these trading strategies are confidential intellectual property and trade secrets that are the foundation of Jane Street's highly successful trading business.

28.    Given how critical its innovative trading strategies are to its success and growth, Jane Street protects the proprietary trading strategies it develops.  As part of their terms of employment, all personnel at Jane Street are required to sign confidentiality agreements that protect Jane Street's confidential information, including its intellectual property and trade secrets. These agreements forbid the disclosure of Jane Street's confidential information, except as authorized by Jane Street, including to any subsequent employers.

29.    Jane Street also limits access to highly sensitive trading data, strategies, and algorithms.  Jane Street uses password-protection and restrictive-access and encryption protocols to prevent unauthorized viewing and/or sharing of restricted information.  Jane Street also uses external security measures, including, *e.g.*, limiting access to physical facilities and requiring security badges for entrance and exit.

B.    **Jane Street's Intellectual Property**

1.    **Background**

30.    Jane Street's substantial and sustained investment in its proprietary trading strategies has made it one of the most successful trading firms in the world.  Jane Street's performance is among the best in its industry, yielding significant trading profits and bolstering its reputation as an industry leader.  This market leading position and Jane Street's internal culture has enabled Jane Street to recruit and retain the highest caliber candidates, both from top tier universities as well as highly qualified specialists already in the industry.  For these reasons and others, Jane Street's proprietary trading strategies and the intellectual property associated with them are some of Jane Street's most valuable assets.

2.    **Development And Implementation Of The Trading Strategy**

31.    Beginning in 2018, Jane Street deployed significant resources, including time and capital, to determine the viability of, and potential trading strategies for, ███████████████.

32.    To this end, Jane Street dedicated its algorithmic team and assigned manual traders to research and characterize ██████████████████████████████████ in order to identify and quantify potential opportunities.

33.    Building upon the years-long effort and findings of the algorithmic team and manual traders, Jane Street identified a set of █████████████████████ ██████████████████████████████████████ ██████████████ opportunities in different segments of ████████████████.

34.    The understanding and insights that resulted from this analysis and research, as well as the magnitude of the potential opportunities, were counterintuitive, unexpected, and initially met with significant skepticism and incredulity internally at Jane Street.  However, the results of

Jane Street's analysis and research indicated there was tremendous potential opportunity if the trading concepts could be further developed and applied.

35.     To validate and further develop these trading concepts, Jane Street continued its algorithmic and trading research and analysis.

36.     For example, in 2023, Jane Street implemented a program of ████████████ ████████████ to its trading (the "2023 Trading Investigation").  Through this program, aided by Jane Street's highly confidential knowledge of market modeling developed by dozens of traders and researchers over more than a decade, Jane Street investigated and identified signals that indicated market inefficiencies and traded in a manner specifically designed to evaluate and corroborate the ██████████████████████████.

37.     Jane Street risked substantial capital in trading activity to better understand (and verify) the tremendous opportunity presented by the Trading Strategy.  Jane Street employees working on the 2023 Trading Investigation understood, due to the uncertainty and potential exposure of the trading, the need for "creative" and "expensive" investigatory trades: "we've come to a fairly similar conclusion with ███████████████████████████ ████████████████████████████████████████████ ██████████████████████████ Spottiswood agreed with this assessment and stated, "this might be the best option given our uncertainty."  Schadewald also agreed that the investigation employed "creative ideas" and "sacrificing … to figure out ██████████████ ███████████████ is probably a really good investment."

38.     Specifically, the 2023 Trading Investigation concerned ████████████████ ████████████████████████████████████████ as compared to ████████ ████████████████████.

39.     The analysis of the results of the 2023 Trading Investigation confirmed Jane Street's initial findings—notwithstanding their facial improbability—and revealed that the market was ██████████████████████████████ for certain classes of trades in the presence of specific market signals and underlying conditions.

40.     Through the 2023 Trading Investigation, Jane Street identified certain signals and strategies, and methods of analyzing and interpreting those signals, that enabled Jane Street to reliably predict future market activity.  Jane Street could then trade profitably based on these predictions.  Jane Street further optimized the profitability of the Trading Strategy by developing a set of heuristic methods to characterize and predict market conditions and corresponding trading opportunities.  Figuring out these heuristics and methods relied on Jane Street's technological and research infrastructure, leveraged the efforts of many of Jane Street's most talented researchers, and built upon Jane Street's decades-long investment in its platform.  Jane Street also utilized algorithmic and machine learning techniques to determine and refine the relevant heuristics— highly bespoke and tailored to this particular market—which could then be implemented through ████████████████████████████████████████████.

41.     Following corroboration of the initially counterintuitive findings, Jane Street implemented a unique trading strategy using the heuristics and methodologies specific for ████████ ████████████████.

42.     As a critical component of this work, Jane Street leveraged and refined intellectual property regarding the quantification and characterization of ████████████████████████ ████████████████████████████████████████████ ████████████████████████████████ This identification and validation was possible only due to the specific knowledge of the market's latent inefficiencies

11

gained from its research and analysis through the 2023 Trading Investigation.   The resulting trading heuristics would prove to be immensely valuable.

43.     After this discovery, more research and development was necessary in order to implement the Trading Strategy.

44.     ████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████

45.     To deploy its trading strategy, however, Jane Street developed methods to quantify and predict ████████████████████████████████████████████████████
████████████

46.     Jane Street deployed several methods for this type of quantification and prediction. These methods included the development and testing of actionable heuristics based on information concerning ████████████████████████████████████████ trading.   In addition to these actionable heuristics, Jane Street designed and tuned specially created market signals and models, all of which were proprietary to Jane Street and collateral to the Trading Strategy.

47.     Jane Street continually worked to improve its understanding of the latent market inefficiencies (and their evolution) to optimize the Trading Strategy, including both the triggering conditions and the specific positions taken.

48.     Over time, Jane Street's research and identification of this particular market, as well as its development and optimization of the Trading Strategy, including the associated signals and

models, yielded significant and consistent returns on its substantial investment of time and resources.

49.     From inception to date, this effort grew from five to approximately twenty-five team members, and involved enormous amounts of time and capital invested by Jane Street and its employees.  The result of this effort—the innovative and proprietary techniques that capitalized on an undiscovered opportunity—was Jane Street's Trading Strategy.

50.     This strategy, and related confidential information developed through Jane Street's years-long efforts to hone and implement the strategy, encompasses the identification, characterization, validation, and implementation needed to capitalize on a latent and valuable opportunity in a market that no other competitor, despite tremendous economic incentive, had discovered.

51.     Despite the profitability of the Trading Strategy, Jane Street is aware of no competitor which has implemented a similar strategy—until Defendants did.  Due to market dynamics and constraints, the entrance of a large competitor employing the same strategy at scale could not go unnoticed.

52.     The trade secrets involved in the development and implementation of the Trading Strategy fall into at least the following categories:

(1) **Validated Trading Methods:**  The validated methods of trading based on research, experimentation, and optimized implementation, including: **A)** the development of key signal information and insights ████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████████, multi-modal signals leveraging machine learning (including particular architecture and data sets) ████████████████████████████████████████████

████████████████████████████████████████████████ **B)** methods and heuristics to interpret such key signal information to more accurately predict ████████████████████; **C)** trading methods and heuristics to optimize trading profits, including optimization and fine-tuning of █████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ and **D)** the profitability of employing these methods.  Due to the opacity of market information, a competitor without knowledge of the Trading Strategy would be unable to identify or mimic Jane Street's trading.

(2) **Results of Time and Capital Investment From Research and the 2023 Trading Investigation:**  Knowledge of the ████████████████████████ ████████████████████████ due to the understanding of certain market dynamics acquired, *e.g.*, from having risked capital through the 2023 Trading Investigation.  The markets' ████████████████████████████████████████████████████ is counter-intuitive and was met with significant skepticism at Jane Street, necessitating the need for the investigation to validate underlying assumptions about ████████████████████████████████████████████

(3) **Intra-Day Models:**  Intra-day models outputting ████████████████████ ████████████████████████████████████████████████████████████ to inform and trigger trading, as described in (1), based on ████████████████████ ██████████████ as well as the parameters for, tuning of, and training data curation for intra-day models.

53.     The success of the Trading Strategy is difficult to overstate.  In short, due to Jane Street's time, effort, and discoveries, the Trading Strategy grew from ████████████████████ in its early stages to ████████████████████

54.     During his time at Jane Street, Schadewald stated that the Trading Strategy was "incredibly valuable," "super valuable," and continually emphasized to leadership "how valuable the trading is."  Schadewald also repeatedly stressed how unusual and counterintuitive the Trading Strategy was.

55.     Spottiswood agreed and was "consistently shocked" by the success of the Trading Strategy.

56.     From 2018 to 2022, during the course of initial research, experimentation, and development of the Trading Strategy, Jane Street's profit was not insignificant, ███████████ ███████████. In 2023 and 2024, however, the strategy came to full maturity.

57.     In the first half of 2023, profitability grew from ████████████████ ████████████ Those numbers rose by multiples in the second half of 2023: averaging approximately ██████████  ████████████████ ████████████ and reaching approximately ████████████████. The Trading Strategy maintained this level of profitability in January and the first half of February 2024.

58.     In all, the Trading Strategy took many months to develop, implement, and optimize iteratively, and was possible only due to the years of effort invested to identify and quantify the latent inefficiencies in ████████████. The confidential information, intellectual property, and trade secrets used in the Trading Strategy are highly valuable to Jane Street and would be highly valuable to any competitor in the investment and trading industries.

59.     On information and belief, the Trading Strategy was innovated by, and unique to, Jane Street, and remained unique to Jane Street until Schadewald, Spottiswood, and Millennium misappropriated Jane Street's intellectual property and trade secrets.

60.     Within days of Schadewald's joining Millennium, Jane Street's profits attributable to the Trading Strategy decreased substantially, and the decrease accelerated in the period following Spottiswood's start at Millennium. Despite regular growth beforehand, in March 2024, profitability decreased ██████████████████████ as of the time of filing this Complaint. The acute change following the former employees' departure is also apparent on shorter timescales. For example, profit in the two weeks preceding Schadewald's departure on Feb 5 was ████████████████ whereas profitability in the first two weeks

of March, by which time, on information and belief, Schadewald was actively trading based on misappropriated Jane Street confidential information, ██████████.

**C.** **Schadewald And Spottiswood Worked On And Learned Of The Trading Strategy While Employed By Jane Street, And Agreed Not To Use Or Disclose The Trading Strategy Outside Of Jane Street**

**1.** **Schadewald's Employment At Jane Street**

61. Schadewald joined Jane Street in October 2018 as a trader. From 2018 to 2024, Schadewald headed the SPX options trading desk and reported to Andrew Westerdale. His responsibilities included managing activities on three trading desks.

62. Prior to joining Jane Street, Schadewald's only other employment as a trader was at Barclays Capital, where his final role was "Head Risk Manager and Market Maker of SPX options, Variance Swaps, and VIX Futures."

63. Upon information and belief, Schadewald had no significant experience trading in ██████████ prior to joining Jane Street.

64. In his role as a trader at Jane Street, Schadewald was involved in many aspects of researching, developing, and implementing Jane Street's proprietary trading strategies.

65. Schadewald had access to Jane Street's research and analysis and interacted with Jane Street's researchers, engineers, and traders on a day-to-day basis and attended regular senior staff meetings concerning the implementation of trade strategies.

66. Due to his role and responsibilities, Schadewald was intimately involved in the development, refinement, and execution of the Trading Strategy.

67. On February 5, 2024, after more than five years at Jane Street, Schadewald verbally provided notice to Jane Street that he had accepted an offer from Millennium just days prior.

16

68.     Schadewald executed a separation letter on February 7, 2024, receiving ██████ ████████████████████████ in consideration for, *inter alia*, reaffirming his ongoing confidentiality obligations, as discussed below, and included within the separation letter:

> Intellectual Property Agreement; Confidentiality. ***As a material term of this agreement, you acknowledge that you have ongoing obligations to adhere to Confidentiality and Intellectual Property Agreement that survive your departure*** from Jane Street and you agree to comply with the Confidentiality and Intellectual Property Agreement.  It is also a material term of this agreement that you will maintain the confidentiality of the existence and terms of this separation agreement.

(a)     ***Schadewald Agrees To The IP Agreement, Which Protects Jane Street's Confidential And Proprietary Trade Secret Information***

69.     To protect Jane Street's confidential information, including its intellectual property and trade secrets, Schadewald was required to execute and agree to be bound by agreements stipulating to the confidentiality of Jane Street's intellectual property and trade secrets as part of his terms of employment.

70.     Schadewald first signed a confidentiality agreement with Jane Street in October 2018.  Schadewald signed a revised version in December 2023 (the "Schadewald IP Agreement"). The two agreements were substantively identical with respect to the prohibition of unauthorized disclosure of Jane Street's confidential information and intellectual property.

71.     The Schadewald IP Agreement, dated and executed on December 22, 2023, broadly requires, *inter alia*, that Schadewald maintain the confidentiality of any confidential information, intellectual property, or trade secrets owned, used, or developed by Jane Street, including any confidential information or intellectual property or trade secrets developed by Schadewald himself while employed by Jane Street, and forbids the unauthorized disclosure of any such confidential information, intellectual property, or trade secrets to third parties, including any future employers of Schadewald.

72.     The Schadewald IP Agreement protects Jane Street's confidential and proprietary trade secret information and Jane Street's rights in view of Schadewald's development of, and access to, Jane Street's confidential information as an employee of Jane Street.

73.     Schadewald agreed to abide by the provisions of this agreement in consideration of his employment and continued employment by Jane Street, including his monetary compensation thereunder.

74.     The Schadewald IP Agreement defines "Confidential Information" as "any and all proprietary and/or confidential information [] which is now or hereafter owned, possessed, developed, or used by or on behalf of [Jane Street], [] in all cases whether reduced to writing, maintained on any form of electronic media, or maintained in [Schadewald]'s mind or memory, and the physical embodiments of such information in any tangible form . . . ."  Schadewald IP Agreement § 1.1.

75.     It further provides that Confidential Information includes:

> *any and all proprietary trading systems* [] (including algorithms[]), 'black box' systems [], analytical and evaluative tools, computer code and proprietary software, information about *what products the Company or its affiliates trade, the methods used to trade those products, the Company's or its affiliates' profitability*, internal business procedures, controls, plans, suppliers, *research and development, discoveries or improvements,* the identity of vendors, customers and counterparties and their respective information, clearing arrangements, clearing and commission rates, computer system passwords and other computer security controls, financial information, personal employee data, and all other information concerning or relating to the way the Company or its affiliates conduct its or their respective business which is not generally known to the public or within the industry.

Schadewald IP Agreement § 1.2 (emphasis added).

76.     Confidential Information does not include "information, knowledge, or data that constitutes general skills, knowledge and experience," "information known by the Undersigned prior to the Undersigned's employment," or "information publicly available, generally known or

readily ascertainable from public sources," *however,* the Schadewald IP Agreement required that Schadewald acknowledge that a "combination, integration or compilation of such information, either with or using [] Confidential Information, *is itself [] Confidential Information.*" Schadewald IP Agreement § 1.3 (emphasis added).

77.     The Schadewald IP Agreement is clear that all Confidential Information "shall be used for the exclusive benefit of the Company both during *and after employment or association with the Company.*"  Schadewald IP Agreement § 2.1 (emphasis added).  Further, Schadewald agreed that "[d]uring and after employment or association with the Company, [he] is not allowed to sell, license or otherwise appropriate, exploit or use any products which embody or otherwise exploit in whole or in part any [] Confidential Information or materials."  *Id.*

78.     Schadewald repeatedly agreed that his contractual obligations with respect to Jane Street's Confidential Information survive the term of his employment with Jane Street: "during and after employment or association with the Company, including after retirement or other separation from employment or association for any reason [Schadewald] will not disclose in writing, orally or by electronic means, any [] Confidential Information, directly or indirectly, to any other person or entity for as long as the [] Confidential Information remains confidential." Schadewald IP Agreement § 2.2.

79.     Schadewald agreed that his "use or disclosure" of Jane Street's Confidential Information "will harm the company."  Schadewald IP Agreement § 2.2.

80.     Schadewald also agreed that "all [] Confidential Information, whether prepared by [Schadewald] or otherwise coming into [his] possession, shall remain the exclusive property of the Company."  Schadewald IP Agreement § 2.4.

81.     Schadewald acknowledged that Jane Street's Confidential Information *"includes trade secrets of the Company which derive independent economic value from not being readily known to or ascertainable by others; that reasonable efforts have been made by the Company to maintain the confidentiality of such information; that such information is the sole property of the Company . . . ."* Schadewald IP Agreement § 2.6.

82.     Further, Schadewald agreed that "any [] use of such information by [Schadewald] except in the course of performing services for or duties to the Company ***shall constitute misappropriation.***" Schadewald IP Agreement § 2.6 (emphasis added).

83.     Schadewald also acknowledged that "misappropriation of [] Confidential Information in breach of this Agreement may subject the [Schadewald] to criminal liability under the Defend Trade Secrets Act of 2016, [] entitle the Company to injunctive relief, and require [Schadewald] to pay compensatory damages, double damages, and attorneys' fees." Schadewald IP Agreement § 2.6.

84.     Schadewald agreed that "all intellectual property, including trade secrets, [] discoveries, concepts, [] know-how, [] models, methods, techniques, [and] processes [] that is created, conceived, [or] developed by [Schadewald] shall belong to and be the sole and exclusive property of Company" if developed by Schadewald in the performance of his duties for Jane Street; if developed using Jane Street's Confidential Information or its resources; or if the intellectual property "fall[s] within the scope of the Company's actual or contemplated business, including the Company's [] anticipated research or development, or relates to trading or financial markets." Schadewald IP Agreement § 4.1.

85. The Schadewald IP Agreement also provides that its terms "will continue in effect after the termination of [Schadewald]'s employment for any reason."  Schadewald IP Agreement § 6.

86. Schadewald further acknowledged that "the restrictions contained in this Agreement are reasonable and no greater than necessary to protect the business and interests of the Company [] and that a violation of these restrictions could cause the Company [] substantial irreparable injury and that monetary damages may not be adequate relief."  Schadewald IP Agreement § 8.

87. Schadewald agreed that Jane Street may seek specific performance and injunctive relief, including a temporary restraining order, if he breached the agreement: "In the event of a breach or threatened breach by the Undersigned of [] this Agreement, the Company, in addition to being entitled to exercise all rights granted by law, will be entitled to specific performance of its rights under this Agreement without proving actual damages.  Accordingly, [notwithstanding the IP Agreement's arbitration provisions] the Company, at its discretion, may seek and/or obtain from a court a temporary restraining order, preliminary injunction, permanent injunction, or any other comparable injunctive relief."  Schadewald IP Agreement § 8.

88. Schadewald also agreed that, in the event of his breach, Jane Street would be entitled to recover all costs and expenses, including attorneys' fees: "the prevailing party in any action brought pursuant to this Section 8 [regarding specific performance and injunctive relief] shall be entitled to recover all costs and expenses (including attorneys' fees) incurred in connection with the enforcement of its or their rights hereunder."  Schadewald IP Agreement § 8.

89.     Finally, *inter alia*, the Schadewald IP Agreement is to be construed, enforced, and governed by the laws of the State of New York without regard to conflict of law provisions. Schadewald IP Agreement § 12.

90.     As described above, per the agreement, Schadewald's obligations to maintain the confidentiality of Jane Street's intellectual property and trade secrets, and to use any intellectual property and trade secrets exclusively for Jane Street's benefit, survived his departure from Jane Street.  Barring authorization from Jane Street, Schadewald was forbidden from disclosing Jane Street's confidential information, including proprietary trading strategies, to Millennium.

91.     Schadewald, an experienced and sophisticated participant in the financial services and trading industries, had an opportunity to review both agreements and consult with an attorney before agreeing to their terms.  Schadewald was undoubtedly aware of the restrictions upon joining Millennium, including because he signed the revised Schadewald IP Agreement just six weeks before resigning.

>        **(b)     *Schadewald Understood The Trading Strategy Was Jane Street's Confidential And Proprietary Trade Secret Information***

92.     Schadewald understood his IP Agreement encompassed the Trading Strategy.

93.     For example, Schadewald repeatedly referred to the Trading Strategy as "IP sensitive" and stressed the need for secrecy to ensure that other employees were "not talking to brokers or friends about [the Trading Strategy]."  And, he encouraged his superiors to remind the trading team of "how serious this potential IP leakage is."

94.     Schadewald repeatedly emphasized that Jane Street's Trading Strategy was "new and IP sensitive" and something Jane Street "definitely dont [sic] want people knowing."

95.     For further example, Schadewald suggested that Jane Street take the extraordinary step of removing the Trading Strategy's profits from Jane Street's "PNL" (internal financial

records tracking profits and losses) because it was so profitable that it might attract undue attention and increase the risk of a confidentiality breach and emphasized the need to instill in junior team members "how IP sensitive … ███████████████."

### 2.    Spottiswood's Employment At Jane Street

96.    Spottiswood interned with Jane Street during the summer of 2018 and worked at Jane Street full-time between August 17, 2020 and February 23, 2024.

97.     Throughout his employment, Spottiswood was a trader on the options trading desk and reported to Schadewald, until Schadewald's resignation from Jane Street.  His responsibilities included researching, developing, and implementing Jane Street's proprietary trading strategies, including management of the implementation of the Trading Strategy.

98.    Spottiswood had access to Jane Street's research and analysis and interacted with Jane Street's researchers, engineers, and traders on a day-to-day basis.  He, like Schadewald, was intimately involved in the development, refinement and execution of the Trading Strategy, and worked closely with Schadewald on the same.

99.    After three and a half years at Jane Street, Spottiswood resigned on February 23, 2024.  On a phone call with Jeffrey Nanney on March 11, 2024, he informally shared the identity of his new employer.

100.    Spottiswood executed a separation letter on March 20, 2024, receiving ███████████ ████████████████████████████ in consideration for, *inter alia*, reaffirming his ongoing confidentiality obligations, as discussed below, and included within the separation letter:

> **Intellectual Property Agreement; Confidentiality.**  By signing this agreement you are also acknowledging that *your Confidentiality and Intellectual Property Agreement survives your departure* and that you will maintain the confidentiality of the existence and terms of this separation agreement. … Please note that Jane Street has the right to provide notice of your continuing confidentiality obligations under your Intellectual Property agreement.  To this end, *you agree to promptly notify Jane Street in writing* if you accept employment in finance (or otherwise re-

23

commence work in finance, whether as an employee, contractor, joint venturer, or otherwise).

101.    That day, on March 20, 2024, Spottiswood provided Jane Street with a formal written notice, stating: "per the agreement I want to provide written notice that I have agreed to a job at Millenium [sic] Management."

### (a)    *Spottiswood Agrees To The IP Agreement, Which Protects Jane Street's Confidential And Proprietary Trade Secret Information*

102.    Spottiswood first signed a confidentiality agreement with Jane Street in May 2018. Spottiswood signed a revised version in August 2020 (the "Spottiswood IP Agreement"). The two agreements were substantively identical with respect to the prohibition of unauthorized disclosure of Jane Street's confidential information and intellectual property.

103.    The Spottiswood IP Agreement, dated and executed by Spottiswood on August 17, 2020, broadly requires, *inter alia*, that Spottiswood maintain the confidentiality of any confidential information, intellectual property, or trade secrets owned, used, or developed by Jane Street, including any confidential information or intellectual property or trade secrets developed by Spottiswood himself while employed by Jane Street, and forbids the unauthorized disclosure of any such confidential information, intellectual property, or trade secrets to third parties, including any future employers of Spottiswood.

104.    The Spottiswood IP Agreement protects Jane Street's confidential and proprietary trade secret information and Jane Street's rights in view of Spottiswood's development of, and access to, Jane Street's confidential information as an employee of Jane Street.

105.    Spottiswood agreed to abide by the provisions of this agreement in consideration of his employment and continued employment by Jane Street, including his monetary compensation thereunder.

24

106.    The Spottiswood IP Agreement defines Confidential Information to include:

information about **what products the Company trades, the methods used to trade those products, its profitability**, and all other information concerning or relating to the way the Company conducts its business which is not generally known to the public … [including] specific arbitrage situations, or particular securities in which it makes or has made markets.
…
[and] **[a]ny information** in addition to the foregoing **which is not generally known to the public or within the industry or trade in which the Company competes which gives the Company any advantage over its competitors**, and the physical embodiments of such information in any tangible form, whether written or machine-readable in nature, and information received from third parties under an obligation of confidentiality, are part of Company Confidential Information.

Spottiswood IP Agreement § 2.1, 2.5 (emphasis added).

107.    Spottiswood agreed that Jane Street's Confidential Information "constitute trade secrets of the Company.."  Spottiswood IP Agreement § 2.7.  He also agreed that

[A]ll intellectual properties, including, but not limited to trade secrets, inventions, products, algorithms, formulas, models, methods, techniques, processes, data, works of authorship, software programs, software program codes, and the physical embodiments of such information; … and other matters constituting trade secrets or Company Confidential Information, that are conceived, developed or written by Employee, either individually or jointly in collaboration with others, shall belong to and be the sole and exclusive property of Company, ….

Spottiswood IP Agreement § 6.1.

108.    As a result of the highly sensitive nature of Jane Street's intellectual property, Spottiswood agreed "not to disclose or discuss" Confidential Information "with nonemployees of the Company, and, not to discuss any such information with other employees of the Company outside the office, in each case, except in the performance of the Employee's duties."  Spottiswood IP Agreement § 2.1 (emphasis added).  Further, Spottiswood agreed that:

Except as authorized in connection with the performance of Employee's duties on behalf of Company, during and after employment with the Company, **Employee will not misuse, misappropriate, or disclose** in writing, orally or by electronic means, **any Company Confidential Information**, directly or indirectly, to any other person.  Employee is not allowed to sell, license or otherwise exploit, use in

business or disclose any products, which embody or otherwise exploit in whole or
in part any Company Confidential Information or material.

Spottiswood IP Agreement § 4.1 (emphasis added).

109.    Spottiswood specifically acknowledged that "Misappropriation of a trade secret of
the Company in breach of this Agreement may subject Employee to criminal liability under the
Defend Trade Secrets Act of 2016 (the "DTSA") … ."  Spottiswood IP Agreement § 4.8.

110.    Spottiswood also agreed that Jane Street may seek specific performance and
injunctive relief, including a temporary restraining order, if Spottiswood breached the IP
Agreement: "the Company, in addition to any other remedies available, shall be entitled to obtain
preliminary and permanent injunctive relief to secure specific performance of such covenants and
to prevent a breach or contemplated or threatened breach of this Agreement."  Spottiswood IP
Agreement § 8.  Jane Street would be entitled to recover all costs and expenses, including
attorneys' fees: "The prevailing party shall be entitled to reasonable attorney's fees and costs… ."
Spottiswood IP Agreement § 8.

111.    The Spottiswood IP Agreement also provides that its terms "will continue in effect
after the termination of [Spottiswood]'s employment for any reason."  Spottiswood IP Agreement
§ 1.  Spottiswood further acknowledged that "the restrictions contained in this Agreement are
reasonable and necessary to protect the business and interests of the Company and that any
violation of these restrictions would cause the Company substantial irreparable injury."
Spottiswood IP Agreement § 8.

112.    Finally, *inter alia*, the Spottiswood IP Agreement is to be construed, enforced, and
governed by the laws of the State of New York without regard to conflict of law provisions.
Spottiswood IP Agreement § 10.

26

113.    As described above, Spottiswood's obligations to maintain the confidentiality of Jane Street's intellectual property and trade secrets, and to use any intellectual property and trade secrets exclusively for Jane Street's benefit, survived his departure from Jane Street.   Barring authorization from Jane Street, Spottiswood was forbidden from disclosing Jane Street's confidential information, including proprietary trading strategies, to Millennium.

114.    Spottiswood had an opportunity to review the Spottiswood IP Agreement and consult with an attorney before agreeing to its terms.

> **(b)     *Spottiswood Understood The Trading Strategy Was Jane Street's Confidential And Proprietary Trade Secret Information***

115.    Spottiswood understood that the Spottiswood IP Agreement encompassed the Trading Strategy.

116.    While at Jane Street, Spottiswood acknowledged how valuable and counterintuitive the Trading Strategy was, saying he was "shocked" and "surprised" by its results, and that it was "really awesome."

117.    During his time at Jane Street, Spottiswood understood this innovative strategy was Jane Street's "IP" and acknowledged "how IP sensitive our trading is."

118.    Spottiswood also understood that the need to protect the Trading Strategy required careful consideration.   For example, he counseled against sharing details of the Trading Strategy internally.   "IP is the main driver," Spottiswood said of his suggested restriction.

119.    Spottiswood also cautioned against using interns on projects relating to the Trading Strategy because of the risk of IP leakage.

D.   **Millennium Recruits Former Jane Street Employees With The Intent Of Misappropriating Jane Street's Confidential And Proprietary Trade Secret Information**

120.   Millennium is aware of Schadewald's and Spottiswood's continuing obligations to Jane Street as former employees due to the IP Agreements.

121.   For example, in 2022, concerning the hiring of a different set of former employees, Jane Street informed Millennium of its former employees' "obligations to maintain the confidentiality of Jane Street's intellectual property" and the "restrictions with respect to their use and disclosure of Jane Street's trade secrets." Those obligations and restrictions were pursuant to, *e.g.*, "Confidentiality and Intellectual Property Agreements" with Jane Street. Lest any doubt remain, Jane Street identified the scope of confidential information and trade secrets subject to those obligations, *i.e.*, "Jane Street's most valuable trading strategies, including not only the specific signals on which Jane Street trades, but equally important the methodologies used both to identify those signals, and to create, refine, and execute trading strategies capitalizing on those signals."

122.   In the first two months of 2024, both Schadewald and Spottiswood left Jane Street to join Millennium to—as Jane Street would later discover—implement Jane Street's Trading Strategy notwithstanding their explicit obligations not to do so.

123.   Schadewald and Spottiswood worked as members of the Jane Street team developing and executing Jane Street's Trading Strategy.

124.   In February 2024, Schadewald and Spottiswood resigned from Jane Street. While it is typical for traders transitioning between firms to take some period of time off, on information and belief, Schadewald and Spottiswood started at Millennium almost immediately.

125.     On information and belief, Schadewald had negotiated with Millennium for (at least) weeks prior to accepting an offer to join Millennium, and provided notice to Jane Street upon resignation.

126.     Based on conversations between the Schadewald and his colleagues at Jane Street, Schadewald's compensation from Millennium ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████

127.     Schadewald's compensation at Millennium is atypical and above-market as compared to a competitor's typical arm's length offer to a trader with Schadewald's experience and performance.

128.     On information and belief, Schadewald's lucrative compensation package is a result of his willingness to rely on and implement Jane Street's confidential intellectual property and trade secrets, including the Trading Strategy, to his personal gain and Millennium's benefit. In other words, Millennium can afford to offer Schadewald this level of compensation at the start because Schadewald can virtually guarantee significant profits on day one by using Jane Street's proprietary trading strategies.

129.     On information and belief, Schadewald's improper use of Jane Street's confidential intellectual property and trade secrets is a direct result of Millennium's solicitation and promised above-market compensation.

130.     On information and belief, Millennium organized Schadewald's trading unit as a "pod," which includes Spottiswood.

131.     A pod is Millennium's term for a trading team that operates semi-independently and does not share its trading strategies with the rest of Millennium.  This organization enables

Millennium to benefit from the intellectual property and trade secrets of other firms (misappropriated via incoming employees) while isolating the spread of "tainted" trade secrets within Millennium.

132.     This setup evidences willful blindness on the part of Millennium—Millennium is eager for the profits of traders using proprietary trading strategies developed by its competitors, like Jane Street, but wants plausible deniability when those traders use protected intellectual property and trade secrets to make those profits.

**E.     Millennium Refuses To Stop Using Jane Street's Proprietary Trade Secrets**

133.     In an attempt to avoid this lawsuit, on April 3, 2024, Jane Street sent Millennium, Schadewald, and Spottiswood letters summarizing the above facts and inferences and demanding that Millennium, Schadewald, and Spottiswood immediately cease using Jane Street's confidential and proprietary trade secret information.

134.     Jane Street was hopeful that Millennium and its employees would comply with Jane Street's reasonable request and stop capitalizing on Jane Street's intellectual property and trade secrets.

135.     However, on April 5, 2024, Defendants responded, refusing to acknowledge the confidentiality or use of Jane Street's Trading Strategy.

136.     Defendants' response did confirm that Millennium, Schadewald, and Spottiswood are actively trading in ███████████████████████

137.     Defendants' response further referenced the "particularly compelling ███████ ███████████████████████████

138.     On information and belief, Millennium continues to profit from Jane Street's misappropriated trade secrets, including the aforementioned Trading Strategy.

F.      **Schadewald's And Spottiswood's Disclosures Allow Millennium To Misappropriate Jane Street's Proprietary Trading Strategy**

139.    On information and belief, Schadewald joined Millennium almost immediately after resigning from Jane Street in February 2024.  The resignation of Schadewald from Jane Street, his near-immediate start at Millennium, and Schadewald's significant pay increase and profit-sharing arrangement caused Jane Street grave concern regarding the possible misuse of its intellectual property.

140.    Within weeks, Jane Street saw evidence indicating that Schadewald and Millennium were, in fact, using Jane Street's proprietary Trading Strategy.

141.    First, in March, the month following Schadewald's exit to Millennium, Jane Street's trading profits through this strategy decreased by more than fifty percent.

142.    Jane Street's ability to implement the proprietary Trading Strategy has not lessened as a result of Schadewald or Spottiswood absence.  The abrupt change in trading profits therefore is a result of external forces, *i.e.*, the entrance of a competitor employing the same strategy.

143.    The change cannot be explained by the Defendants employing general knowledge and skills in trading.  The decrease in profitability, due to the dynamics of the relevant █████ ███████████████████████ evidences that a competitor is now capturing profits from the same source that the Trading Strategy capitalizes on, and is doing so via the same means and manner.

144.    Second, Millennium and Schadewald continued to target Jane Street employees who are knowledgeable of Jane Street's intellectual property and trade secrets relating to the Trading Strategy.

145.    On March 11, 2024, Spottiswood—responsible for managing implementation of the Trading Strategy—verbally informed Jane Street that he accepted an offer to work at Millennium.  On March 20, 2024, Spottiswood provided formal notice of the same via email.

146.    Once more, despite industry standard being that a trader takes some amount of time off between firms, on information and belief, Spottiswood joined Millennium near-immediately to work with Schadewald.  This further supports an inference that Millennium and Schadewald are seeking urgently to reproduce Jane Street's proprietary Trading Strategy at Millennium.

147.    Third, Defendants have confirmed that Millennium, Schadewald, and Spottiswood are engaged in trading in ███████████████████

148.    Defendants have confirmed that Schadewald's and Spottiswood's trading activity is not based on "use of sophisticated automated computer programmed trades."

149.    On information and belief, Schadewald and Spottiswood are trading based on Jane Street's confidential and trade secret information, *i.e.*, actionable heuristics from trade secret categories (1) and (2) described in Paragraph 52.

150.    Schadewald and Spottiswood claim they "are entitled to put their own hard-earned skill and ability to work at [Millennium]."

151.    However, Schadewald's and Spottiswood's skill in implementing Jane Street's Trading Strategy and their knowledge of it cannot be used in their work for Millennium due to their respective IP Agreements and federal and state law.

152.    Fourth, contemporaneously with Schadewald's arrival at Millennium in mid-February, Jane Street learned that a new competitor entered and immediately began ██████ ████████████████████████████████████████████

153.    Jane Street's third party broker—used to execute the Trading Strategy—temporarily stopped processing Jane Street's orders on March 6 and 28, 2024, due to the broker ████████████████████████████████████████████████████ different than what is typical of clients of that size).

154.    Jane Street had never previously encountered this problem with its broker as part of its Trading Strategy.  When Jane Street inquired why the broker had to pause its execution, the broker informed Jane Street that another entity— ███████████████████████████ ████████████████████████████████████████████ ███████████████████████████████████ The broker further informed Jane Street that the other entity was in its ████████████████████ Stated differently, within days or weeks of Schadewald resigning and joining Millennium, a new competitor suddenly appeared and implemented ████████████████████ using the same vendor as Jane Street's Trading Strategy.

155.    The broker also informed Jane Street that the competitor's trading was ██████████ ████████████████████████████ which imposes practical limitations on the means to profit from trading.

156.    This method of trade execution through Jane Street's broker in light of these constraints evidences trading which seeks to profit on ██████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████

157.    Therefore, the new competitor's trade execution beginning in mid-February evidences reliance on insights and understanding of ████████████████████████ ████████████████████████████████████████████— the actionable heuristics from Jane Street's development of the Trading Strategy validated after initial incredulity—in order to profitably trade.

158.    On information and belief, the new competitor caused the third party broker to exceed margin limits due to the execution of ████████████████████████████ ████████, mirroring Jane Street's Trading Strategy,

159.    The illustrative facts and circumstances above provide only one reasonable inference, a competitor—Millennium—has knowledge of and is deploying Jane Street's proprietary Trading Strategy in the same market and to reap the trading profit that Jane Street previously received.

160.    On information and belief, Schadewald and Spottiswood breached their respective IP Agreements by disclosing and using Jane Street's confidential information, including intellectual property and trade secrets, to implement Jane Street's proprietary Trading Strategy for Millennium.

161.    Millennium has knowledge of Schadewald's and Spottiswood's obligations concerning Jane Street's confidential information, including intellectual property and trade secrets and the restriction on use thereof.

162.    The misappropriation and disclosure of Jane Street's confidential information enabled Millennium, Schadewald, and Spottiswood to improperly capitalize on and profit from Jane Street's intellectual property and trade secrets, which had taken Jane Street years and ████ ████████ to develop.

163.    This newfound and illicit competition, armed with Jane Street's own confidential and proprietary trade secret information, immediately damaged Jane Street by capturing a substantial portion of the opportunity that Jane Street identified and designed its proprietary Trading Strategy to profit from.

**G.** **Jane Street Has Been, And Will Be, Severely Harmed By Defendants' Misappropriation Of Jane Street's Confidential And Proprietary Trade Secret Information**

164.    Jane Street developed its intellectual property and trade secrets at great expense and through years of painstaking research, analysis, experimentation, and trial and error.

165.    The development and implementation of Jane Street's proprietary Trading Strategy allowed it to capitalize on a unique opportunity in the market and give it a significant first-mover, competitive advantage.  Defendants' exploitation of stolen intellectual property and trade secrets greatly harms Jane Street.

166.    Jane Street's success depends on the iterative processes of identification of and capitalization on inefficiencies in the market.  Jane Street's creditors and investors are aware of this fact which means that Jane Street's ability to secure funding is a result of its ability to not only develop but also to protect valuable intellectual property.  Protecting this information ensures longevity of associated profits.  Because of Defendants' improper use, Jane Street is at risk of permanent, irreversible harm due to reputational harm with respect to investors, loan ratings agencies, and prime brokers.  This threatens Jane Street's commercial and competitive position.

167.    Further, the loss of trade secrets to a competitor in such a manner threatens severe damage to Jane Street's ability to continue to develop the intellectual property that makes Jane Street successful.  Jane Street relies on an open and collaborative culture and internal trust among the employees who develop trading strategies for the firm.  Jane Street's highly-skilled employees work more collaboratively than at competitors, which leads to the development of stronger trading strategies.  If Schadewald and Spottiswood are not prohibited from misappropriating and using Jane Street's trade secrets, which are among the most valuable trade secrets of the firm, to aid a competitor, there is a material risk that this culture of trust and collaboration—which enabled the creation of these trade secrets in the first place—will deteriorate, thereby threatening Jane Street's

continued generation of the highest quality intellectual property and creating perverse incentives for current employees.

168.    There is also the threat that Defendants will further disclose Jane Street's confidential and proprietary information throughout the trading industry, which will even further erode and ultimately destroy the value of Jane Street's trade secrets.

169.    On information and belief, Schadewald is earning approximately ▉ of Millennium's profits from this trading activity as a result of unlawfully using and/or disclosing Jane Street's confidential trading strategy to Millennium.

170.    With this action, Jane Street seeks to vindicate its rights, prevent any further misappropriation and misuse of its confidential, proprietary, and trade secret information, and obtain compensation for its damages and for Defendants' unjust enrichment resulting from their unlawful conduct.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Breach of Contract (Schadewald IP Agreement)**
**New York Law**
**(Against Schadewald)**

171.    Jane Street incorporates by reference and re-alleges the foregoing paragraphs.

172.    The Schadewald IP Agreement is and was a valid, binding, and enforceable contract between Jane Street and Schadewald.

173.    To the extent Jane Street possessed any obligations under the Schadewald IP Agreement, Jane Street fully performed its obligations.

174.    As described in the foregoing allegations, under the terms of the Schadewald IP Agreement, in exchange for employment and monetary compensation, Schadewald agreed that he would maintain the confidentiality of and not disclose Jane Street's confidential information,

including its intellectual property, trade secrets, and proprietary trading strategies.  Schadewald also agreed he would not use Jane Street's confidential information, including its intellectual property, trade secrets, and proprietary trading strategies, outside of the scope of his employment with Jane Street.

175.    On information and belief, Schadewald breached the agreement by using and disclosing Jane Street's confidential information, including its intellectual property and trade secrets relating to Jane Street's Trading Strategy.  This use and disclosure of Jane Street's confidential information was not in connection with Schadewald's work for Jane Street, nor were they authorized by Jane Street.

176.    Schadewald's use and disclosure of Jane Street's confidential information is a breach of his obligations pursuant to at least Sections 2.1, 2.2, 2.4, 2.6, 4.1, 6, and 8 of the Schadewald IP Agreement.

177.    As a result of Schadewald's breaches, Jane Street has suffered, and continues to suffer, damages in an amount to be determined at trial, together with interest, costs, and attorneys' fees.

178.    Moreover, as specifically set forth above, Jane Street has the right, and is entitled, to enforce the Schadewald IP Agreement and its terms and to therefore remedy the foregoing breach of contract by monetary damages and specific performance.

## SECOND CAUSE OF ACTION
### Breach of Contract (Spottiswood IP Agreement)

**New York Law**
**(Against Spottiswood)**

179.  Jane Street incorporates by reference and re-alleges the foregoing paragraphs.

180.  The Spottiswood IP Agreement is and was a valid, binding, and enforceable contract between Jane Street and Spottiswood.

181.  To the extent Jane Street possessed any obligations under the Spottiswood IP Agreement, Jane Street fully performed its obligations.

182.  As described in the foregoing allegations, under the terms of the Spottiswood IP Agreement, in exchange for employment and monetary compensation, Spottiswood agreed that he would maintain the confidentiality of and not disclose Jane Street's confidential information, including its intellectual property, trade secrets, and proprietary trading strategies.  Spottiswood also agreed he would not use Jane Street's confidential information, including its intellectual property, trade secrets, and proprietary trading strategies, outside of the scope of his employment with Jane Street.

183.  On information and belief, Spottiswood breached the agreement by using and disclosing Jane Street's confidential information, including its intellectual property and trade secrets relating to Jane Street's Trading Strategy.  This use and disclosure of Jane Street's confidential information was not in connection with Spottiswood's work for Jane Street, nor were they authorized by Jane Street.

184.  Spottiswood's use and disclosure of Jane Street's confidential information is a breach of his obligations under the Spottiswood IP Agreement, pursuant to at least Sections 2.1, 2.3, 2.5, 4.1, 4.8, and 8.

185.    As a result of Spottiswood's breaches, Jane Street has suffered, and continues to suffer, damages in an amount to be determined at trial, together with interest, costs, and attorneys' fees.

186.    Moreover, as specifically set forth above, Jane Street has the right, and is entitled, to enforce the Spottiswood IP Agreement and its terms and to therefore remedy the foregoing breach of contract by monetary damages and specific performance.

**THIRD CAUSE OF ACTION**
**Tortious Interference With Contract (IP Agreements)**
**New York Law**
**(Against Millennium)**

187.    Jane Street incorporates by reference and re-alleges the foregoing paragraphs.

188.    The Schadewald and Spottiswood IP Agreements are and were valid, binding, and enforceable contracts between Jane Street and Schadewald, and Jane Street and Spottiswood, respectively.

189.    Millennium was aware of Schadewald's and Spottiswood's obligations as former Jane Street employees, due to the IP Agreements, and specifically with respect to confidential material and trade secrets including trading strategies, as demonstrated by, *e.g.*, the letter correspondence with Millennium in 2022.

190.    Notwithstanding, Millennium engaged in intentional conduct that was a significant factor in causing Schadewald and Spottiswood to breach their IP Agreements.  On information and belief, Millennium induced Schadewald and Spottiswood to breach the IP Agreements by offering them employment and monetary compensation with the expectation of Schadewald and Spottiswood using and disclosing Jane Street's confidential, proprietary, and trade secret information, including the Trading Strategy.

191.     Millennium's unjustified conduct only took place as a means to profit from Schadewald's and Spottiswood's breach of the IP Agreements and cause Jane Street competitive harm.

192.     Because of Millennium's conduct, Jane Street has suffered, and continues to suffer, damages in an amount to be determined at trial.

### FOURTH CAUSE OF ACTION
**Misappropriation of Trade Secrets**
**Defend Trade Secrets Act of 2016, 18. U.S.C. § 1836 *et seq.***
**(Against All Defendants)**

193.     Jane Street incorporates by reference and re-alleges the foregoing paragraphs.

194.     As described above, Jane Street owns and possesses confidential, proprietary, and trade secret information including its proprietary Trading Strategy and related business practices.

195.     The confidential, proprietary, and trade secret information described above relates to a trading strategy undertaken, or intended to be undertaken, in interstate commerce and/or globally.

196.     Jane Street took reasonable measures to keep its proprietary Trading Strategy secret and confidential by, among other things, limiting access to the information only to authorized personnel, securing its electronic materials using password-protected computer programs, securing its physical office spaces, and entering into confidentiality and non-disclosure agreements with employees, such as the respective IP Agreements.

197.     Jane Street's confidential and proprietary trade secret information is not available for others in the investment industry—or any other industry—to use through any legitimate means.

198.     Jane Street's confidential and proprietary trade secret information derives independent economic value, both actual and potential, from not being generally known to or readily ascertainable by other persons or businesses who could obtain economic value from its

disclosure or use, including competitor investment firms, in that the information is the basis of differentiating Jane Street's trading strategy and financial performance in a highly competitive industry and efficient market.

199.    Jane Street has expended ████████████ in the creation, development, and implementation of this confidential and proprietary trade secret information, and it would be exceedingly difficult—if not impossible—for a competitor, or any other party, to trade based on this information without dedicating the time and incurring the costs necessary to identify and research the opportunity and to develop a strategy to capitalize on it.

200.    Schadewald and Spottiswood received access to this information only after signing and agreeing to the terms of their respective IP Agreements, executed for the benefit of Jane Street. Schadewald and Spottiswood had a duty, and knew they had a duty, to maintain the secrecy of all information they received pursuant to the IP Agreements, and to use that information exclusively for purposes as directed by Jane Street.

201.    Despite their full awareness of their duty to maintain the secrecy of such information, and despite the lack of any consent from Jane Street to make such use or disclosures, Schadewald and Spottiswood used and disclosed this information in their employment with Millennium, thereby willingly transferring Jane Street's confidential and proprietary trade secret information to Jane Street's direct competitor for Defendants' financial gain.

202.    Defendants thus misappropriated, and threaten to continue to misappropriate, Jane Street's trade secret information in the improper and unlawful manner as alleged herein, including by using Jane Street's trade secret information to implement Jane Street's proprietary Trading Strategy and receive investment profits Defendants would not be able to earn in the absence of Jane Street's trade secret information.

203.    Defendants' misappropriation of Jane Street's confidential and proprietary trade secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive. Defendants have attempted to and continue to attempt to conceal their misappropriation.

204.    Defendants' misappropriation was done with a conscious disregard of Jane Street's rights and a desire to profit from such misappropriation while causing Jane Street competitive harm.  As such, Defendants' misappropriation of Jane Street's trade secret information was "willful and malicious" as set forth in 18 U.S.C. §§ 1836(b)(3)(C) and 1836(b)(3)(D), further entitling Jane Street to recover exemplary damages and its attorneys' fees and costs.

205.    On information and belief, if Defendants' conduct is not remedied, Defendants will continue to misappropriate, disclose, and use Jane Street's trade secret information for their own benefit and to Jane Street's detriment.

206.    As a direct and proximate result of Defendants' conduct as alleged herein, Jane Street has suffered and continues to suffer severe competitive harm and significant damages, in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
### Misappropriation of Trade Secrets
### New York Law
### (Against All Defendants)

207.    Jane Street incorporates by reference and re-alleges the foregoing paragraphs.

208.    As described above, Jane Street owns and possesses confidential, proprietary, and trade secret information including its proprietary Trading Strategy and related business practices.

209.    The confidential, proprietary, and trade secret information described above relates to a trading strategy undertaken, or intended to be undertaken, in interstate commerce and/or globally.

210.    Jane Street took reasonable measures to keep its proprietary Trading Strategy secret and confidential by, among other things, limiting access to the information only to authorized personnel, securing its electronic materials using password-protected computer programs, securing its physical office spaces, and entering into confidentiality and non-disclosure agreements with employees, such as the IP Agreements.

211.    Jane Street's confidential and proprietary trade secret information is not available for others in the investment industry—or any other industry—to use through any legitimate means.

212.    Jane Street's confidential and proprietary trade secret information derives independent economic value, both actual and potential, from not being generally known to or readily ascertainable by other persons or businesses who could obtain economic value from its disclosure or use, including competitor investment firms, in that the information is the basis of differentiating Jane Street's trading strategy and financial performance in a highly competitive industry.

213.    Jane Street has expended ███████████ in the creation, development, and implementation of this confidential and proprietary trade secret information, and it would be exceedingly difficult—if not impossible—for a competitor, or any other party, to create, develop, or implement the same information without incurring great expense for significant time.

214.    Schadewald and Spottiswood received access to this information only after signing their IP Agreements, executed for the benefit of Jane Street. Schadewald and Spottiswood had a

duty, and knew they had a duty, to maintain the secrecy of all information they received pursuant to the IP Agreements, and to use it exclusively for purposes as directed by Jane Street.

215.    Despite their full awareness of their duty to maintain the secrecy of such information, and despite the lack of any consent from Jane Street to make such use or disclosures, Schadewald and Spottiswood used and disclosed this information in their employment with Millennium, thereby willingly transferring Jane Street's confidential and proprietary trade secret information to Jane Street's direct competitor for Defendants' financial gain.

216.    Defendants thus misappropriated, and threaten to continue to misappropriate, Jane Street's trade secret information in the improper and unlawful manner as alleged herein, including by using Jane Street's trade secret information to implement Jane Street's proprietary Trading Strategy and receive investment profits Defendants would not be able to earn in the absence of Jane Street's trade secret information.

217.    Defendants' misappropriation of Jane Street's confidential and proprietary trade secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive. Defendants have attempted to and continue to attempt to conceal their misappropriation.

218.    On information and belief, if Defendants' conduct is not remedied, Defendants will continue to misappropriate, disclose, and use Jane Street's trade secret information for their own benefit and to Jane Street's detriment.

219.    As a direct and proximate result of Defendants' conduct as alleged herein, Jane Street has and continues to suffer severe competitive harm and significant damages, in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION
**Unjust Enrichment**
**New York Law**
**(Against All Defendants)**

220.   Jane Street incorporates by reference and re-alleges the foregoing paragraphs.

221.   Based on the conduct alleged in this Complaint, Defendants unjustly enriched themselves at the direct expense of Jane Street.

222.   Defendants were enriched by deceptively, illicitly, and anti-competitively acquiring, disclosing, and using Jane Street's confidential information, intellectual property, and trade secrets, including the Trading Strategy.

223.   Defendants would not have acquired a commercial and competitive advantage or profited from the opportunity in ███████████████ identified by Jane Street without deceptively, illicitly, and anti-competitively acquiring, disclosing, and using Jane Street's confidential information, including the Trading Strategy.

224.   Jane Street was severely injured by Defendants' deceptive, illicit, and anti-competitive practices, including by unfairly and unjustly losing the commercial and competitive advantage and profits (both real and future potential) Jane Street gained by identifying the opportunity on which it capitalized using the Trading Strategy.

225.   Jane Street's injury, as described, was directly related to Defendants' enrichment.

226.   Defendant's enrichment at Jane Street's expense was wholly without justification because Jane Street protected its confidential information through security precautions and confidentiality agreements, including the IP Agreements; and Jane Street relied on and was induced by Schadewald's and Spottiswood's representations in the IP Agreements in disclosing its confidential information to Schadewald and Spottiswood.

227.    As a direct and proximate result of Defendants' conduct as alleged herein, Jane Street has and continues to suffer severe competitive harm and significant damages, in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION
### Unfair Competition
### New York Law
### (Against All Defendants)

228.    Jane Street incorporates by reference and re-alleges the foregoing paragraphs.

229.    Based on the conduct alleged in this Complaint, Defendants committed acts of unfair competition at the direct expense of Jane Street.

230.    Jane Street acquired its confidential information, intellectual property, trade secrets, and business strategies, including the Trading Strategy, through a significant investment of time, money, and resources, and this confidential information confers and will confer value and a competitive advantage to the party in possession of it.

231.    Schadewald and Spottiswood, while employed with Millennium, unfairly competed with Jane Street by using and disclosing Jane Street's confidential information, intellectual property, trade secrets, and business strategies, including the Trading Strategy, for their benefit and for the benefit of Jane Street's direct competitor, Millennium, and against the legitimate business interests of Jane Street.

232.    Defendants' actual and threatened misappropriation, misuse, and/or disclosure of Jane Street's confidential information, intellectual property, trade secrets, and business strategies, and Schadewald's and Spottiswood's deliberate and intentional violation of their contractual obligations owed to Jane Street, have resulted and will result in the commission of acts of unfair competition.

233.    Defendants misappropriated, misused, and/or disclosed Jane Street's confidential information, intellectual property, trade secrets, and business strategies in bad faith, in that Defendants acted deceptively, illicitly, and anti-competitively and in breach of Schadewald's and Spottiswood's contractual duties owed to Jane Street.

234.    Defendants would not have acquired a commercial and competitive advantage or profited from the opportunity in ██████████████ identified by Jane Street without deceptively, illicitly, and anti-competitively acquiring, disclosing, and using Jane Street's confidential information and business strategies, including the Trading Strategy.

235.    Defendants' acts of actual and threatened unfair competition are without justification, because Jane Street protected its confidential information and business strategies through security precautions and confidentiality agreements, including the IP Agreements; and Jane Street relied on and was induced by Schadewald's and Spottiswood's representations in the IP Agreements in disclosing its confidential information and business strategies to Schadewald and Spottiswood; and are being committed through improper means, and have proximately caused or will inevitably cause injury to Jane Street.

236.    As a direct and proximate result of Defendants' conduct as alleged herein, Jane Street has and continues to suffer severe competitive harm and significant damages, in an amount to be determined at trial.

## VICARIOUS LIABILITY / RESPONDEAT SUPERIOR

237.    Jane Street incorporates by reference and re-alleges the foregoing paragraphs.

238.    Millennium is vicariously liable for Schadewald's and Spottiswood's tortious acts after Schadewald and Spottiswood began their employment with Millennium because these acts

were performed while in the employment of Millennium and were within the scope of that employment or within the authority delegated to the employee.

## JOINT AND SEVERAL LIABILITY

239.    Jane Street incorporates by reference and re-alleges the foregoing paragraphs.

240.    At all relevant times, Defendants were jointly engaged in the commission of the aforementioned tortious and unlawful actions.   On information and belief, Millennium and Schadewald and Spottiswood each acted intentionally, and their actions caused a single, indivisible injury to Jane Street.   Accordingly, Defendants Millennium, Schadewald, and Spottiswood are jointly and severally liable for all of Jane Street's damages as pleaded herein.

## PRAYER FOR RELIEF

**WHEREFORE** Plaintiff Jane Street respectfully requests judgment in its favor and against Defendants as to all Causes of Action of the Complaint stated against them, for:

a)    specific performance and other equitable relief, including directing Schadewald and Spottiswood to comply with their contractual obligations to Jane Street and directing Schadewald, Spottiswood, and Millennium to return or destroy any intellectual property developed by Schadewald and Spottiswood, solely or jointly with others, during their employment with Millennium that utilized Jane Street's confidential information and proprietary trading strategies, including the Trading Strategy;

b)      compensatory damages arising from the breach of contractual obligations by Schadewald and/or Spottiswood;

c)      compensatory damages arising from tortious interference, unjust enrichment, and/or unfair competition by Millennium;

d)      compensatory damages for actual loss, unjust enrichment, and/or unfair competition caused by the misappropriation of Jane Street's trade secret information by Defendants;

e)      exemplary damages, punitive damages, and consequential damages, including those pursuant to applicable statutes and contractual agreement;

f)      vicarious liability;

g)      joint and several liability;

h)      reasonable attorneys' fees and costs, including those pursuant to applicable statutes and contractual agreement;

i)      pre-judgment and post-judgment interest; and

j)      any and all other relief the Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Jane Street hereby demands trial by jury for all causes of action, claims, or issues in this action that are triable by jury as a matter of right.

Dated:   New York, New York
         April 26, 2024

QUINN EMANUEL URQUHART
   & SULLIVAN, LLP

By :/s/ *Deborah K. Brown*
_____

Alex Spiro
Deborah K. Brown
Jeffrey C. Miller
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
alexspiro@quinnemanuel.com
deborahbrown@quinnemanuel.com
jeffreymiller@quinnemanuel.com

Greg Miraglia (*pro hac vice forthcoming*)
300 West 6th Street
Austin, Texas 78701
Telephone: (737) 667-6100
gregmiraglia@quinnemanuel.com

Jeff Nardinelli (*pro hac vice forthcoming*)
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
jeffnardinelli@quinnemanuel.com

*Attorneys for Plaintiff*